## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PULTE HOME CORPORATION, *et al.*　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　Plaintiffs　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　v.　　　　　　　　　　　　　　　*　　　Civil Action No. 8:14-cv-03955-GJH
　　　　　　　　　　　　　　　　　　　*　　　Judge George Jarrod Hazel
MONTGOMERY COUNTY,　　　　　　*
MARYLAND, *et al.*　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　Defendants　　　　　　　　　*

## MEMORANDUM OF GROUNDS AND AUTHORITIES IN SUPPORT OF DEFENDANT MONTGOMERY COUNTY, MARYLAND'S MOTION FOR PROTECTIVE ORDER

Defendant Montgomery County, Maryland, by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 26(c), submits this memorandum in support of Defendant's Motion for Protective Order and states as follows:

## I.　BACKGROUND AND STATEMENT OF THE CASE

Consistent with well established doctrine, this Court should enter a protective order granting Montgomery County legislative and executive privilege as to certain discovery sought in this case. Further, because requiring Montgomery County to create a privilege log would undermine the purpose of the privilege, this Court should order that no privilege log be required as to persons in the legislative and executive branches entitled to the privileges.

On November 14, 2014, the Plaintiffs, Pulte Home Corporation and Shiloh Farm Investments, LLC, filed the instant lawsuit in the Circuit Court for Montgomery County, Maryland. The Plaintiffs seek monetary damages, mandamus, and declaratory and injunctive relief for alleged violations of the Maryland and federal constitutions. The Plaintiffs claim that certain legislative decisions of the County Council for Montgomery County, Maryland, including

decisions that it rendered in its capacity as the District Council,[1] denied the Plaintiffs due process, violated equal protection, and effected a taking of the Plaintiffs' property. The County Executive for Montgomery County also was involved in the legislative process and decision–making at issue in this suit.

The parties have commenced discovery in this matter, including negotiating a Document and Electronically Stored Information ("ESI") Agreement and Order and exchanging lists of proposed custodians to be searched for ESI. Initially, the County agreed to a search of approximately 26 employees of four different departments of County government. However, Plaintiffs then added a request to conduct an ESI search of 13 present and past members of the Montgomery County Council, three Council staff members,[2] County Executive Isiah Leggett and Mr. Leggett's Special Assistant, Joy Nurmi. Consistent with the applicable law, discussed below, Defendant Montgomery County has asserted legislative and executive privilege as to the Council members, Council staff, the County Executive and Special Assistant. Based on the broad application of the legislative and executive privileges, these persons should not be subjected to discovery, nor should Defendant be required to create a privilege log as to documents in their possession.

Plaintiffs dispute Defendant's assertion of privilege and, on April 13, 2016, the matter was brought to the Court's attention in a teleconference addressing disputes regarding the proposed ESI Agreement and Order. By Letter Order dated April 14, 2016, the Court directed

---

[1]  Maryland law creates and designates the County Council for Montgomery County, sitting as the District Council, as the zoning and land use authority for the County. Md. Code Ann. Land Use, § 22-101, *et seq.*

[2] The present County Council members are: Roger Berliner; Marc Elrich; Nancy Floreen; Tom Hucker; Sidney Katz; George Leventhal; Nancy Navarro; Craig Rice; and Hans Reimer. The past Council members are Valerie Ervin; Phillip Andrews; Michael Knapp; and Dutchy Trachtenberg. The Council Staff are: Cindy Gibson, Chief of Staff of Roger Berliner; Keith Levchenko, Senior Legislative Analyst; and Marlene Michaelson, Senior Legislative Analyst.

Montgomery County to file a motion for protective order on the privilege and privilege log issues. For the reasons stated herein, Defendant Montgomery County seeks a protective order shielding County Council members, Council staff, the County Executive and his Special Assistant from discovery in this case, including any obligation to create a privilege log.

## II.   PLAINTIFFS' ALLEGATIONS AND THE LEGISLATIVE PROCESS

According to the Complaint, Plaintiffs are the owners, or contract owners, of 541 acres of land in Clarksburg, Maryland. Complaint (Compl.), ¶ 5. The Plaintiffs contracted to purchase the land between March 2005 and January 2006 and, beginning in July 2004, also purchased transferable development rights ("TDRs"). Compl., ¶¶ 5, 15. At the time Plaintiffs purchased the land, development in Clarksburg was guided by the 1994 Master Plan.[3] Compl., ¶ 7. The 1994 Master Plan required that development in Clarksburg proceed incrementally in stages. Compl., ¶ 8. The Plaintiffs' property was designated as a Stage 4 property, the last stage of development. Compl., ¶ 8. At the time Plaintiffs purchased the property, the property was zoned RE-1/TDR-2, the zone recommended by the 1994 Master Plan. Compl., ¶ 9.

The 1994 Master Plan recommended development in Clarksburg, but, as the Plaintiffs admit, the Plan concomitantly recommended certain measures "to protect the water quality of its environment." Compl., ¶ 10. The Master Plan proposed that "several triggers be met before development of properties within Stage 4 could proceed...." Compl., ¶ 10. The 1994 Master Plan states that once the foregoing "triggers" are met, the "County Council will consider Water and Sewer Plan amendments that would permit the extension of public facilities in the Ten Mile Creek area," but also provides that the County Council may "defer action on a Water and Sewer Plan category change, pending further study or consideration ..." or "consider such other land

---

[3] The title of the 1994 Master Plan is "Clarksburg Master Plan & Hyattstown Special Study Area."

use actions as are deemed necessary." Compl., ¶ 11; 1994 Master Plan, p. 199. The Plaintiffs contend that the "triggers" were satisfied by 2009 when Pulte filed an application for a change in its water and sewer category on May 12, 2009. Compl., ¶ 12. However, prior to the filing of the application, on January 26, 2009, the County Executive released the 2007 Special Protection Area (SPA) Annual Report, which included an assessment of declining water quality in Clarksburg area. According to a County Council Committee Memorandum of July 23, 2009, the County Council had convened an Interagency Working Group in March of 2009, well before the filing of Pulte's category change request, to review the report and recommend steps on how best to proceed with Stage 4 development in Clarksburg.

On October 13, 2009, the County Council created an Ad Hoc Water Quality Working Group to assess water quality issues in the Stage 4 area and expressly stated that, "[t]he Council intends to defer any Water and Sewer Plan category change related to Stage 4 in Clarksburg until after it has reviewed the Working Group's draft." Council Resolution No. 16-1149. Consideration of water quality issues in Stage 4 area continued, and by letter dated September 17, 2010, the County's Department of Environmental Protection returned the application fee and advised Pulte that its application "would not be processed until early Spring 2011." Compl., ¶ 18. On August 28, 2012, "Pulte resubmitted its Water and Sewer Category Change Request application" and filing fee. Compl., ¶ 19. Subsequently, on April 1, 2014, "the Council instructed County staff that any pending Water and Sewer applications in Clarksburg" were "to be reviewed and heard not individually but all together at some indefinite time in the future." Compl., ¶ 30.

4

On October 8, 2012, the Council "requested that the Planning Board[4] study the Ten Mile

Creek watershed by re-opening the Clarksburg Master Plan and preparing an amendment

thereto." Compl., ¶ 36.  On September 10 and 12, 2013, the Planning Board "held its public

hearing on its Draft Master Plan Amendment . . ." which made various recommendations

concerning the Plaintiffs' property.  Compl., ¶ 46.  Counsel for Pulte and an expert retained by

Pulte spoke at the hearing.  Compl., ¶ 46.  Pulte also submitted "written testimony."  Compl.,

¶ 51.  In October of 2012, the Council directed the Planning Board to prepare an amendment to

the 1994 Master Plan that would address development in the Ten Mile Creek area.  *See* Council

Resolution No. 17-1048.

On October 25, 2013, the Planning Board transmitted its Draft Master Plan Amendment

to the County Executive and County Council, and M-NCPPC's recommendations concerning the

property.  Compl., ¶ 54.  The Planning Board recommended that Pulte's property be re-zoned

from the RE-1/TDR-2 Zone to the RNC (Rural Neighborhood Cluster) Zone.  Compl., ¶ 54.  The

Planning Board also recommended that the property be subject to a 10 percent imperviousness

limit and a 65 percent open space requirement.  Compl., ¶ 54.  On November 27, 2013, Pulte's

consultants submitted a report to the Council explaining Pulte's objections to the Planning Board

recommendation.  Compl., ¶ 55.  On December 3, 2013, the Council "held the first night of its

public hearing on the Planning Board Draft Amendments."  Compl., ¶ 56.[5]  "The written

testimony, reports, data, and facts presented previously by Pulte to the Planning board were also

presented to the County Council as part of its public hearing."  Compl., ¶ 56.  On December 19,

2013, Pulte "submitted to the public hearing record" reports from its expert environmental

---

[4] The Planning Board is a component of Co-Defendant Maryland-National Capital Park and Planning Commission (M-NCPPC).

[5] Additional public hearings were held on December 5, 2013 and January 28, 2014.

consultants. Compl., ¶ 61. On December 20, 2013, the County Executive transmitted his fiscal

impact analysis to the Council. Council Resolution No. 17-1048. On December 20, 2013, the

Council "closed the public hearing record on the Draft Clarksburg Master Plan Amendment."

Compl., ¶ 62. "On January 13, 17, 24, 27, 29, February 4 and 11, 2014," two Council

committees conducted work sessions on the "Draft Amendment." Compl., ¶ 63. On March 4,

2014, the full Council conducted a work session on the "Draft Amendment" and approved it by

straw vote. Compl., ¶ 65; Council Resolution No. 17-1048. On April 1, 2014, the County

Council, sitting as the District Council, formally approved the Resolution. Compl., ¶ 66;

Resolution No. 17-1048. On May 21, 2014, M-NCPPC adopted the 2014 Amendment to the

Master Plan. Compl., ¶ 71. M-NCPPC "re-adopted" the amendment on July 31, 2014. Compl.,

¶ 75.

Prior to the re-adoption of the Master Plan Amendment, on May 13, 2014, the Council

"held a public hearing" on a zoning text amendment ("ZTA") "to create a Clarksburg West

Environmental Overlay Zone . . . which overlay zone would ultimately be applied to the subject

property in addition to the RNC zone." Compl., ¶ 69. On July 15, 2014, the Council adopted the

Clarksburg West Environmental Overlay Zone Text Amendment. Compl., ¶ 72. The ZTA took

effect on August 4, 2014. Compl., ¶ 76.

On September 8, 2014, a Council committee recommended that the Council approve a

resolution "creating the Ten Mile Creek Special Protection Area . . . in Clarksburg." Compl.,

¶ 77. On that same day, the committee recommended that the Council approve the draft

Clarksburg Sectional Map Amendment. Compl., ¶ 78. On September 16, 2014, the County

Council, sitting as the District Council, enacted the sectional map amendment applicable to

Clarksburg. Compl., ¶ 80. The SMA re-zoned the Pulte property to the RNC Zone and placed

the Clarksburg West Environmental Overlay Zone "on several private properties . . ." including the Pulte property "as well as a few small houses nearby . . . ." Compl., ¶ 80. On September 16, 2014, the Council "enacted the Ten Mile Creek Special Protection Area." Compl., ¶ 82.

Properties in Stage 4 have been addressed by agency and legislative action post-dating the allegations in the Complaint. On December 3, 2014, the County Council received a recommendation from the County Executive for a comprehensive water/sewer category map amendment intended to implement the land use recommendations in the Ten Mile Creek Limited Master Plan Amendment approved by the Council on April 1, 2014. *See* Council Resolution Nos. 18-66 and 17-1048. On February 24, 2015, the Council approved a water and sewer category change that allows for the extension of public water and sewer service to Stage 4 properties, including the Pulte property. Council Resolution No. 18-66. As expected, the Washington Suburban Sanitary Commission is now working on a plan for providing water and sewer service to the area, including the Pulte property. *Id.*

## III.    THE LEGISLATIVE RECORD

As described above, in considering the proposed amendment to the 1994 Master Plan, the County Council heard from multiple experts and citizens who expressed concern about the effects of development on Ten Mile Creek. Information and analyses were supplied by both independent consultants retained by M-NCPPC and proponents of development, particularly Pulte. Federal, state and local government staff provided input at Committee and Council work sessions. Water quality issues were discussed at length, including the effects of water run-off created by impervious surfaces and the relationship between the amount of impervious surface and water quality. Cumulatively, over 6,000 pages of documentary records, plus many hours of recorded testimony, were provided and relied upon by the County Council.

This body of written submissions and testimony comprises the legislative record on which the County Council acted in: amending the 1994 Master Plan; creating the Ten Mile Creek Special Protection Area; approving the Sectional Map Amendment that re-zoned the Pulte property; and placing the Clarksburg West Environmental Overlay Zone on Stage 4 properties. In discovery, Defendant Montgomery County intends to produce copies of the voluminous documents and recorded testimony which comprise the legislative record. This public record comprises the complete body of information that should be referenced in any judicial challenge to the County Council's legislative action.

## IV.   ARGUMENT

### A.   Defendant Should Not Be Required to Respond to Discovery That Violates the Legislative Privilege.

#### 1.   Legal standard – legislative immunity and privilege.

"[L]egislative privilege is a derivative of legislative immunity." *Equal Emp. Opportunity Commission v. Washington Suburban Sanitary Comm'n,* 666 F. Supp. 2d 526, 531 (D. Md. 2012). The Speech or Debate Clause of the United States Constitution immunizes federal legislators from lawsuits.[6] *Equal Emp. Opportunity Comm'n v. Washington Suburban Sanitary Comm'n,* 631 F.3d 174, 180 (4th 2011); U.S. Const. Art. I, § 6. This legislative immunity has been extended not only to federal legislators, but to "a wide range of legislative actors," including state and local legislators. *Id.* at 180-181; *see also Tenney v. Brandhove,* 341 U.S. 367, 372-75 (1951) (state legislators, like their federal counterparts, have absolute immunity from actions brought under 42 U.S.C. § 1983); *Bruce v. Riddle,* 631 F. 2d 272, 279 (4th Cir. 1980) ("We think, therefore, that if legislators of any political subdivision of a state function in a

---

[6]   Maryland's Constitution and Declaration of Rights contain analogous clauses.  *See Montgomery County v. Schooley,* 627 A.2d 69, 73 (Md. App. 1993).

legislative capacity, they are absolutely immune from being sued under the provisions of § 1983.") *Favors v. Cuomo*, 285 F.R.D. 187, 208 (E.D.N.Y. 2012) ("federal courts in civil cases have extended absolute legislative immunity to state legislators to the same extent as to federal legislators"); *2BD Associates Ltd. Partnership v. County Comm'rs for Queen Anne's County*, 896 F. Supp. 528, 531 (D. Md. 1995) ("The doctrine also applies to actions by local government officials in their legislative capacities so as to afford them absolute immunity.").

In *Baker v. Mayor and City Council of Baltimore*, 894 F.2d 679, 681 (4th Cir.), *cert. denied*, 498 U.S. 815 (1990), the court declared it was "beyond dispute that municipal legislators enjoy the protection of immunity when acting in the sphere of legitimate legislative activity." The immunity "covers all those properly acting in a legislative capacity, not just actual officeholders." *Equal Emp. Opportunity Comm'n*, 631 F.3d at 181 (internal citations omitted). Legislative "staff members" are within the ambit of the immunity. *Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992).

The immunity applies not only to a wide range of actors, but also to a wide range of acts. *Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998). Many types of activities fall within the scope of the immunity (or privilege). "Policy-making" qualifies as legislative activity. *Marylanders for Fair Representation*, 144 F.R.D. at 300. "[C]ommittee reports, resolutions, and the act of voting" are within the "legislative sphere," along with "the preparation and introduction of legislation ... to consider and accept or reject." *Id.* The actions of officials in the executive branch, like County Executive Leggett and his staff, also may be cloaked with derivative legislative immunity if they are "within the sphere of legitimate legislative activity." *Id.* at 300.

In *Bruce v. Riddle*, the plaintiff, Bruce, filed an action under 42 U.S.C. § 1983 against a county council, claiming that the council enacted an unconstitutional zoning ordinance. 631 F.2d 272 (4th Cir. 1980). The action was dismissed and Bruce appealed. Bruce contended that the council members "acted outside of their legislative immunity by meeting privately with interested individuals who tended to influence their vote on the zoning ordinances." *Id.* at 279. The court addressed the contention as follows:

> Viewing the complaint in the light most favorable to Bruce, the complaint alleges that the defendant members of the Council met with a number of their constituents who had selfish interests in the passage of the zoning ordinance and were influenced in their vote as a result of the meetings. The proof of these allegations at trial would not remove the defendants from the scope of their legislative activities. There may well be circumstances involved in private meetings by legislators that would remove them from the umbrella of legislative immunity. Illegal acts such as bribery are obviously not in aid of legislative activity and legislators can claim no immunity for illegal acts. Plaintiff, however, alleges no such illegal conduct.

> The Greenville County Council members met with constituents who, concededly, for their own interest, were interested in the passage of the ordinance. The Council members might well have met with constituents who were conversely opposed to the ordinance. **Meeting with "interest" groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider. The possibility that legislators may be "politically" motivated to attend such meetings cannot take away from the legislative character of the process.**

*Id.* at 279-80 (emphasis added). The court then quoted the Supreme Court:

> Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of the judgment against them based upon a jury's speculation as to motives.

*Id.* at 280 (quoting *Tenney*, 341 U.S. at 377); *see also Williams v. Johnson*, 597 F. Supp. 2d 107, 114 (D.D.C. 2009) ("investigation and information gathering by a legislator – whether formally

or informally conducted – is protected by the Speech or Debate Clause" if it is "in aid of"

legislative activity).

The breadth of the immunity was succinctly described in *United States v. Dowdy*, where

the court stated that the Speech or Debate Clause:

> does not simply protect against inquiry into acts which are manifestly legislative.
> In our view, it also forbids inquiry into acts which are purportedly or apparently
> legislative, even to determine if they are legislative in fact.   Once it was
> determined, as here, that the legislative function . . . was apparently being
> performed, the propriety and the motivation for the action taken, as well as the
> detail of the acts performed, are immune from judicial inquiry.

479 F.2d. 213, 226 (4th Cir. 1973).[7]

The doctrine of legislative immunity has a twofold effect; is not just an immunity from

suit, it is an evidentiary and testimonial privilege as well.  *Equal Emp. Opportunity Comm'n*, 631

F.3d at 180-181; *Marylanders for Fair Representation*, 144 F.R.D. at 297; *2BD Associates*, 896

F. Supp. at 531.  As the Court of Appeals for the Fourth Circuit has explained:

> Legislative privilege against compulsory evidentiary process exists to safeguard
> this legislative immunity and to further encourage the republican values it
> promotes. *See Burtnick*, 76 F.3d at 613. "Absolute immunity enables legislators
> to be free, not only from 'the consequences of litigation's results, but also from
> the burden of defending themselves.'" *Id.* (quoting *Dombrowski v. Eastland*, 387
> U.S. 82, 85, 87 S. Ct. 1425, 18 L. Ed. 2d 577 (1967)) (emphasis added).  Because
> litigation's costs do not fall on named parties alone, this privilege applies whether
> or not the legislators themselves have been sued. *See id.*; *MINPECO, S.A. v.
> Conticommodity Servs., Inc.*, 844 F.2d 856, 859, 269 U.S. App. D.C. 238 (D.C.
> Cir. 1988) ("A litigant does not have to name members or their staffs as parties to
> a suit in order to distract them from their legislative work. **Discovery procedures
> can prove just as intrusive.**").  Consequently, if the EEOC or **private plaintiffs
> sought to compel information from legislative actors about their legislative
> activities, they would not need to comply** . . . .

*Equal Emp. Opportunity Comm'n*, 631 F.3d at 181 (emphasis added) (internal citations omitted).

Thus, the strictures of absolute immunity give rise to an equally rigorous privilege.

---

[7]  *Dowdy* is a criminal case, but the discussion of the scope of the Speech or Debate Clause is likewise applicable to
a civil case.

It has been recognized that the value and importance of the legislative privilege is lost if it is not applied to legislative staff and aides. *See Gravel v. United States,* 408 U.S. 606, 616-17 (1972) (stating that, in the context of the legislative privilege for members of Congress, "the day–to–day work of … aides is so critical to the Members' performance that they must be treated as the latter's alter egos"); *Lee v. Virginia State Bd. of Elections,* 2015 WL 9461505, at *7 (E. D. Va. December 23, 2015) ("Legislative Employees are in substantially the same position as the Nonparty Legislators themselves in terms of eligibility to claim legislative privilege.") *Page v. Virginia State Bd. of Elections,* 15 F. Supp. 3d 657, 667 (E.D. Va. 2014) (threat of disclosure of communications of legislative aides and assistants would impede future deliberations by the legislature); *Florida v. United States,* 886 F. Supp. 2d 1301, 1304 (N.D. Fla. 2012) (privilege extends to staff members to avoid intrusion on legislators' own deliberative process and communication with staff); *Marylanders for Fair Representation,* 144 F.R.D at 301 ("If these staff members are not accorded the same testimonial and liability immunity as legislators, the purpose of *Tenney* would be vitiated.")

Thus, as an evidentiary bar, legislative privilege shields legislators and their aides from discovery. "Any probing of legislative acts is sufficient to trigger immunity." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 419 (D.C. Cir. 1995). Legislators cannot be compelled to testify in a deposition. *See 2BD Associates Ltd.*, 896 F. Supp. at 531; *Marylanders for Fair Representation*, 144 F.R.D. at 297. Moreover, the immunity is not limited to forced testimony. Compelling a legislator to produce documents is tantamount to compelling a legislator to testify. "Documentary evidence can certainly be as revealing as oral communications – even if only indirectly, when . . . the documents in question . . . do not detail specific congressional actions." *Brown & Williamson Tobacco Corp.*, 62 F.3d 408, 420 (D.C.

Cir. 1995). Hence, legislators cannot be compelled, through a request for production of documents, to produce their notes or files, even in a case where legislative intent purportedly is at issue. *See Simpson v. City of Hampton*, 166 F.R.D. 16, 18-19 (E.D. Va. 1996).[8]

A core purpose of legislative privilege is to protect against judicial inquiry into the motives of legislators. *Tenney,* 341 U.S. at 377. Otherwise stated, a party cannot "inquire into legislative motive if such an inquiry would necessitate an abrogation of legislative immunity."[9] *Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. at 298 (internal quotation omitted). In reviewing the constitutionality of legislative acts, the critical question is whether the challenged legislation bears "a real and substantial relation to the public health, morals, safety and welfare of the citizens ...." *Mears v. Town of Oxford,* 449 A.2d 1165, 1172 (Md. App. 1982) (internal citations omitted). The "motives, wisdom or propriety of a municipal governing body in passing an ordinance are not subject to judicial inquiry ...." *County Council for Montgomery County v. District Land Corp.,* 337 A.2d 712, 720 (Md. 1975). Thus, in a municipal context, "individual council members and other city officials may not testify as to the motives actuating council action, as recorded in its minutes, nor may they testify as to what was intended or meant by an adopted measure." *Id.* (internal quotation omitted). When considering the validity of a legislative act, a court must generally confine itself to the record of the legislative proceedings; judicial second-guessing of legislative judgments is disallowed.

---

[8] State legislators enjoy the benefits of legislative immunity and legislative privilege regardless of whether they are named as parties to the underlying lawsuit. *Lee,* at *3 (quoting *Schultz v. Virginia* 854 F.2d 43, 46 (4th Cir. 1988)) ("[W]e reject plaintiff's argument that he can circumvent the doctrine of legislative immunity by declining to name as defendants individual legislators. The purpose of the doctrine is to prevent legislators from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves.").

[9] Significantly, the courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United Stated v. O'Brien,* 391 U.S. 367, 383 (1968).

"Inquiry into the facts undergirding a legislative decision is precisely an inquiry into the motives

of the legislator." *Manders v. Brown*, 643 A.2d 931, 940 n.7 (Md. App. 1993), *cert. denied*, 643

A.2d 931 (Md. 1994).

A pertinent application of this principle is provided by the decision in *District*

*Land, supra.* There, property owners challenged the Council's decision to "down-zone"

their property.[10]  The property owners deposed various state officials and obtained their

correspondence in an effort to show that the down-zoning was 'intended to depress the price" of

the property.  *District Land,* 337 A.2d at 720.  The trial court admitted and considered

"depositions and papers" that were "not of public record."  *Id.*  The Court of Appeals of

Maryland held that the trial court erred in admitting this evidence and, in its review of Council

action, confined itself to the public record.  According to the court, reliance on extraneous

material outside the legislative record "was misplaced, as these depositions and papers were

evidentiary matters not of public record."  *Id.*

### 2.     The County Council acted in a legislative capacity and is entitled to a protective order based on legislative privilege.

The Plaintiffs' lawsuit challenges various land use actions that the County Council

undertook in two legislative capacities.  With respect to the regulation of land use through

zoning, under state law, the County Council is designated the District Council.  Md. Code Ann.,

Land Use § 22-101.  The District Council is the zoning and land use authority for the County.

Md. Code Ann., Land Use § 22-101, *et seq.; see also Pan Am. Health Org. v. Montgomery*

*County,* 889 F. Supp. 234 237 (D. Md. 1994), *aff'd,* 59 F.3d 167 (4th Cir. 1994) (discussing

statutory zoning authority in Montgomery County).  The District Council is charged with, among

other things, regulating zoning, amending zoning maps, and, amending master plans.  State law

---

[10] *District Land* is particularly pertinent because the County rezoned the properties through a sectional map amendment. 337 A.2d at 718.

authorizes the District Council to " regulate the construction, alteration, and uses of buildings and structures and the uses of land including surface, subsurface and air rights." Md. Code Ann., Land Use § 22-201.  When the District Council so regulates, it acts in a legislative capacity.  *See Mayor and Council of Rockville v. Rylyns*, 814 A.2d 469, 479-80 (Md. 2002); *Nottingham Village, Inc. v. Baltimore County*, 292 A.2d 680, 687 (Md. 1972) ("Zoning or rezoning in accordance with a comprehensive plan is a legislative function").

In approving water and sewer extensions and creating special protection areas, the County Council does not act in its capacity as the District Council; it acts as the County Council for Montgomery County, the legislative branch of County government.  State law grants the County Council the authority to adopt a water and sewer plan, and amendments thereto, subject to state approval.  Md. Code Ann. Envir., § 9-501, *et seq*. This Court has determined that the process of approving a water and sewer category change is legislative. *See Kent Island Joint Venture v. Smith*, 452 F. Supp. 455, 458 (D. Md. 1978) (describing an amendment to a water and sewerage plan as "clearly legislative.")  Further, County law authorizes the County Council to designate a special protection area by certain legislative acts, including a land use plan or a resolution.  Montgomery County Code § 19-60(b)(2), et seq., (2014, as amended).

All of the forgoing acts are aptly described as land use decisions.  Where the County Council makes land use decisions that "involve generalizations concerning a policy or state of affairs and the establishment of a general policy affecting the larger population," it acts in a legislative capacity. *Alexander v. Holden*, 66 F.3d 62, 66 (4th Cir. 1995) (internal quotation omitted).  Legislative acts usually involve the "adoption of prospective, legislative-type rules" that "establish a general policy affecting the larger population." *EEOC v. Washington Suburban Sanitary Comm'n*, 631 F.3d at 184 (internal quotations omitted).  In the instant action, the

County Council made land use decisions affecting the entirety of Stage 4 of the planned development of Clarksburg and, therefore, acted in a legislative capacity. *See District Land,* 337 A.2d at 718 (sectional plan amendment constituted comprehensive rezoning).

The body of controlling law, set out above and summarized in *N.C. State Conf. of the NAACP v. McCrory,* 2015 U.S. Dist. LEXIS 13648 (M.D.N.C. Feb. 4, 2015), makes clear that legislative privilege applies in the present case. The *McCrory* case is illustrative in that there a discovery dispute arose out of subpoenas *duces tecum* served on numerous state legislators. The court held that the legislative privilege shields production of communications among legislators or between legislators and their legislative staff or the creation of a privilege log regarding the same. *Id.* at *25-26. The court concluded:

> For reasons enumerated by the Supreme Court, the Fourth Circuit, and numerous lower courts, this court concludes that, for Plaintiff's requests for discovery communications among legislators and between legislators and their staff, the potential intrusion into the legislative process outweighs the countervailing factors.

*Id.* at *25.[11] In reaching this decision, the court cited with approval the decision in *Marylanders for Fair Representation,* 144 F.R.D. 292, which prohibited taking the depositions of state legislators with respect to legislation enacted by the General Assembly. *Id.* at *22.

Rule 26(c) confers broad discretion on the Court to decide when a protective order is appropriate and what degree of protection is required. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36 (1984). The standard by which the Court is guided is "good cause." *Webb v. Green Tree Servicing, LLC,* 283 F.R.D. 276, 278 (D. Md. 2012).

In the present case, communications among County Council members and between the Council members and their staff should be treated as privileged and not subjected to discovery.

---

[11] The court allowed discovery of communications with members of the public; however, in the present case, a large volume of communications with the public are part of the public record that will be produced.

This would include electronic searches for ESI, requests for production of documents, subpoenas *duces tecum,* interrogatories, depositions or other discovery tools. Nor, as discussed below, should Defendant be required to create a privilege log as to such material. *McRory.* at *27. A protective order covering communications among legislators and between legislators and their staff should issue insofar as such discovery has been or may be propounded.

Furthermore, as explained above, in judicial challenges to legislative action, the court should not allow inquiry going beyond the "public record" on the legislation. *District Land,* 337 A.2d at 720. Consistent with this reasoning, with respect to the County Council, document discovery should be limited to the public record on the legislative matter at issue - - *i.e.,* the 2014 Amendment to the Clarksburg Master Plan and the related zoning changes. Communications among council members, emails between council members and staff persons and internal memoranda should not be discoverable. A protective order should issue to the extent Plaintiff seeks discovery that goes beyond the public record.[12]

3. **The County Executive is entitled to the protection of legislative privilege in performing legislative functions.**

In the present case, the County Executive, Isiah Leggett, through executive branch employees and officials, took a number of actions mandated by law that were an integral part of the legislative process. With respect to the Master Plan Amendment, after the public hearing, M-NCPPC submitted a revised Planning Board draft to the District Council incorporating modifications to the amendment. A copy of the plan amendment was transmitted to the County Executive. The law requires the Executive to transmit a fiscal impact analysis to the District

---

[12] In this regard, it should be noted that in addition to the voluminous public record, Montgomery County anticipates producing substantial ESI discovery as a result of its agreement with Plaintiff to search through emails and other ESI of 26 custodians utilizing 66 separate search terms.

Council within 60 days. *See* Md. Code Ann., Land Use § 21-211. On December 20, 2013, the County Executive transmitted his fiscal impact analysis. Council Resolution No. 17-1048.

With respect to the Zoning Text Amendment, a copy must be transmitted to the County Executive within 5 days following introduction so the Executive may comment. Montgomery County Code, 2004 Zoning Ordinance, § 59-H-9.2. The County Executive also plays a supportive role in the enactment and amendment of the County's 10-year comprehensive plan for water and sewer service. Md. Code Ann., Envir. § 9-515, *et seq.* By statute, the County Executive's duties include: preparing a preliminary draft of the plan; preparing amendments to the plan; submitting them to the County Council for comment, revision, public hearing and approval; and review and recommendation of changes to any plan or amendment adopted by the Council. *Id.* at § 9-515(c).

In the present case, on December 3, 2014, the County Executive submitted to the County Council a recommendation regarding a comprehensive water/sewer category map amendment intended to implement the land use recommendations in the Ten Mile Creek Limited Master Plan Amendment Area. *See* Council Resolution No. 17-1048. On February 24, 2015, the Council approved the recommendation, allowing the extension of public water and sewer service to the Ten Mile Creek area. Council Resolution No. 18-66.

In *Marylanders for Fair Representation, supra*, the court considered the extent to which the Governor of Maryland was entitled to legislative immunity for his actions in preparing and presenting a legislative redistricting plan. Relying on Supreme Court precedents, the court applied a "functional" approach to determining whether the executive could invoke legislative privilege. 144 F.R.D. at 298-299 (citing *Forrester v. White*, 484 U.S. 219, 223-24 (1987)). Following the approach used in *Forrester*, the court looked to three factors to determine if

18

legislative immunity applies to the executive: (1) the actor, who must be a government official or an individual working on his behalf; (2) the act itself, which must fall within the "sphere of legitimate legislative activity;" and (3) the act's proximity to the legislative arena.  144 F.R.D. at 299.

Analyzing these factors in relation to the Governor's role in a legislative redistricting plan, the court held that the preparation and introduction of legislation fell within the purview of legitimate legislative activity.  *Id.* at 300-01.  As a result, the Governor and staff members who worked on a committee dealing with the legislation were entitled to "full immunity both from liability and inquiry as to their actions" in preparing and commenting on the legislation.  *Id.* at 301.

The same result is warranted in the present case. All of the acts described above committed by executive branch officials were in furtherance of the legislative process.  Here, the County Executive provided the Council a fiscal impact statement regarding the Ten Mile Creek Limited Master Plan Amendment, commented on the Council's recommendations regarding future development of the Ten Mile Creek area of Clarksburg and proposed a comprehensive water/sewer category map amendment that was adopted by the Council.  These functions are integral to the legislative process and entitle the County Executive and his staff[13] to the protections of legislative privilege.

**B.      Defendant Montgomery County Should Not Be Required to Respond to Discovery That Violates the Executive Privilege.**

The analog to legislative privilege is executive privilege.  The purpose of the privilege is to protect the deliberative decision-making functions of government.  *Ethyl Corp. v. U.S.E.P.A.,* 25 F.3d 1241, 1248 (4th Cir. 1994); *City of Virginia Beach, Va. v. U.S. Dep't of Commerce,* 995

---

[13] Special Assistant, Joy Nurmi, advised Mr. Leggett on legislative matters relating to the 2014 Plan Amendment and the comprehensive water/sewer category change.

F.2d 1247, 1252-53 (4th Cir. 1993); *Greene v. Thalhimer's Dept. Store,* 93 F.R.D. 657, 659 (E.D. Va. 1982). The privilege encompasses documents "reflecting advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated." *Ethyl Corp.,* 25 F.3d at 1248, quoting *NLRB v. Sears Roebuck & Co.,* 421 U.S. 132, 150 (1975).

The executive deliberative process privilege is designed to protect the quality of administrative decision-making by insuring that it is not done "in a fishbowl." *City of Virginia Beach,* 995 F.2d at 1253 (citation omitted). "Thus, the privilege encourages free-ranging discussion of alternatives; prevents public confusion that might result from premature release of such non-binding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions, but for matters considered before making up their minds." *Id.* (internal quotation omitted). Executive privilege shields from disclosure intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated. *Greene,* 93 F.R.D. at 659.

To invoke the privilege, the documents sought must be predecisional and deliberative. *City of Virginia Beach,* 995 F.2d at 1253. Predecisional documents are "those prepared in order to assist an agency decision-maker in arriving at his decision." *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 42 U.S. 168, 184 (1975)). Deliberative material "reflects the give and take of the consultative process" by revealing the manner in which the agency evaluates possible alternative policies or outcomes. *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980)). Thus, the deliberative process privilege protects

"recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect personal opinions of the writer rather than the policy of the agency." *Id.*

In the present case, the County Executive's analyses were pre-decisional and deliberative and, therefore, are covered by the executive deliberative process privilege. Montgomery County should not have to produce such documents or divulge their contents in discovery. *See Christian Coalition Intern. v. U.S.,* 2002 WL 1482523, at *1-3 (E.D. Va. May 31, 2002). Nor should the County have to bear the substantial burden and cost of itemizing each and every such communication in a privilege log. As a result, the Court should enter a protective order to shield Montgomery County from the intrusions on executive privilege posed by Plaintiff's discovery requests.

C. **Defendant Should Not Be Required to Create a Privilege Log as to Documents Held by the County Council, Council Staff, the County Executive and the Executive's Special Assistant.**

Defendant Montgomery County should not be required to produce a privilege log for persons entitled to blanket assertions of legislative or executive privilege. Requiring Defendant to create a privilege log of patently privileged material "would undermine the very purpose and function of legislative privilege, unduly intruding into legislative affairs and imposing significant burdens on the legislative process." *McCrory,* 2015 U.S. Dist. LEXIS 13648, at *26. The same reasoning applies with respect to executive privilege.

The reality is that the burden imposed by requiring a privilege log would be nearly as intrusive as production itself. For the 18 persons at issue, Defendant would have to conduct a full blown ESI search for emails and documents spanning a period of over 13 years, then itemize every related document as to subject matter, sender and recipient, even though all of the material clearly is privileged. This constitutes an unnecessary and undue burden. Legislative privilege

"exists to protect legislators from the burden of having to deal with the distractions and disruptions that discovery imposes on their ability to carry out their governmental functions." *Powell v. Ridge,* 247 F.3d 520, 530 (3d Cir. 2001). If the County Council, County Executive, and staff members are required to search for and list every email, text message, or document pertaining to the 2014 Plan Amendment and related zoning changes, the purpose of the legislative and executive privileges will be completely undermined.

In such circumstances, the courts have not required persons entitled to a privilege to create a privilege log. *See McRory,* 2015 U.S. Dist. LEXIS 13648, at *26-27; *National Ass'n Chain Drugstores v. U.S. Dep't of Health,* 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009) (privilege log not required as to documents outside the administrative record); *Blue Ocean v. Gutierrez,* 503 F. Supp. 2d 366, 372 (D.D.C. 2007) (same). Here, Defendant should not be required to create a privilege log as to past and present members of the County Council, staff of the County Council, the County Executive, or his Special Assistant.

## V.    CONCLUSION

Based on the foregoing, Defendant Montgomery County, Maryland, requests that its Motion for Protective Order be granted and that the Court enter the proposed order submitted herewith.

Respectfully submitted,

MARC P. HANSEN
COUNTY ATTORNEY

_____/s/_____
Patricia P. Via, Chief
Division of Litigation
Federal Bar No. 04829
(*signature by Paul F. Leonard, Jr. with the permission of Patricia P. Via*)
patricia.via@montgomerycountymd.gov

_____/s/_____
Paul F. Leonard, Jr.
Associate County Attorney
Federal Bar No. 14781
paul.leonard@montgomerycountymd.gov


_____/s/_____
Haley M. Roberts
Assistant County Attorney
Federal Bar No. 19331
(*signature by Paul F. Leonard, Jr. with the
permission of Haley M. Roberts*)
haley.roberts@montgomerycountymd.gov


_____/s/_____
Erek L. Barron, Esquire
Federal Bar No. 15693
Whiteford, Taylor & Preston, LLP
7501 Wisconsin Ave., Suite 700W
Bethesda, Maryland 20814
(301) 804-3610 (Phone)
(301) 215-6359 (Fax)
ebarron@wtplaw.com
(*signature by Paul F. Leonard, Jr. with the
permission of Erek L. Barron*)


_____/s/_____
John J. Hathway, Esquire
Federal Bar No. 03847
Whiteford, Taylor & Preston, LLP
1025 Connecticut Ave., N.W., Suite 400
Washington, D.C. 20036
(202) 659-6800 (Phone)
(202) 331-0573 (Fax)
jhathway@wtplaw.com
(*signature by Paul F. Leonard, Jr. with the
permission of John J. Hathway*)

_____/s/_____
Howard R. Feldman, Esquire
Federal Bar No. 05991
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202
(410) 347-8700 (Phone)
(410) 752-7092 (Fax)
(*signature by Paul F. Leonard, Jr. with the permission of Howard R. Feldman*)


Attorneys for Defendant
Montgomery County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland  20850
(240) 777-6700 (Phone)
(240) 777-6705 (Fax)


Filed:  May 6, 2016