# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

_____
                              )

**Pulte Home Corp., et al.,**          )

                              )

          **Plaintiffs,**        )

                              )

**v.**                            )     **Civil No. 8:14-cv-3955-GJH**

                              )

**Montgomery County, Maryland, et al.,**  )

                              )

          **Defendants.**       )

                              )
_____)

## NON-PARTY CITIZENS' GROUPS'
## OPPOSITION TO MOTION TO COMPEL AND
## MEMORANDUM IN SUPPORT OF
## CROSS-MOTIONS TO QUASH SUBPOENAS

Donald B. Mitchell, Jr. (D. Md. Bar No. 22944)
Sylvia G. Costelloe
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20006
(202) 857-6172
donald.mitchell@arentfox.com

*Attorneys for Audubon Naturalist Society of the Mid-Atlantic States, Inc.; Montgomery Countryside Alliance, Inc.; Seneca Creek Watershed Partners, Inc.; Sierra Club, Montgomery County Group; Muddy Branch Alliance, Inc.; Clean Water Action; Conservation Montgomery, Inc.; Sugarloaf Citizens Association, Inc.; Friends of Ten Mile Creek and Little Seneca Reservoir, Inc.; Liveable Clarksburg Coalition, Inc.; Ms. Diane Cameron; Mr. John Cook; Save Ten Mile Creek Coalition (an unincorporated association)*

# TABLE OF CONTENTS

**Page**

I. DEMOCRACY IN ACTION:  THE PUBLIC DEBATE  OVER THE PRESERVATION OF TEN MILE CREEK .................................................1

    A. THE FATE OF TEN MILE CREEK  WAS LEFT OPEN IN THE 1994 MASTER PLAN ...................1

    B. PULTE SPECULATIVELY ACQUIRES TEN MILE CREEK REAL ESTATE....................................3

    C. PULTE APPLIES FOR WATER AND SEWER CHANGES AND THE LAND USE REVIEW PROCESS BEGINS ....................................................................................................3

    D. THE CONSERVATION COMMUNITY ORGANIZES TO PROTECT TEN MILE CREEK .................4

II. DESCRIPTION OF THE NON-PARTY CITIZENS' GROUPS WHO  HAVE BEEN SUBPOENAED BECAUSE THEY  PETITIONED THEIR GOVERNMENT TO SAVE TEN MILE CREEK .......................................................................................8

III. THE SUBPOENAS AT ISSUE HERE ARE ASTONISHINGLY BROAD .........................12

IV. THE INFORMATION SOUGHT IS IRRELEVANT  TO THE CLAIMS IN THE UNDERLYING LITIGATION ........................................................................14

    A. THE DUE PROCESS AND EQUAL PROTECTION CLAIMS: PULTE MUST *FIRST* PROVE A CONSTITUTIONAL PROPERTY INTEREST.............................................................15

    B. THE NON-PARTY CITIZENS' GROUPS HAVE *NO* INFORMATION RELEVANT TO THE TAKINGS CLAIM .................................................................................18

V. THE FIRST AMENDMENT PRIVILEGE: PULTE'S DISCOVERY MAY NOT GO FORWARD BECAUSE  IT IMPROPERLY AND UNNECESSARILY INTRUDES UPON THE CITIZENS' GROUPS' CORE FIRST AMENDMENT RIGHTS ...................19

    A. PULTE'S MOTION TO COMPEL SHOULD BE DENIED, AND ITS SUBPOENAS QUASHED BECAUSE PULTE HAS FAILED TO SATISFY  THE FIRST AMENDMENT BALANCING TEST EMPLOYED BY THE COURTS WHEN DISCOVERY REQUESTS WOULD POTENTIALLY CHILL EXERCISE OF FIRST AMENDMENT RIGHTS .......................................21

        1. The First Amendment's Associational Freedoms  Apply to Subpoenas and Discovery Requests ................................................................................22

        2. The Courts Engage in "Exacting Scrutiny" or "Strict Scrutiny" When Balancing a Discovery Request  Against a Person's First Amendment Rights .............................28

        3. Pulte Seeks to Punish Those Who Exercise Their Democratic Rights ......................32

        4. The *Wyoming v. Department of Agriculture* Case is Indistinguishable ....................36

        5. Pulte's Cases Are Not to the Contrary .....................................................39

    B. THE NON-PARTY CITIZENS' GROUPS' DECLARATIONS  ESTABLISH THAT PULTE'S DISCOVERY REQUESTS WOULD CHILL AND INTIMIDATE THEIR EXERCISE OF THEIR CORE  FIRST AMENDMENT RIGHTS TO PETITION THE GOVERNMENT AND TO FREEDOM OF ASSOCIATION..............................................................................41

1.  The Non-Party Citizen Groups Have Established  A Factual Likelihood That The Discovery Sought Will Chill  The Exercise of Their Political and Associational Rights ................................................................................................................... 42

2.  The Information Sought Is Not "Crucial" To Pulte's Case ........................................ 45

3.  Pulte Has Not Made The Requisite Showing  That It Has Exhausted Every Alternative Source ..................................................................................................... 46

VI. PULTE's DISCOVERY REQUESTS ALSO FAIL  BECAUSE THEY VIOLATE RULE 45 AND  ARE UNDULY BURDENSOME ON NON-PARTIES ............................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adolph Coors Co. v. Wallace*,
  570 F. Supp. 202 (N.D. Cal. 1983)..............................................................25

*AFL-CIO v. Federal Elec. Comm'n*,
  333 F.3d 168 (D.C. Cir. 2003)................................................................24, 25

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960) ...................................................................................25

*Black Panther Party v. Smith*,
  661 F.2d 1243 (D.C. Cir. 1981)........................................................*passim*

*Britt v. Superior Court*,
  20 Cal. 3d 844 (1978).................................................................................25

*Brown v. Socialist Workers '74 Campaign Committee*,
  459 U.S. 87 (1982) ................................................................................22, 23

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..........................................................................20, 28, 39

*Bursey v. United States*,
  466 F.2d 1059 (9th Cir. 1972)..............................................................23, 48

*City of Greenville v. Syngenta Crop Protection, Inc.*
  2011 WL 5118601 (C.D. Ill. 2011) ......................................................48, 50

*County Council of Montgomery County v. District Land Corp.*,
  274 Md. 691 (1975) ....................................................................................16

*Cusumano v. Microsoft Corp.*,
  162 F.3d 708 (1st Cir. 1998).......................................................................49

*Dunnet Bay Const. Co. v. Hannig*,
  No. 10-CV-3051, 2011 WL 5417123 (C.D. Ill. Nov. 9, 2011) .................39

*Ealy v. Littlejohn*,
  569 F.2d 219 (5th Cir. 1978).......................................................................23

*Educ. Fin. Council v. Oberg*,
  No. 10-MC-0079-JDB, 2010 WL 3719921 (D.D.C. Mar. 8, 2010).....49, 50

*Federal Election Comm'n v. Machinists Non-Partisan Political League,*
   655 F.2d 380 (D.C. Cir. 1981) ................................................................................23, 28, 32

*Gardner v. City of Baltimore,*
   969 F.2d 63 (4th Cir. 1992) .................................................................................*passim*

*Grandbouche v. Clancy,*
   825 F.2d 1463 (10th Cir. 1987) .....................................................................................28

*Henry v. Jefferson County Comm'n,*
   637 F.3d 269 (4th Cir. 2011) ..................................................................................18, 46

*Herbert v. Lando,*
   441 U.S. 153 (1979) ........................................................................................................40

*Int'l Action Ctr. v. United States,*
   207 F.R.D. 1 (D.D.C.2002) (Kessler, J.) ......................................................................30

*Int'l Union v. Nat'l Right to Work Legal Defense Foundation,*
   590 F2d 1139 (D.C. Cir. 1978) ......................................................................................30

*In re Lazaridis,*
   865 F. Supp. 2d 521 (D.N.J. 2011) ...............................................................................49

*Lingle v. Chevron U.S.A. Inc.,*
   544 U.S. 528 (2005) ........................................................................................................18

*Local 814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n,*
   667 F.2d 267 (2d Cir. 1981) ..........................................................................................42

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) ........................................................................................................18

*Lucas v. South Carolina Coastal Council,*
   505 U.S. 1003 (1992) ......................................................................................................18

*Master Printers of America v. Donovan,*
   751 F.2d 700 (4th Cir. 1984) .........................................................................................39

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ....................................................................................................*passim*

*NAACP v. Button,*
   371 U.S. 415 (1963) ........................................................................................................21

*North Carolina Elec. Mem. Corp. v. Carolina P. & L. Co.,*
   666 F.2d 50 (4th Cir. 1981) .....................................................................................39, 40

*North Carolina Right to Life, Inc. v. Leake*
    231 F.R.D. 49 (D.D.C. 2005) ........................................................................49, 50

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) .........................................................................................18

*Pebble Ltd. P'ship v. U.S. Envir. Protection Agency,*
    310 F.R.D. 575 (D. Alaska 2015).......................................................................39

*Penn Central Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) .........................................................................................18

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2010) .....................................................................*passim*

*Pollard v. Roberts,*
    283 F. Supp. 248 (E.D. Ark.), *aff'd*, 393 U.S. 14 (1968) ......................................42

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) .........................................................................................21

*Roth v. United States,*
    354 U.S. 476 (1957) .........................................................................................21

*Shelton v, Tucker,*
    364 U.S. 479 (1960) ...................................................................................21, 42

*Sierra Club v. Union Electric Co.,*
    No. 4:14-cv-408-AGF, 2015 WL 9583394 (E.D. Mo. Dec. 31, 2015) ....................39

*Silkwood v. Kerr-McGee Corp.,*
    563 F.2d 433 (10th Cir. 1977) ...........................................................................47

*Smith v. Arkansas State Highway Employees Local 1315,*
    441 U.S. 463 (1979) .........................................................................................21

*State of Wyoming v. U.S. Dep't of Agriculture,*
    208 F.R.D. 449 (D.D.C. 2002) (Urbina, J.).....................................................*passim*

*State of Wyoming v. U.S. Dep't of Agriculture,*
    Misc. No. 02-mc-23 (D. Ore. Aug. 12, 2012) (Haggerty, J.)………...........................………37

*U.S.E.P.A. v. Duke Energy Corp.,*
    218 F.R.D. 469 (E.D.N.C. 2003) (Magistrate Judge opinion), *upheld on review*, 2012 WL 1565228 (E.D.N.C. 2012) (District Judge opinion)..................40

*United States v. Amerigroup Illinois, Inc.,*
    No. 02 C 6074, 2005 WL 3111972 (N.D. Ill. Oct. 21, 2005)..................................48

**Statutes**

42 U.S.C. § 1983 ................................................................................................ 14, 15, 25

**Other Authorities**

Council Resolution No. 16-1149 ................................................................................. 3

Council Resolution No. 17-1048 ............................................................................. 5, 7

Council Resolution No. 17-1048 ................................................................................. 7

Fed. R. Civ. P. 45(d)(1) ..................................................................................... 48, 49

Fed. R. Civ. P. 26(b)(1) ......................................................................................... 31

## NON-PARTY CITIZENS' GROUPS'
## OPPOSITION TO MOTION TO COMPEL AND
## MEMORANDUM IN SUPPORT OF CROSS-MOTIONS TO QUASH SUBPOENAS

**"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association…. [S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.  …  It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on freedom of association…."** *NAACP v. Alabama,* **357 U.S. 449, 460-62 (1958).**

This motion presents important questions involving the rights of private citizens and citizens' groups under the First Amendment to the United States Constitution.  The subpoenas in question seek access to the core of these individual's and citizens' groups' First Amendment-protected activities and communications.  Their enforcement would violate the First Amendment.

At its heart, this case and these subpoenas are about *politics*, and constitute nothing more nor less than the effort of a defeated political player, Pulte — which took a calculated business and political risk and spent millions of dollars to assemble unentitled property — to conduct discovery on the private First Amendment-protected political papers and strategies of the parties that opposed it.  What is worse — and equally dispositive here — is that the access sought is duplicative, unnecessary and irrelevant to the resolution of the underlying matter.

The subpoenas should be quashed in their entirety.

## I.    DEMOCRACY IN ACTION:  THE PUBLIC DEBATE
## OVER THE PRESERVATION OF TEN MILE CREEK

### A.    THE FATE OF TEN MILE CREEK
### WAS LEFT OPEN IN THE 1994 MASTER PLAN

Located in northern Montgomery County, Ten Mile Creek is the least disturbed and most natural creek remaining in Montgomery County.  Flowing south, Ten Mile Creek is also the

major tributary to Little Seneca Lake, a man-made reservoir which is the emergency drinking water supply, in case of problems with the Potomac River, for the Washington metropolitan area. *See* Exhibit 1 (map).  As such, it has long been a matter of intense public interest.

Following a lengthy planning process, in 1994 the Montgomery County Council approved the Clarksburg Master Plan & Hyattstown Special Study Area ("1994 Master Plan") to control future growth in the Clarksburg area.[1]  One prominent goal of the Master Plan was to preserve the ecological vitality of the Ten Mile Creek watershed.  The 1994 Master Plan recommended that development of Clarksburg "be staged ... to be responsive to [*inter alia*] environmental protection objectives."  1994 Master Plan at 34.  "Environmental studies for the [1994 Master] Plan indicate that the Ten Mile Creek watershed has the greatest constraints for development" and "is the most prone to environmental degradation from development."  *Id.* at 138.  Because of that environmental sensitivity, the Ten Mile Creek area at issue in this suit was placed in the last stage for potential development, Stage 4.  *Id.* at 197.  "Due to the environmentally fragile nature of the streams in this area" the 1994 Master Plan required a series of events to occur in Stages 1 through 3 before the County Council would even *consider* development in the Ten Mile Creek Area.  *Id.* at 198-99.  "Once [those] events occur[red], the County Council [would] *consider* … changes that would permit the extension of public [water and sewer] facilities to the Ten Mile Creek area."  *Id.* at 199 (emphasis added).  And the 1994 Master Plan was explicit that all options were open when that consideration finally occurred, warning that following its deliberations the County Council "*may*" decide to grant the water and sewer extensions *or* may "[d]efer action … pending further study or consideration as deemed necessary and appropriate by the Council," *or* may "[c]onsider such other land use actions as are

---

[1]      Quoted excerpts from the 1994 Master Plan are attached as Exhibit 2.

deemed necessary." *Id.* at 199 (emphasis added).

## B.   PULTE SPECULATIVELY ACQUIRES TEN MILE CREEK REAL ESTATE

In the face of this explicitly unsettled future land use determination, plaintiff Pulte began speculating in land in the Ten Mile Creek watershed.  According to its own Complaint, between March 2005 and January 2006 — notably, the height of pre-crash residential housing market, when home building and flipping were spinning like a roulette wheel — Pulte purchased the rights to 541 acres of undeveloped land in the Ten Mile Creek watershed.  Cmpt. ¶¶ 5, 16.  Pulte even purchased 323 transferrable development rights, hoping to use them to *increase* the density of its construction of residential units in the Ten Mile Creek watershed.  Pulte envisioned building in the vicinity of 900 houses in this sensitive Stage 4 watershed.

## C.   PULTE APPLIES FOR WATER AND SEWER CHANGES
##        AND THE LAND USE REVIEW PROCESS BEGINS

In May 2009, Pulte applied for a Water and Sewer Service Area Category Change to request Montgomery County to extend public water and sewer infrastructure to its speculatively acquired land.  Cmpt. ¶ 1.  Consistent with the Phase 4 requirements of the 1994 Master Plan, the County Council began to review the water quality data resulting from the development that had taken place elsewhere in Clarksburg during Phases 1 through 3 prior to taking action on the sensitive Ten Mile Creek area.

On October 13, 2009, the County Council created an "Ad Hoc Water Quality Working Group" (the "Ad Hoc Group") to assess water quality issues in the Stage 4 area and expressly stated that "[t]he Council intends to defer any Water and Sewer Plan category change related to Stage 4 in Clarksburg until after it has reviewed the Working Group's report."  Council Resolution No. 16-1149.  The Ad Hoc Group was charged with gathering information about the potential effects of Pulte's proposed development in Ten Mile Creek under Phase 4 of the 1994

Master Plan, and advising the Council on potential ways to mitigate those effects.  The Ad Hoc Group was specifically composed by the Council *to represent a cross-section of stakeholders* and County staff.  Of its ten members, there were two citizens' and/or environmental group representatives (Diane Cameron, from Audubon Naturalist Society, and Clarksburg citizen John Cook,[2] both subpoena recipients), three were development industry representatives, (including one being paid by Pulte, Amy Quant, an employee of Soltesz, Pulte's Ten Mile Creek engineering firm, *see* Cmpt. ¶ 22), four were County or Maryland-National Capital Park and Planning Commission ("M-NPCPPC") employees, and one was an architect.  *See* Declaration of Diane Cameron ("Cameron Decl."), attached as Exhibit 4, at ¶ 6.  The Ad Hoc Group held meetings in 2009 and 2010, and published a report at the conclusion of its work in 2010 in which a majority recommended that the County Council adopt a Master Plan amendment in order to formulate changes to zoning and other land use actions necessary to protect Ten Mile Creek. The representatives of the development industry presented a minority report stating that development could proceed with developer-proposed mitigation measures.  The County Council continued to study the matter.

### D.   THE CONSERVATION COMMUNITY ORGANIZES TO PROTECT TEN MILE CREEK

In 2012 Pulte renewed its push to build a 900-house subdivision in the Ten Mile Creek watershed.  *See* Cmpt. ¶¶ 19, 21-22 (noting Pulte's 2012 submission of a Water and Sewer application and a Pre-Application Concept Plan).  In response, in October 2012, the County

---

[2]     Interestingly, Mr. Cook — who, apparently because he sided with the majority of the Ad Hoc Group against the Pulte development proposal is now disparagingly described by Pulte as an "environmental activist," Pulte Memorandum in Support of Motion to Compel Production of Documents of Third Parties Audubon Natural Society [*et al.*] ("Pulte Br."), at 18 — was first approached about being a member of the Ad Hoc Group *by Pulte's land use attorney* at the time, Robert Harris, and Pulte's civil engineers for the project.  *See* Declaration of John Cook ("Cook Decl."), attached as Exhibit 3, at ¶ 4.

Council directed M-NCPPC's Planning Board to undertake a limited amendment of the 1994

Master Plan.  Cmpt. ¶ 36 (referring to Council Resolution No. 17-1048).

As the Fourth Circuit has recognized *is to be expected* in Our Democracy,[3] citizens

opposed to the Pulte plans began to assemble together and organize in order to petition their

government.  The Audubon Naturalist Society — which had been carefully monitoring Ten Mile

Creek both biologically and politically for almost two decades, *see* Declaration of Lisa

Alexander ("Alexander Decl."), attached as Exhibit 5, at ¶ 7 ("staff and volunteers have been

monitoring and sampling Ten Mile Creek since the 1990s") — authorized its Conservation

Director, Diane Cameron, to work with citizens and groups from around the County to urge

protection of Ten Mile Creek under the auspices of what they called the Save Ten Mile Creek

Coalition ("STMCC").  Ms. Cameron's Declaration describes a paradigmatic grassroots

democratic effort:

> 7.  Between April 2013 and May 2014, I served as the Coordinator of the
> Save Ten Mile Creek Coalition ("Coalition"), which was formed by
> organizations that came together through their common interest in Ten
> Mile Creek.  The Coalition was comprised of 30 environmental, civic,
> labor, watershed, and faith-based groups.  The purpose of the Coalition
> was to focus well-informed public participation in Montgomery County's
> land use planning decisions, that collectively would determine the fate of a
> unique and irreplaceable water resource.  …  As Coordinator of the

---

[3]     *See Gardner v. City of Baltimore*, 969 F.2d 63, 67 & 72 (4th Cir. 1992) (emphasis added):

Few other municipal functions have such an important and direct impact on the daily
lives of those who live or work in a community.  The formulation … of land-use
policies, therefore, *frequently involves heated political battles*, which typically pit
local residents opposed to development against developers … supporting it.
*[C]ommunity input is inescapably an integral element of this system.*

                                        *   *   *

Those who live near proposed development have the most significant personal stake
in the outcome of land-use decisions *and are entitled, under our system of
government, to organize and exert whatever political influence they might have.*  Nor
is it necessarily improper for municipal government to consider or act upon such
political pressure.  Such give-and-take between government officials and an engaged
citizenry *is what democracy is all about*.

Coalition, I was responsible for overseeing the integration of the organizing, communications, outreach, and political strategies for the Coalition, and advocating for full protection of Ten Mile Creek and Little Seneca Reservoir. …

8. The focus of our campaign was to educate the public and encourage the public's participation in the democratic decision-making process for water quality protection through a specific land use plan termed the "10 Mile Creek Area Limited Amendment," which would amend the [1994 Master Plan]. Through a variety of organizing tactics, the [STMCC] generated record-breaking levels of public involvement in Montgomery County's land use and water quality decision-making process….

10. Throughout my service as coordinator of the Save Ten Mile Creek campaign, … I communicated frequently with a variety of non-governmental organizations, in order to make sure that their leaders and members were aware of Montgomery County's decision-making process on the Ten Mile Creek issue, including opportunities for public participation in those decisions. … To coordinate this work, I conducted a conference call each week…. During the campaign, I interacted with Planning Commission and County agency staff to learn about the Ten Mile Creek land use planning process. I also participated in conservationist-initiated meetings with elected officials including members of the Montgomery County Council. …

11. My work on the Save Ten Mile Creek Campaign was exhaustive, especially in the face of well-funded opposition in the land development industry. Those opposing interests employed advocacy strategies and tactics similar to ours, through alliances and associations of their own, to pursue their own political and policy objectives.

Cameron Decl. ¶¶ 7-11.

The citizens' efforts were successful. In September 2013, the M-NCPPC Planning Board held a public hearing on its draft 1994 Master Plan amendment which proposed to limit development in the Ten Mile Creek watershed. Cmpt. ¶ 46. Counsel for Pulte and an expert retained by Pulte spoke at the hearing. *Id.* Pulte also submitted written testimony. Cmpt. ¶ 51. Members of the Save Ten Mile Creek Coalition and other citizens who were not members of the Coalition did the same. Thereafter, in October 2013, the M-NCPPC Planning Board issued a draft amendment to the 1994 Master Plan; the draft amendment recommended down-zoning the

Pulte property.  Cmpt. ¶ 54.

In December 2013, the County Council held multiple nights of public hearings.  Cmpt. ¶¶ 56, 59.  Pulte testified at those hearings, *id.* at ¶¶ 57-58, and also submitted several reports from its many hired experts into the record, *id.* at ¶¶ 60-61.  Ms. Cameron and many other members of the Save Ten Mile Creek Coalition testified against Pulte's plans.[4]  On April 1, 2014, the County Council approved the Planning Board's draft Ten Mile Creek Area Limited Amendment to the 1994 Master Plan.  Cmpt. ¶ 66 (referring to Council Resolution No. 17-1048).  The Amendment recommended additional restrictions on development based on environmental concerns in order to protect Ten Mile Creek and limited Pulte to one house per acre, or about 500 houses instead of its originally proposed 900.  Council Resolution No. 17-1048, p. 26.

Thereafter, the County Council took actions to implement this Amendment to the 1994 Master Plan.  On July 15, 2014, the County Council adopted the Clarksburg West Environmental Overlay Zone Text Amendment.  Cmpt. ¶ 72.  Finally, on September 16, 2014, the County

---

[4]      Pulte takes special umbrage at the testimony of Mr. Michael Gravitz, who it describes as "an environmental leader from Chevy Chase," quoting his testimony at length in both its Complaint and its Memorandum.  Cmpt. ¶ 59; Pulte Br. 9-10.  Mr. Gravitz told the elected members of the County Council:

> My other job [tonight] is to talk about the politics of the issue and tell you how I think voters and challengers will see it next Spring in the primary [election] season. … I believe if you don't preserve the Ten Mile Creek watershed, the scenario goes like this.  The environmental community will tell voters that you just approved … three huge development projects that will pollute the headwaters of their emergency drinking water supply, and that you decided to ignore all the warnings and evidence to the contrary.  … I can't tell you what to do.  But I can tell you what our Coalition will do.  We will remind our members of the likely impact of your vote and make your decision on Ten Mile Creek and Little Seneca *the litmus test* of environmental stewardship in this election cycle.

*Id.* (quoting Mr. Gravitz, emphasis in original).  In other words, Mr. Gravitz *told elected politicians that he would organize voters* to hold them accountable if they took action that those voters might believe was contrary to their interests.  ***It is difficult to imagine anything closer to the core of democracy than a citizen threatening to hold elected officials accountable at the ballot box***.  Pulte, however, somehow sees this open exercise of democracy as wrong.

Council enacted the Sectional Map Amendment applicable to Clarksburg.  Cmpt. ¶ 80.  The

SMA re-zoned the Pulte property.  Under the rezoning, Pulte would only be permitted to

construct about 500 houses.  Pulte then brought this suit against Montgomery County and the M-

NCPPC, alleging that the County's land use decisions violated Due Process, Equal Protection,

and constituted a Taking of its speculatively acquired property.

## II.   DESCRIPTION OF THE NON-PARTY CITIZENS' GROUPS WHO HAVE BEEN SUBPOENAED BECAUSE THEY PETITIONED THEIR GOVERNMENT TO SAVE TEN MILE CREEK

In aid of its suit against the County Pulte issued thirteen subpoenas to various non-party

citizens and citizens' groups (the "Non-Party Citizens' Groups) who opposed its 900-house

project and petitioned Montgomery County to preserve the Ten Mile Creek Watershed.[5]

None of the Non-Party Citizen's Groups are parties in Pulte's lawsuit.  Their only

connection with the underlying action is that they exercised their democratic and First

Amendment rights to make their views about the importance of Ten Mile Creek and the

---

[5]     The subpoenas were issued to (1) Audubon Naturalist Society of the Mid-Atlantic States, Inc., a District of Columbia non-profit corporation headquartered in Chevy Chase, MD; (2) Montgomery Countryside Alliance, Inc., a Maryland non-profit corporation formed in 2001; (3) Seneca Creek Watershed Partners, Inc., a Maryland non-profit corporation formed in 2013; (4) the Sierra Club, Montgomery County Group, a group of Montgomery County members of the national environmental conservation organization; (5) Muddy Branch Alliance, Inc., a Maryland non-profit corporation formed in 2011; (6) Clean Water Action, a District of Columbia non-profit corporation with over 50,000 members in Maryland; (7) Conservation Montgomery, Inc., a Maryland non-profit corporation formed in 2010; (8) Sugarloaf Citizens Association, Inc., a Maryland non-profit corporation formed in 1973; (9) Friends of Ten Mile Creek and Little Seneca Reservoir, Inc., a Maryland non-profit corporation formed in late 2014 to engage in long-term efforts to protect Ten Mile Creek; (10) Liveable Clarksburg Coalition, Inc., a Maryland non-profit corporation formed in 2013; (11) Ms. Diane Cameron, a former Audubon Naturalist Society employee who served on the County's Ad Hoc Group and later coordinated the activities of the Save Ten Mile Creek Coalition; (12) Mr. John Cook, a Clarksburg resident who served on the Ad Hoc Group; and (13) the Save Ten Mile Creek Coalition ("STMCC"), an unincorporated association of groups and individuals that came together to support strong land use protection measures for the Ten Mile Creek watershed; the STMCC disbanded at the end of 2014 after the County took its final land use protection measures.  Groups (1) through (8) were members of the STMCC.  Groups (9) and (10) and individual (12) were not members of the STMCC.

excessiveness of Pulte's grandiose plans known to the County Council.  Having lost that debate, Pulte has now embarked on a County-wide fishing and intimidation expedition.

**Audubon Naturalist Society of the Mid-Atlantic States, Inc.** ("ANS") is a small environmental non-profit, founded in 1897, and is "the oldest independent environmental conservation organization serving the D.C.-metro region."  Alexander Decl., at ¶ 5.  ANS is a Section 501(c)(3) charitable organization, and over 50% of ANS's budget is funded by membership donations and grants.  *Id.*  As noted in Ms. Alexander's Declaration, ANS had a long-standing interest in protecting Ten Mile Creek and "ANS decided to lead the public efforts to participate in the Clarksburg master planning process that was triggered by Pulte's proposal to build approximately 900 houses in the Ten Mile Creek watershed."  *Id.* at ¶ 10.  The efforts were led by ANS's Conservation Director at the time, Ms. Diane Cameron, who helped assemble and convene the Save Ten Mile Creek Coalition ("STMCC").  *Id.* at ¶ 11.

**Ms. Diane Cameron** was the Conservation Program Director for ANS from February 2008 through March 2016.  Cameron Decl., at ¶ 3.  In that role, one of Ms. Cameron's responsibilities at ANS "was to undertake activities to protect various sensitive environmental areas by coordinating public political activity to influence decision-makers to protect those areas."  *Id.* at ¶ 5.  Between April 2013 and May 2014, Ms. Cameron served as the Coordinator of the STMCC, which was comprised of "30 environmental, civic, labor, watershed, and faith-based groups."  *Id.* at ¶ 7.  "As Coordinator of the Save Ten Mile Creek Coalition, [Ms. Cameron] was responsible for overseeing the integration of the organizing, communications, outreach, and political strategies for the Coalition, and advocating for full protection of Ten Mile Creek and Little Seneca Reservoir."  *Id.*  As part of her work, she "conducted a conference call each week, attended by a dozen conservation activists from Montgomery County and the greater

Washington, D.C. region, to share information, plan for events, and discuss strategy." *Id.* In addition, she "participated in conservationist-initiated meetings with elected officials including members of the Montgomery County Council." *Id.*

The **Montgomery Countryside Alliance, Inc.** ("MCA") is a Maryland non-profit corporation established in 2001, the mission of which "is to promote sound economic, land-use and transportation policies that preserve the natural environment, and open spaces and rural lands in Montgomery County's Agricultural Reserve for the benefit of all Washington Metropolitan area residents." *See* Declaration of MCA Executive Director Caroline Taylor ("Taylor Decl."), attached as Exhibit 6, at ¶ 3. MCA has about 2,500 members and supporters, and only two paid staff members and one part-time paid contractor. *Id.* at ¶ 6. Caroline Taylor of MCA worked with Ms. Cameron to build the STMCC "to ensure that the final plan for development for Stage 4 would neither compromise the master plan's goal of protecting the area's fragile water resources nor undermine other existing master plans." *Id.* at ¶ 12.

Several other organizations were also involved in the campaign to protect Ten Mile Creek against Pulte's excessive development plans, either as members of the Save Ten Mile Creek Coalition or as independent petitioners of their County government. (As described in this and the following two paragraphs, not all of the citizens' groups or individuals subpoenaed by Pulte were members of the Save Ten Mile Creek Coalition.) **Seneca Creek Watershed Partners, Inc.** (led by Ms. Ann Smith) and the **Muddy Branch Alliance, Inc.** (led by Ms. Jennie Howland) are two of the nine separate watershed protection groups in Montgomery County, each dedicated to protecting a separate watershed or creek.[6] Both Seneca Creek

---

[6]     There are nine separate watersheds and incorporated watershed protection groups in Montgomery County, protecting Rock Creek, Muddy Branch, Little Falls, Seneca Creek, Ten Mile Creek/Little Seneca Reservoir, Watts Branch, Sligo Creek, Cabin Branch, and Northwest Branch. The Muddy Branch

Watershed Partners and the Muddy Branch Alliance joined the STMCC, and each of their leaders testified at the public hearings in support of the proposed amendments to the 1994 Master Plan.  *See* Declarations of Ms. Ann Smith ("Smith Decl."), attached as Exhibit 7, at ¶ 14, and Ms. Jennie Howland ("Howland Decl."), attached as Exhibit 8, at ¶ 9.  **Conservation Montgomery, Inc.** (led by Ms. Caren Madsen), a Maryland non-profit corporation, was also a member of the STMCC, and Ms. Madsen also testified at public hearings in support of the proposed amendments to the 1994 Master Plan to protect Ten Mile Creek.  *See* Declaration of Caren Madsen ("Madsen Decl."), attached as Exhibit 9, at ¶ 8.  The **Sugarloaf Citizens Association, Inc.**, a Maryland non-profit corporation formed in 1973, is a neighborhood citizens association for the community that adjoins the Ten Mile Creek Watershed.  It joined the STMCC, and its leader, Ms. Beth Daly, also testified at the County Council's public hearings in support of efforts to protect Ten Mile Creek.  *See* Declaration of Beth Daly ("Daly Decl."), attached as Exhibit 10, at ¶ 6.  Two national environmental conservation organizations — the **Sierra Club** and **Clean Water Action** — each with thousands of members in the State of Maryland — also joined the STMCC and mobilized their members to petition the County to protect Ten Mile Creek.  *See* Declaration of Mr. Josh Tulkin, head of the Maryland branch of the Sierra Club ("Tulkin Decl."), attached as Exhibit 11, at ¶ 6, and Declaration of Brent Bolin, of Clean Water Action ("Bolin Decl."), attached as Exhibit 12, at ¶ 5.

Two of the citizens' groups that Pulte has subpoenaed were not members of the STMCC.  **Friends of Ten Mile Creek and Little Seneca Reservoir, Inc.** did not exist at the time of the County master planning and zoning decisions that Pulte challenges.  It was formed in August

---

Alliance and the Seneca Creek Watershed Partners joined the STMCC.  The Friends of Ten Mile Creek and Little Seneca Reservoir was formed after the County passed the amendments to the Master Plan to protect Ten Mile Creek in 2014.

2014 by citizens of the area who had been active in the political debates to protect Ten Mile

Creek and saw a need to organize to sustain and protect in the future Ten Mile Creek against

what it expects to be continued efforts by developers to build in the Ten Mile Creek watershed.

*See* Declaration of Jay Cinque ("Cinque Decl."), attached as Exhibit 13, at ¶ 6.  **Liveable**

**Clarksburg Coalition, Inc.**, led by Ms. Melane Hoffmann, was another citizens' coalition

formed during the political debates about the Master Plan for the future of the Ten Mile Creek

watershed, but not a member of the STMCC.  *See* Declaration of Melane Hoffman, attached as

Exhibit 14, at ¶ 6.  Ms. Hoffman wrote newsletters and issued community alerts to help her

fellow Clarksburg residents become engaged in the political process.  *Id.* at ¶ 7.  All of these

organizations, whether members of the STMCC or not, were and are dedicated to preserving Ten

Mile Creek through advocacy and civic engagement.

 **Mr. John Cook** was not involved with the Save Ten Mile Creek Coalition and was not

part of the political campaign to protect Ten Mile Creek.  In fact, he is not affiliated with any of

the above-referenced citizen groups.  *See* Cook Decl., at ¶ 2.  He was appointed and served as a

volunteer member of the Ad Hoc Water Quality Working Group created by the County Council,

about which he was first approached to serve by *Pulte's* own land use attorney.  Cook Decl. ¶ 4.

His "role was to participate in the work of this group as a private citizen, representing no parties

and no position."  *Id.* at ¶ 5.  He did not hold himself out as having any scientific expertise in the

subject matter, but simply evaluated the evidence and information that was presented to him

during the Working Group's meetings.  *Id.*  His involvement with Ten Mile Creek ended after

serving on the Ad Hoc Water Quality Working Group.  *Id.* at ¶ 2.

## III. THE SUBPOENAS AT ISSUE HERE ARE ASTONISHINGLY BROAD

 Unhinged by the results of the democratic process and desperate to salvage its speculative

2005-06 land investment, Pulte has embarked on an overbroad and abusive subpoena campaign that can only be viewed as an attempt to punish those who participated in the Save Ten Mile Creek Coalition and to intimidate them — and others who might learn of this proceeding — from participating in their government again.  Pulte admits as much, baldly stating that the Non-Party Citizens' Groups have been subpoenaed because of "their efforts to interfere with and block Pulte's development of its own land.  They weighed in on, and influenced, policy and zoning decisions affecting Pulte's private property."  Pulte Br. 32-33.  The subpoenas infringe upon core First Amendment protected areas.

Of the thirteen subpoenas at issue, eleven — those issued to the Save Ten Mile Creek Coalition, eight of its member citizen groups, and the two newer citizens groups that were not member of the STMCC (the "Citizens' Group Subpoenas") — are identical and call for 24 categories of documents.  The remaining two subpoenas — those to Ms. Cameron and Mr. Cook, who each served on the Ad Hoc Group (the "Cameron & Cook Subpoenas) — contain those same 24 categories as well as sixteen more related to their service on the Ad Hoc Committee.

At bottom, the 24 categories of documents sought in the Citizens' Groups Subpoenas fall into two groups of 12 each — (1) twelve requests for all documents involving *communications with and proceedings at* the County Council and the M-NCPPC (the "Category One External Communications Documents") and (2) twelve requests for all documents involving *internal communications within and between the citizens' groups and the work they did to organize and prepare* the positions they presented to the County and the M-NCPPC (the "Category Two Internal Documents").  The Citizens' Group Subpoena requests for Category One External Communications Documents are set forth in Exhibit 15, while the Citizens' Group Subpoena requests for Category Two Internal Documents are set forth in Exhibit 16.  The sixteen additional

categories related to the Ad Hoc Group in the Cameron and Cook Subpoenas similarly divide between (i) nine requests for communications *between them and the County or Commission* about the Ad Hoc Group's work (also the "Category One External Communications Documents") and (ii) seven requests regarding *communications between them and other private parties* about the Ad Hoc Group's work *and documents regarding the preparation and research each of them might have done or reviewed* during the Ad Hoc Group's work (also the "Category Two Internal Documents").  The Cameron & Cook Subpoena Requests for Category One External Communications Documents are set forth in Exhibit 17, while the Cameron & Cook Subpoena Requests for Category Two Internal Documents are set forth in Exhibit 18.

Looked at broadly, then, all of the subpoenas generally seek both (i) all documents related to external communications with the County and Commission and (ii) these citizens' private *communications with each other and the work they did to Assemble with each other and develop a political strategy to Petition their government*.  The latter category in particular infringes on core First Amendment protected areas.

## IV.   THE INFORMATION SOUGHT IS IRRELEVANT TO THE CLAIMS IN THE UNDERLYING LITIGATION

In order to understand the extraordinary, unprecedented and intrusive nature of Pulte's subpoenas *and just how unnecessary this whole process is*, this memorandum first describes the legal framework of the claims Pulte makes in its substantive causes of action in the underlying litigation.  We then address the relevant First Amendment law.

Pulte's Complaint contains five counts: Count I — Substantive Due Process (Fifth Amendment, Fourteenth Amendment, 42 U.S.C. § 1983); Count II — Right to Equal Protection (Fourteenth Amendment, 42 U.S.C. § 1983); Count III — Taking Without Just Compensation (Fifth Amendment, 42 U.S.C. § 1983); Count IV — Procedural Due Process (Fifth Amendment,

Fourteenth Amendment, 42 U.S.C. § 1983); and Count V — Right to Remedy for Injury to One's Property (state law).  Four of the five counts allege violations of the Fifth and/or Fourteenth Amendments to the U.S. Constitution and seek relief under 42 U.S.C. § 1983.

A.    **THE DUE PROCESS AND EQUAL PROTECTION CLAIMS: PULTE MUST *FIRST* PROVE A CONSTITUTIONAL PROPERTY INTEREST**

The Fourth Circuit has established clear rules limiting the role of the district courts in cases like this challenging the land-use regulation process.

> Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials *is simply not the business of the federal courts*.  …  Federal judges lack the knowledge of and sensitivity to local conditions necessary to a proper balancing of the complex facts that are inherent in municipal land-use decisions.  …  Accordingly, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes.  *Section 1983 does not empower us to sit as a super-planning commission or a zoning board of appeals*, and it does not constitutionalize every run of the mill dispute between a developer and a town planning agency.

*Gardner v. City of Baltimore,* 969 F.2d 63, 67-68 (4th Cir. 1992) (quotations and citations omitted, emphasis added).

As part of that limited role, the federal courts *do not even address the merits* of a dispute — here, from Pulte's point of view, whether the science relied upon by the County Council supports the land use decisions that the Council made, or whether the Council was arbitrary and capricious and thus violated due process — unless the plaintiff, *as a "first step,"* first establishes that it "possessed a property interest in the [underlying law, here the 1994 Master Plan] that is cognizable under the Fourteenth Amendment's Due Process Clause.  *If there is no cognizable property interest, there is no need to reach the question* of whether a purported deprivation was arbitrary or capricious."  *Id.* at 68 (emphasis added, citations omitted).  And, in turn,

> whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the

> local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval. **Any significant discretion conferred upon the local agency defeats the claim of a property interest**.

*Id.* (*italics* in original, bold emphasis added).  *See also id.* ("a cognizable property interest exists 'only when the discretion of the issuing agency *is so narrowly circumscribed that approval of a proper application is virtually assured*'"; "the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest") (emphasis added, citations omitted).  Applying this test, the Fourth Circuit has explicitly rejected developers' claims "that they were deprived of due process because the Planning Commission acted at the behest of politically influential residents … who opposed any development…. Because [the appealing developers] possessed no cognizable property interest, [the City's] actions do not constitute a constitutional violation *even if* their decisions were motivated solely by political considerations."  *Id.* at 71 (emphasis in original).

 In Maryland, the "test of the validity of a [County's] comprehensive rezoning is whether it bears a substantial relationship to the public health, comfort, order, safety convenience, morals and general welfare, and such zoning enjoys a strong presumption of validity and correctness." *County Council of Montgomery County v. District Land Corp.,* 274 Md. 691, 700 (1975) (quotations and citations deleted).  This test mirrors the federal courts' application of the highly deferential "arbitrary and capricious" test *if the plaintiff has first established a constitutionally protected property interest* under the standard set forth in *Gardner* above.  And in applying this test, the trial court "in its review of the evidence is bound by the record made before the governmental body from which the appeal is taken." *Id.* at 705.  Under that standard, depositions and papers from outside that legislative record — *like those sought from the Non-Party Citizens' Groups here* — are not admissible and consideration of such extra-record materials is "erroneous."  *Id.* at 706.

Here, it is apparent that Pulte had no "property interest in the [underlying law] that is cognizable under the Fourteenth Amendment's Due Process Clause," *Gardner, supra* at 68, and had no legitimate claim of entitlement to the multitudinous permits necessary to build its 900-house subdivision. *At the time Pulte purchased the properties in question, they were subject to the 1994 Master Plan and governed by Phase 4 of that 1994 Master Plan.* The 1994 Master Plan explicitly stated that "[d]ue to the environmentally fragile nature of the streams in this area" a series of other events had to occur *before the County Council would even consider development* in the Ten Mile Creek Area. *Id.* at 198-99. And "[o]nce [those] events occur[red], the County Council [would] *consider* … changes that would permit the extension of public [water and sewer] facilities to the Ten Mile Creek area," and that following those deliberations the County Council "*may*" decide to grant the water and sewer extensions or *"[d]efer action … pending further study* or consideration as deemed necessary and appropriate by the Council," or "*[c]onsider such other land use actions as are deemed necessary*." *Id.* at 199 (emphasis added).

In other words, Pulte *knew* when it purchased the land that it was not *entitled* to anything. In the language of *Gardner*, the discretion of the issuing agency was *not* "so narrowly circumscribed that approval of a proper application is virtually assured." 969 F.2d at 68. To the contrary, in the 1994 Master Plan the County Council had explicitly reserved authority to respond to Phase 4 proposals by "defer[ring] action pending further study" and the authority to "consider such other land use actions as are deemed necessary," including down-zoning. Nothing could have been *more* uncertain than sewer extensions and permits to build 900 houses in the Ten Mile Creek watershed. In the face of the weighty First Amendment concerns described below, this Court should require Pulte to establish the constitutionally protected property interest required by *Gardner* **before** the Court even considers enforcing subpoenas that

17

trench so deeply into the protected First Amendment conduct of the Non-Party Citizens' Groups.

### B.    THE NON-PARTY CITIZENS' GROUPS HAVE *NO* INFORMATION RELEVANT TO THE TAKINGS CLAIM

*None* of the information sought from the Non-Party Citizens' Groups in the subpoenas is even remotely relevant to Pulte's remaining claim that the County's land use actions constituted an uncompensated Taking.

The Supreme Court has recognized three types of Takings claims.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005).  The first, physical taking, e.g., *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), is not at issue here.  The second type — government actions "that completely deprive an owner of *all* economically beneficial use[e]" of her property, *e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (emphasis in original) — is also not at issue here, since the County Council's actions still permit Pulte to build approximately *500* houses.  *Henry v. Jefferson County Comm'n,* 637 F.3d 269, 276 (4th Cir. 2011) (right to build some single family homes will "defeat a claim to total worthlessness"); *Palazzolo v. Rhode Island,* 533 U.S. 606, 631 (2001) ("permitting a landowner to build a substantial residence on an 18-acre parcel does not leave the property 'economically idle'").

It is the third category, described as "regulatory takings," *Lingle,* 544 U.S. at 538, that is at issue here.  Analysis of these types of claims is "governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978)."  *Id.*  The *Penn Central* test requires application of several factors.  "Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'"  *Id.*  In this third type of case the burden is on *the plaintiff* to provide evidence that would "allow a court to assess the diminution in value occasioned by the so-called regulatory taking."  *Henry v. Jefferson County, supra,* 637 F.3d at

277.  In other words, for a Takings analysis, the primary question is whether there has been an unconstitutional diminution in value.  The relevant evidence must be provided *by Pulte* in the form of *economic analysis*.  Nothing in the files of the Non-Party Citizens' Groups is even remotely relevant to the economic valuation of Pulte's real estate, before or after the County Council's actions, or speaks to the reasonableness or legitimacy of Pulte's "distinct investment-backed expectations."  For purposes of Takings analysis, *it does not matter* what the Non-Party Citizens' Groups did or believed or said about land use policy or science or "imperviousness" or politics or Pulte's proposed land use.  The only thing that matters is whether the County's decision to limit Pulte to about 500 houses constituted an unconstitutional monetary effect on Pulte.  And evidence regarding the extent of Pulte's real estate speculation and the remaining value in Pulte's land as rezoned is entirely within Pulte's control.

Because there is absolutely no legal need or justification under the law governing the constitutional claims Pulte has asserted for Pulte's intrusive discovery requests against the Non-Party Citizens' Groups who received subpoenas — let alone the "compelling" justification required under First Amendment case law — Pulte's motion to compel must be denied.  Its subpoenas should be quashed in their entirety, and a protective order entered barring any future attempts by Pulte to carry out discovery against the democratically active citizens of Montgomery County.

## V.  THE FIRST AMENDMENT PRIVILEGE: PULTE'S DISCOVERY MAY NOT GO FORWARD BECAUSE IT IMPROPERLY AND UNNECESSARILY INTRUDES UPON THE CITIZENS' GROUPS' CORE FIRST AMENDMENT RIGHTS

Pulte's subpoenas in this case demand that the Non-Party Citizens' Groups provide Pulte with every one of their documents that touch in any way upon the Ten Mile Creek master plan amendment process.  The subpoena would reach all of the Non-Party Citizens' Groups' (1)

19

external communications with their government, and (2) their *internal* documents as well as all

documents that relate in any way to their strategic communications *with each other* and with

other conservation advocacy organizations, their joint and individual lobbying efforts, and the

broader public and political campaign on behalf of preservation of Ten Mile Creek.  *See* Exhibits

15-18 (setting forth and categorizing the subpoena requests).

These requests aim straight at the heart of the Non-Party Citizens' Groups' First

Amendment rights to petition the government and to freedom of association.  *See* Section V.A.1,

below.  When a party's discovery requests implicate privileged First Amendment materials, the

courts have developed a First Amendment balancing test that requires "exacting scrutiny" and a

showing both that the material sought is "crucial" to proof of the claims in the underlying

litigation, that the request is the least restrictive way of obtaining that information, and that all

alternative sources of that information have been exhausted.  *See* Section V.A.2, below,

discussing *Buckley v. Valeo,* 424 U.S. 1 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243

(D.C. Cir. 1981), and *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010).

Pulte fails this test.  *See* Section V.B, below.  The Declarations submitted by the twelve

subpoena recipients (other than the STMCC) establish beyond dispute that the subpoenas present

an *actual present* chilling effect and *a likely future*  chilling effect that will cause the members of

the Non-Party Citizens' Groups either not to exercise their First Amendment rights, or to

exercise them in a more restrained and constrained fashion.  *See* Section V.B.1, below.  Because

Pulte lacks any compelling need for this information, *see* Section V.B.2, and because all of the

information necessary to Pulte's 14th Amendment and Takings claims is available from the

governmental defendants, *see* Section V.B.3 — who, after all, are the parties that adopted the

regulations of which Pulte complains — Pulte's motion to compel must be denied and its

subpoenas quashed.

A. **PULTE'S MOTION TO COMPEL SHOULD BE DENIED, AND ITS SUBPOENAS QUASHED BECAUSE PULTE HAS FAILED TO SATISFY THE FIRST AMENDMENT BALANCING TEST EMPLOYED BY THE COURTS WHEN DISCOVERY REQUESTS WOULD POTENTIALLY CHILL EXERCISE OF FIRST AMENDMENT RIGHTS**

The First Amendment assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484 (1957). In doing so, it protects a wide range of inter-related activities, including the rights "to speak freely, to advocate ideas, to associate with others, and to petition [the] government for redress of grievances." *Smith v. Arkansas State Highway Employees Local 1315,* 441 U.S. 463, 464 (1979). As the Supreme Court has explained:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts v. United States Jaycees,* 468 U.S. 609, 622 (1984) (citations omitted). *See also Shelton v. Tucker,* 364 U.S. 479, 486 (1960) (the right of free association is "a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society"); *NAACP v. Alabama,* 357 U.S. 449, 460 (1958) (observing the "close nexus between the freedoms of speech and assembly" and their relationship to "[e]ffective advocacy of both public and private points of view").

First Amendment freedoms "need breathing space to survive." *NAACP v. Button,* 371

U.S. 415, 433 (1963).  In order to provide this "breathing space," the Supreme Court held in

*NAACP v. Alabama* that the forced disclosure of information that might deter the full exercise of

an organization's First Amendment rights is subject to the "closest scrutiny," 357 U.S. at 461,

and may only occur if there is a "compelling" need for the information.  *Id.* at 463.

> Effective advocacy of both public and private points of view, particularly
> controversial ones, is undeniably enhanced by group association, as this
> Court has more than once recognized by remarking upon the close nexus
> between the freedoms of speech and assembly.  It is beyond debate that
> freedom to engage in association for the advancement of beliefs and ideas
> is an inseparable aspect of … freedom of speech.  Of course, it is
> immaterial whether the beliefs sought to be advanced by association
> pertain to political, economic, religious or cultural matters, and state
> action which *may* have the effect of curtailing the freedom to associate is
> *subject to the closest scrutiny.*

*NAACP v. Alabama,* 357 U.S. at 460-61 (citations omitted, emphasis added).

### 1.      The First Amendment's Associational Freedoms
### Apply to Subpoenas and Discovery Requests

Forced disclosure of a person's political associations and activities can have a chilling

effect upon his exercise of First Amendment freedoms.  *E.g., Brown v. Socialist Workers '74*

*Campaign Committee,* 459 U.S. 87, 91 (1982) (disclosure "can seriously infringe on privacy of

association and belief guaranteed by the First Amendment") (quoting *Buckley v. Valeo,* 424 U.S.

1, 64 (1976)).  The Supreme Court has long understood the Constitution, therefore, to provide a

bulwark "against the compelled disclosure of political associations and beliefs."  *Id.*  In the

seminal case of *NAACP v. Alabama, supra,* the Court held that because the "[i]nviolability of

privacy in group association may in many circumstances be indispensable to preservation of

freedom of association," the State of Alabama could not constitutionally compel the NAACP to

produce the names and addresses of its members and agents.  357 U.S. at 462.  The Court found

it "hardly a novel perception that compelled disclosure of affiliation with groups engaged in

advocacy may constitute [an] effective ... restraint on freedom of association."  *Id.*

a)      **The First Amendment Privilege
Protects Much More Than Just Membership Lists**

But the cases are much broader than only membership lists, and there are numerous cases in which courts have recognized that a party's ability to exercise its First Amendment rights can be chilled through the disclosure of information other than membership lists.  In *Federal Election Comm'n v. Machinists Non-Partisan Political League,* 655 F.2d 380, 388-89 & n.17 (D.C. Cir. 1981), for example, the FEC issued a subpoena in which it demanded — as Pulte does in this case — that an organization which had been involved in efforts to encourage Senator Kennedy to run for the presidency in 1980 turn over its *internal* communications as well as "all communications *among various groups." Id.* at 388 (emphasis added).  In holding that the FEC did not have the jurisdiction to issue such an intrusive subpoena, the court emphasized that "release of such information ... carries with it a real potential for chilling the free exercise of political speech and association guarded by the First Amendment."  *Id.*

The Fifth Circuit reached a similar conclusion when it held that a grand jury could not demand that an organization answer questions — like those asked by Pulte here — concerning (1) who associates with the organization, (2) who attended the organization's meetings and (3) what was discussed, and (4) the source of the organization's funding.  Such questions, the court concluded, abridged the organization's First Amendment associational and free speech rights. *Ealy v. Littlejohn,* 569 F.2d 219, 230 (5th Cir. 1978).  Such rights must be "zealously guarded by this Nation's courts."  *Id.* at 226.  *See also Brown v. Socialist Workers,* 459 U.S. at 96-98 & n.13 (applying First Amendment protections to group's disbursements, noting that financial transactions "can reveal much about a person's activities, associations, and beliefs") (quotation marks and citation omitted); *Bursey v. United States,* 466 F.2d 1059, 1088 (9th Cir. 1972) (disclosure of details related to group's funding "is as effective a chilling device as is

23

compulsory disclosure of its membership lists").

> *Membership lists are not the only information afforded First Amendment protection*.  In blocking the government's discovery request of political action groups, this court recently stated, "it is crucial to remember that we are considering the essence of First Amendment freedoms — the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest."  *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 2 (D.D.C.2002) (Kessler, J.).  The First Amendment's protection "extends not only to the organization itself, but also to its staff, members, contributors, and others who affiliate with it."  *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C.Cir.1978).

*State of Wyoming v. U.S. Dep't of Agriculture,* 208 F.R.D. 449, 454-55 (D.D.C. 2002) (Urbina,

J.) (emphasis added).  *See also Perry v. Schwarzenegger,* 591 F.3d 1147, 1158 (9th Cir. 2010)

("the district court erred by limiting the First Amendment privilege to 'the identities of rank-and-

file volunteers and similarly situated individuals' and affording no greater protection to

Proponents' internal communications than the generous relevance standard of Federal Rule of

Civil Procedure 26.  …  *A political campaign's communications and activities 'encompass a*

*vastly wider range of sensitive material' protected by the First Amendment than would be true in*

*the normal discovery context*") (emphasis added).[7]  A rule that permits discovery of such

---

[7]      The *Perry* court found that the First Amendment privilege extended to (1) "views expressed and ideas advocated" at meetings of the political party or campaign at issue, *id*. at 1162, (2) "statements of a highly sensitive and political character made at union meetings, *id.*, (3) "disclosure of internal campaign communications" and "internal campaign information," *id.,* (4) "disclosure of contributions to candidates and political parties," *id.,* (5) "disclosure of … evaluations about advocacy of their members' positions," *id.,* and (6) "disclosing detailed descriptions of training programs, member mobilization campaigns, polling data and [political] strategies," which "will directly frustrate the organizations' ability to pursue their political goals effectively *by revealing to their opponents' activities, strategies and tactics [that] we have pursued in the subsequent elections and will likely follow in the future*," *id.* at 1163 n.10 (emphasis added).  In *AFL-CIO v. Federal Elec. Comm'n,* 333 F.3d 168, 172-73 (D.C. Cir. 2003), the court similarly noted that documents detailing (7) meetings with elected officials, (8) training programs for union activists, (9) get out the vote activities and (10) polling data analyzing the effectiveness of particular political messages, was protected because revealing that information "would disadvantage them *by revealing political tactics and strategies to their opponents*." (Emphasis added.)

materials "encourages political opponents to file charges against their competitors to serve the dual purpose of 'chilling the expressive efforts of their competitor and learning their political strategy…." *AFL-CIO v. Federal Elec. Comm'n*, 333 F.3d 168, 178 (D.C. Cir. 2003).[8]

As these cases make clear, First Amendment protections extend far beyond the membership-list boundary that Pulte would erect, and instead reach forced disclosure of *any* information that could hinder an organization's exercise of its First Amendment rights.  *See Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle interference").

> b) ***Perry v. Schwarzenegger:* The First Amendment Creates a "Privilege" Against Discovery**

In its landmark 2010 opinion in *Perry v. Schwarzenegger, supra*, the Ninth Circuit applied what it deemed the First Amendment "privilege" to discovery of citizens' *internal political organizing and strategizing*, the exact information Pulte's Category Two External Communications requests seek to obtain in this case.  *Perry* was a challenge to Proposition 8, a 2008 ballot initiative that passed and amended the California constitution to ban gay marriage. Same-sex couples brought an action against the State to invalidate the initiative, arguing that it violated their Fourteenth Amendment Due Process and Equal Protection rights to gay marriage under the U.S. Constitution.  The anti-gay marriage proponents ("Proponents") of the initiative intervened as defendants to argue in favor of the initiative's constitutionality.  591 F.3d at 1152. The same-sex plaintiffs then served a request for production of documents on the Proponents

---

[8]     *See also Britt v. Superior Court,* 20 Cal. 3d 844, 857 (1978) ("in some respects, the threat to First Amendment rights may be more severe in a discovery context, since the party directing the inquiry is a litigation adversary who may well attempt to harass his opponent and gain strategic advantage by probing deeply into areas which an individual may prefer to keep confidential"); *Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 209 (N.D. Cal. 1983) ("enhanced scrutiny" of First Amendment issues "is appropriate since civil lawsuits could be misused as coercive devices to cripple, or subdue, vocal opponents").

"seeking, among other things, production of Proponents' internal campaign communications relating to campaign strategy and advertising."  *Id.*  The Proponents objected, arguing that their internal campaign communications were privileged under the First Amendment and "offered evidence" — via Declarations, as the Non-Party Citizens' Groups do here — "that the disclosure of internal strategy documents would burden political association rights by discouraging individuals from participating in initiative campaigns and by muting the exchange of ideas within those campaigns."  *Id.* at 1153.  When the district court permitted the discovery to go forward, the Ninth Circuit issued a writ of *mandamus* barring the discovery, holding that

> The freedom to associate with others for the common advancement of political beliefs and ideas lies at the heart of the First Amendment. Where, as here, discovery would have the *practical effect* of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights.

*Id.* at 1152 (emphasis added).

The Ninth Circuit laid out in detail the legal history of what it termed the "First Amendment Privilege."  *See id.* at 1159 (section heading).

> "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama,* 357 U.S. 449, 460 (1958); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)…. Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo,* 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is ... protected by the First and Fourteenth Amendments." *Kusper v. Pontikes,* 414 U.S. 51, 56-57 (1973). … "Infringements on that right may be justified by regulations adopted to serve **compelling state interests**, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*
>
> The government may abridge the freedom to associate directly, or "abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *NAACP,* 357 U.S. at 461. Thus, the government must justify its actions not only when it imposes direct limitations on associational rights, *but also when*

> governmental action "would have the practical effect 'of discouraging' the exercise of constitutionally protected political rights." *Id.* … Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights.  Accordingly, they "must survive **exacting scrutiny**." *Buckley,* 424 U.S. at 64.
>
> The compelled disclosure of political associations can have just such a chilling effect.  *See id.* ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."); *AFL-CIO v. FEC,* 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation.").  Disclosures of political affiliations and activities that have a "deterrent effect on the exercise of First Amendment rights" are therefore subject to this same "**exacting scrutiny**."  *Buckley,* 424 U.S. at 64-65.  A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment *privilege.  See, e.g., Black Panther Party v. Smith*, 661 F.2d 1243, 1264 (D.C. Cir. 1981), *vacated as moot,* 458 U.S. 1118 (1982); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any *non-privileged* matter that is relevant to any party's claim or defense[.]") (emphasis added).

*Id.* at 1159-60 (footnotes omitted, *italics* in original, **bold** emphasis added).

Pulte baldly — and, as is obvious from the cases above, incorrectly — attempts to limit the reach of the Non-Party Citizens' Groups' First Amendment rights by claiming that it "does not seek regularly protected information like membership lists."  Pulte Br. 34.  Pulte also suggests what appears to be a type of "waiver" theory — claiming that it "instead seeks documents pertaining to [the groups'] public and intentional decision to insert themselves directly into the [land use and Master Plan] process…."  *Id.*  Apparently, under Pulte's reading of the First Amendment, a citizen only has First Amendment rights if she does not use them, and waives First Amendment associational rights by getting involved with democracy and joining with others to petition her government!

Pulte's argument would have the untenable result that *a political* entity like Pulte — after all, Pulte was petitioning the same County government to build it a water and sewer system as

well as infrastructure like schools to support 900 houses — could infringe and limit its *political*

opponent's First Amendment rights by alleging that the opponent engaged in political activity —

which, of course, is exactly Pulte's goal.

> **2.     The Courts Engage in "Exacting Scrutiny" or "Strict Scrutiny"**
> **When Balancing a Discovery Request**
> **Against a Person's First Amendment Rights**

> **a)     The D.C. Circuit's *Black Panther* Test**

Applying this Supreme Court authority to the discovery field, the D.C. Circuit has held

that "before a state or federal body can compel disclosure of information which would trespass

upon first amendment freedoms, a 'subordinating interest of the State' must be proffered, *and it*

*must be 'compelling*.'"  *Federal Election Comm'n v. Machinists, supra,* 655 F.2d at 389

(emphasis added, citations omitted).[9]  As the Supreme Court explained in *Buckley v. Valeo,* 424

U.S. 1, 64 (1976) (emphasis added):

> We long have recognized that significant encroachments on First
> Amendment rights of the sort that compelled disclosure imposes cannot be
> justified by a mere showing of some legitimate governmental interest.
> Since *NAACP v. Alabama* we have required that the subordinating
> interests of the State must survive ***exacting scrutiny****.  We have also*
> *insisted that there be a "relevant correlation" or "substantial relation"*
> *between the governmental interests and the information required to be*
> *disclosed.*

When First Amendment concerns like these are at stake in a discovery dispute, a court

must weigh the possibility of infringement of constitutional rights against the need for disclosure

applying this "exacting" or "closest" scrutiny.  The leading case setting forth how this should be

---

[9]     The relevant "state or federal body" in this case involving private litigation is this Court.  *See*
*Grandbouche v. Clancy,* 825 F.2d 1463, 1466 (10th Cir. 1987) (the First Amendment is "applicable in the
context of discovery orders, even if all of the litigants are private entities [because] the trial court's
enforcement of that order provide[s] the requisite governmental action that invokes First Amendment
scrutiny.  *See NAACP v. Alabama,*  357 U.S. [at 463]").

done is *Black Panther Party v. Smith,* 661 F.2d 1243, 1264-70 (D.C. Cir. 1981), *vacated as moot*, 458 U.S. 1118 (1982).  In *Black Panther Party,* the United States sought discovery of the identity of the members of the Party and other sensitive information.  In evaluating the Party's claim of a First Amendment privilege against discovery — in a case where the Black Panthers were the actual litigating plaintiff — the D.C. Circuit stated:

> In our view, *a balancing inquiry should be conducted to determine whether a claim of privilege should be upheld.*  Before granting a motion to compel discovery and forcing a plaintiff to choose between disclosure and sanctions, the plaintiff's First Amendment claim should be measured against the defendant's need for the information sought....
>
> * * *
>
> Balancing one party's First Amendment interests against another party's need for disclosure to determine whether a claim of privilege should be upheld or whether discovery should be ordered *requires a detailed and painstaking analysis.* … We emphasize, however, that *the litigant seeking protection need not prove to a certainty that its First Amendment rights will be chilled by disclosure.  It need only show that there is some probability that disclosure will lead to reprisal or harassment.*
>
> * * *
>
> The interest in disclosure should also be carefully examined.  Several factors are relevant in conducting this examination.  First, courts must consider the relevance of the information sought.  *The interest in disclosure will be relatively weak unless the information goes to "the heart of the matter,"* that is, unless it is *crucial* to the party's case.  Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity.  Second, courts must determine whether the litigants seeking disclosure have pursued alternative sources.  Even when the information sought is crucial to a litigant's case, *disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information*.  Because of the preferred position of First Amendment rights, "compelled disclosure ... [is] normally the end, and not the beginning, of the inquiry."  Infringement of First Amendment interests must be kept to a minimum.

661 F.2d at 1264-69 (emphasis added, footnotes and citations omitted).[10]

The holding of *Black Panther Party* is particularly apt here.  Pulte must show (1) that the information sought is not just relevant to a claim but absolutely "crucial" to it, and (2) that the information is not available from any other source.  *Id.; see also International Union, supra* at n.10*; International Action Center*, 207 F.R.D. at 4 (following *Black Panther*).  "Even when the information sought is crucial to a litigant's case, disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information."  *Black Panther Party, supra,* at 1268.

### b)  The Ninth Circuit's *Perry v. Schwarzenegger* Test

Building upon the D.C. Circuit's *Black Panther* test, the Ninth Circuit expressed the test to be applied when the First Amendment privilege is asserted in discovery as follows:

> In this circuit, a claim of First Amendment privilege is subject to a two-part framework.  The party asserting the privilege "must demonstrate ... a 'prima facie showing of arguable first amendment infringement.'"  *Brock v. Local 375,* 860 F.2d 346, 349-50 (9th Cir. 1988).  "This *prima facie* showing requires appellants to demonstrate that enforcement of the [discovery requests] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) *other consequences which objectively suggest an impact on*, or 'chilling' of, the members' associational rights."  *Id.* at 350.
>
> "If appellants can make the necessary *prima facie* showing, the evidentiary burden will then shift to the government ... [to] demonstrate that the information sought through the [discovery] is rationally related to a *compelling* governmental interest ... *[and] the 'least restrictive means'* of obtaining the desired information."  *Id.; see also Dole v. Serv. Employees Union,* 950 F.2d 1456, 1459-61 (9th Cir. 1991) (same).

*Perry,* 591 F.3d at 1160-61 (citations shortened, emphasis added).

---

[10]     *See also Int'l Union v. Nat'l Right to Work Legal Defense Foundation*, 590 F2d 1139, 1152 (D.C. Cir. 1978) ("at least two inquiries … must be made by a court facing a substantial claim of constitutional privilege before it orders discovery:  1) can the information sought be discovered through alternative sources and has the party seeking disclosure made reasonable attempts to obtain the information elsewhere; and 2) does the information sought go to the heart of the lawsuit").

In this case, the Non-Party Citizens' Groups have certainly made a *prima facie* showing that the Pulte subpoenas will result in (1) membership withdrawal, or discouragement of new members, (2) reduced and constrained involvement in political debates over land use, and (3) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry,* at 1160.  As discussed in detail in Section V.B.1, below, the Declarations show that Montgomery County's leading citizens are stating that ***if they are to be subpoenaed each time they engage in political action they will engage in less of it***.  *E.g.,* Cinque Decl. ¶ 12; Alexander Decl. ¶ 17 ("As ANS's leader, I would have to limit my own and my staff's use of collaboration on and even discussion about environmental advocacy strategies because those confidential conversations could be subject to public disclosure."); Smith Decl. ¶ 25 ("I wouldn't want to speak at a public hearing or work with the County anymore").  And the Declarations show that the subpoenas have ***already*** had an effect on how some of the subpoena recipients are *currently* exercising their rights to assemble and petition their government.  *See* Cameron Decl. ¶ 13 ("*Already*, I have encountered a chilling effect on current work, as citizens and environmental group representatives express concerns about exposing their organizations and themselves to litigation if they speak out against a proposed development project.").  *See* Section V.B.1, below (discussing the Declarations of the subpoenaed parties in detail).

Thus, the burden shifts to Pulte and the constitutional "strict scrutiny" test applies.  Pulte must demonstrate that the information is "highly relevant" to the claims actually asserted in the litigation — "a more demanding standard of relevance than that under" F.R. Civ. P. 26(b)(1), 591 F.3d at 1161 — which it cannot do.  Pulte must demonstrate that the information sought goes to "the heart of the matter" and is "crucial" and *necessary* to proceed with its claims, *Black Panther,* 661 F.2d at 1269, which it cannot do.  Pulte must demonstrate that it has a *compelling*

need for the material, which it cannot do.  *See* Section V.B.2, below.  Pulte must demonstrate

that the information is "otherwise unavailable," *id.*, which it cannot do.  Pulte must demonstrate

that these subpoenas are "the least restrictive means" to satisfy those needs, which it cannot do

— especially until it has exhausted all other sources of information, including the defendants

themselves, which it has not done.  *See* Section V.B.3, below.

### 3. Pulte Seeks to Punish Those Who Exercise Their Democratic Rights

The arrogance and anti-democratic spirit of intimidation and retribution that run

throughout Pulte's arguments are breath-taking.

### a) Pulte Criticizes the Non-Party Citizens' Groups for Engaging in the Political Process

Pulte readily acknowledges that the land use planning process was innately and

intimately *political*, but criticizes the Non-Party Citizens' Groups for engaging in the political

battle.  *E.g.,* Pulte Br. 1 ("[t]hey improperly pressured decision-makers"); *id.* at 2 (the Non-Party

Citizens' Groups "mobilized citizens, spent years collecting data, and pushed their biased

'scientific' analyses in order to influence Defendants"); *id.* at 4 ([i]ntense political pressure from

a coalition of local environmental groups was (and continues to be) the driving force behind the

Defendants' Decisions").  Apparently, it is especially improper in Pulte's world for citizens to

engage in political activity *in an election year*.  *E.g., id.* at 24 ("Ms. Cameron's … was the face

of a vocal, grassroots coalition in an election year"); *see also* footnote 5, *supra* (quoting Pulte's

criticism of Mr. Gravitz's promise to seek accountability at the ballot box).

Pulte criticizes the Non-Party Citizens' Groups for petitioning their government, even

though the First Amendment makes it every citizen's right to do so.  *See, e.g., id.* at 2 ("they

were in constant, direct contact with the Defendants"); *id.* at 6-7 ("the members of the Coalition

worked tirelessly to pressure the Defendants … and supply them with data and quasi-scientific

analysis to justify their anti-development agenda"); *id.* at 7 ("[a]cting on behalf of the Coalition and its members, Ms. Cameron engaged in a series of communications with members of the County Council").  Pulte *even criticizes the Non-Party Citizens' Groups for writing to their legislators and meeting with their elected Council Members and Executive*.  *E.g., id.* at 8 ("the Coalition letter was sent to Councilmembers Roger Berliner, Marc Elrich, and Hans Riemer and argues for a stringent imperviousness cap on development in the Ten Mile Creek Watershed"); *id.* at 13 ("representatives met with Montgomery County Executive Ike Leggett and his senior staff as part of the Coalition to discuss development in the Watershed"); *id.* ("representatives met with individual County Councilmembers").

Pulte also criticizes the Non-Party Citizens' Groups for meeting with each other and acting together, even though the right to Assemble is enumerated in the First Amendment and even though the Supreme Court has long recognized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama,* 357 U.S. at 460.  *See, e.g.,* Pulte Br. 9 (the Non-Party Citizens' Groups "acted in concert"); *id.* at 7 (an email from Ms. Cameron "evidences an orchestrated and coordinated plan to induce the County Council into enacting what the Coalition believed to be an appropriate imperviousness cover limit for the Property").  Indeed, Pulte readily admits that it seeks the Non-Party Citizens' Groups' private documents so that it can unravel "their concerted efforts to pressure Defendants to pass the 2014 Amendment."  *Id.* at 19.

Pulte even apparently believes that judicial standards apply to politics and that citizens opposing Pulte should never meet or communicate with their elected officials without Pulte present.  *E.g., id.* at 25 (it "appears that fundamentally unfair *ex parte* contacts occurred between policymakers and the Subpoenaed Parties") *id.* at 14 criticizing Councilman Elrich as the

"recipient of the Coalition's *ex parte* letter"); *id.* at 26 (subpoenas seek "documents memorializing back-room, off-the-record conversations with decision makers").  But it was *politics* that Pulte was engaged in, not a jury trial before a sitting judge.

> **b)     Pulte Readily Admits That It Has Subpoenaed the Non-Party Citizens' Groups *Precisely Because* They Engaged in the Political Process**

Pulte makes no bones about the fact that it has subpoenaed these parties *precisely because* they engaged in the political process and *precisely because* they "inserted themselves" into a matter that they apparently should have stayed out of.  The lesson of intimidation and retribution is crystal clear.  As Pulte most recently put it, "the Subpoenaed Parties are not ordinary third parties with no meaningful interest in the underlying litigation.  The Subpoenaed Parties *voluntarily inserted themselves in the dispute*" and therefore should be subject to subpoena.  Pulte's Opposition to Motion for Extension of Time (ECF No. 90), at 1 (emphasis added).  *See also* Pulte Br. 28 ("The Court is not confronted with a situation where a random third party … finds himself subject to a third party subpoena by unfortunate circumstance…. The Subpoenaed Parties *intentionally inserted themselves* in practically every event….") (emphasis added); *id.* at 6 (Pulte "issued subpoenas to third parties … who *actively inserted themselves* in the decision-making process") (emphasis added).  The very phrasing — "voluntarily inserted themselves into the dispute" — reflects an anti-democratic idea that the "dispute" or "process" was solely one between Pulte and the County and did not involve the citizens who *are* the County, and makes clear that if the citizens had not "inserted themselves" into what (allegedly) was not their business they would not have been subpoenaed.

But perhaps Pulte's most revealing and damning statement appears near the end of its brief, when it states that it issued these subpoenas because of the Non-Party Citizens' Groups'

"efforts to interfere with and block Pulte's development of *its own land*. They weighed in on, and influenced, policy and zoning decisions affecting Pulte's *private property*. Pulte certainly is entitled to discover what these parties did in their concerted efforts to block Pulte's development plans…." Pulte Br. 32-33 (emphasis added). We are aware of no doctrine of law that states that citizens may not become involved in land use decisions affecting private property. Indeed, the Fourth Circuit has explicitly recognized exactly the opposite. *See Gardner v. City of Baltimore,* 969 F.2d at 72 ("Those who live near proposed development have the most significant personal stake in the outcome of land-use decisions and are entitled, under our system of government, to organize and exert whatever political influence they might have").

Pulte's argument proves far too much. If, hypothetically, Toxic Waste Management Company, Inc. (TWMC) bought 500 acres next to an elementary school in Silver Spring and proposed to construct a toxic waste landfill and incinerator there, are the citizens of Silver Spring required to stay silent upon pain of receiving a subpoena from TWMC seeking intimate details of their assembly to oppose such a project? If Consolidated Nuclear proposes to build an atomic power plant along the Potomac River at Great Falls must the citizens remain silent and not present their views of nuclear safety or water protection upon pain of a subpoena from ConNuc for all of the scientific evidence they developed — even that which they decided not to present to the government[11] — so that ConNuc can challenge the citizens' science or the objectivity of their arguments or the legitimacy of their fears before some federal court?

For this is exactly what Pulte seeks to do. By its own admission, Pulte seeks to obtain

---

[11]    Pulte argues that it "has the right to discover what the Subpoenaed Parties considered, offered, *and withheld* from the Defendants," Pulte Br. 24 (emphasis added), and "whether the anti-development Coalition was aware of facts and data *contrary* to the positions they took, and if so, how they addressed such information before the Defendants." *Id.* at 26. But the County Council's actions must and will rise or fall based on the evidence the Council *did* have available to it, not based on what it was not told.

"internal Coalition communications that will evidence the true nature of the Coalition's behind-the-scenes, orchestrated effort to further their view of what 'science dictates.'"  Pulte Br. 8-9.

Pulte claims the right to "evidence proving the fervor and high degree of coordination behind the Coalition's push for the Decisions."  *Id.* at 26.

Pulte admits that it will ask this Court to "analyze … the *sufficiency of the evidence* justifying those Decisions," *id.* at 23-24 (emphasis added), and apparently will attempt to elevate its favored land use concept of "Environmental Site Design" to the status of a constitutional principle, since it alleges that this Court *must* hold that County's failure to accede to Pulte and employ that concept violated its alleged "substantive due process" rights.  *Id.* at 5.  Apparently Pulte believes that ultimately it is *this Court* that will *try the science* the Non-Party Citizens' Groups offered or the science that the County Council relied on, forgetting the Fourth Circuit's admonition that:

> Federal judges lack the knowledge of and sensitivity to local conditions necessary to a proper balancing of the complex facts that are inherent in municipal land-use decisions. … According, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes. *Section 1983 does not empower us to sit as a super-planning commission or a zoning board of appeals*, and it does not constitutionalize every run of the mill dispute between a developer and a town planning agency.

*Gardner, supra,* 969 F.2d at 67-68 (quotations and citations omitted, emphasis added).

Pulte's subpoenas should be seen for what they are:  a not very subtle attempt to muzzle the citizens of Montgomery County and dissuade and intimidate them from engaging in the land use planning process.

### 4.    The *Wyoming v. Department of Agriculture* Case is Indistinguishable

In a case indistinguishable from this one, the District Court for the District of Columbia denied a motion to enforce Rule 45 subpoenas issued to non-party environmental groups and

granted a cross-motion to quash.  *See State of Wyoming v. U.S. Dep't of Agriculture,* 208 F.R.D. 449 (D.D.C. 2002) (Urbina, J.).[12]  There, numerous environmental conservation groups had banded together to establish the Heritage Forests Campaign, just as the Montgomery County citizens' conservation groups in this case formed the Save Ten Mile Creek Coalition.  The Heritage Forests Campaign successfully petitioned the Forest Service to promulgate what became known as the Roadless Area Rules, protecting the national forests from road construction, as the Montgomery County citizens' groups successfully protected Ten Mile Creek from construction of 900 houses.  The State of Wyoming, which favored roads in the wilderness forests, sued the Forest Service to invalidate the Roadless Area Rules, just like Pulte, which favors houses in the Ten Mile Creek watershed, sued the County.  And the State of Wyoming, just like Pulte, then issued Rule 45 subpoenas to the environmental groups and the Campaign that had defeated it at the Forest Service.  Just like Pulte, Wyoming sought "a broad range of documents" including both external communications like the "documents the non-party witnesses sent or received about the Roadless Regulations to or from any member of the USDA, and *private internal correspondence* like documents sent to numerous other non-subpoenaed environmental groups, "and/or any other conservation or environmental group; [and] all documents related to meetings or conversations held with a member or agent of any of these groups…."  And just like Pulte does here, "Wyoming charge[d] that the non-party witnesses …

---

[12]      In the *Wyoming v. Dep't of Agriculture* litigation, in addition to the subpoenas to the national environmental organizations discussed in Judge Urbina's opinion, the State of Wyoming also issued a subpoena to Mr. Ken Rait, a private citizen who was the leader of the Heritage Forests Campaign — the gentleman who played the role in the Roadless Areas Rules dispute at issue there that Ms. Cameron played in leading the Save Ten Mile Creek Coalition in this case.  Because Mr. Rait was a citizen of Oregon, that subpoena was issued by the District of Oregon, and proceedings by Mr. Rait to quash his subpoena occurred in that court.  As did Judge Urbina in the District of Columbia, the District of Oregon also quashed the subpoena issued to Mr. Rait.  *See State of Wyoming v. U.S. Dep't of Agriculture,* Misc. No. 02-mc-23 (D. Ore. Aug. 12, 2012) (Haggerty, J.), attached as Exhibit 19.

provided critical research data, legal memoranda, advice, and recommendations to the USDA

regarding the development of the Roadless Regulations." *Id.* at 452.

Initially, the District of Columbia court noted the extreme breadth of the subpoenas.  The

court then found that the "threshold issue before the court is whether the information Wyoming

seeks is relevant to [the] claim[s] [it makes in the underlying lawsuit].  The court concludes that

it is not." 208 F.R.D. at 453.

> The nonparty witnesses correctly point out that the requested documents
> fall outside the scope of discovery needed for Wyoming to prove its
> [substantive] claim[s] [in the underlying litigation]. … In addition, the
> discovery sought is obtainable from another source [the defendants
> themselves] that is more convenient, less burdensome, and less expensive.
> Moreover, the discovery is 'unduly burdensome' considering the non-
> party status of the witnesses.

*Id*. at 454.

Moreover, the court specifically found that the non-party environmental groups' First

Amendment interests were, in fact, implicated and potentially infringed by Wyoming's requests.

> Memberships lists are not the only information afforded First Amendment
> protection.  In blocking the government's discovery request of political
> action groups, this court recently stated "it is crucial to remember that we
> are considering the essence of First Amendment freedoms — the freedom
> to protest policies to which one is opposed, and the freedom to organize,
> raise money, and associate with other like-minded persons so as to
> effectively convey the message of the protest." *Int'l Action Ctr. v. United
> States*, 207 F.R.D. 1, 2 (D.D.C. 2002) (Kessler, J.).  The First
> Amendment's protection "extends not only to the organization itself, but
> also to its staff, members, contributors, and others who affiliate with it."
> *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590
> F.2d 1139, 1147 (D.C. Cir. 1978).  In a case *involving requests for
> internal communications and communications among various groups*, the
> D.C. Circuit ruled that releasing the information would have a potential
> "for chilling the free exercise of political speech and association guarded
> by the First Amendment." *Fed. Election Comm'n v. Machinists Non-
> Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981).

*Id.* 454-55 (emphasis added).

Finding that the subpoenaed materials were not relevant to the legal claims asserted in the

underlying litigation and that Wyoming had neither sought the materials elsewhere nor demonstrated that the relevant materials were not obtainable from the defendants, the court denied the motion to enforce and quashed the non-party subpoenas.[13]

### 5.    Pulte's Cases Are Not to the Contrary

Pulte's brief gives almost no consideration to the First Amendment issues its subpoenas raise, simply asserting that the Non-Party Citizens' Groups "grossly overstate the breadth of the protection offered" in the Fourth Circuit, Pulte Br. 33, although the Fourth Circuit, too, follows Supreme Court law.  But the cases Pulte cites are factually distinguishable *and themselves accept all of the above law as correct; indeed, two of them recognize, but factually distinguish, Wyoming v. Dep't of Agriculture, supra.*  What is worse, Pulte ignores Fourth Circuit precedent that expressly applies the *NAACP v. Alabama* and *Buckley v. Valeo* tests and holds that "[e]xacting scrutiny is required even if the infringement on first amendment rights arises 'not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure.'"  *Master Printers of America v. Donovan,* 751 F.2d 700, 704 (4th Cir. 1984).

The issue in *N.C. Elec. Mem. Corp. v. Carolina P. & L. Co.,* 666 F.2d 50 (4th Cir. 1981), was "whether the Noerr-Pennington exemption from anti-trust violations prevents discovery of

---

[13]        *See also Dunnet Bay Const. Co. v. Hannig,* No. 10-CV-3051, 2011 WL 5417123 (C.D. Ill. Nov. 9, 2011) (following *Perry* and *Wyoming v. Dep't of Agriculture* and quashing subpoena issued by disappointed highway contract bidder to Governor's political committee seeking communications between that committee and the Governor or highway department related to disadvantaged business enterprise preferences policy); *Pebble Ltd. P'ship v. U.S. Envir. Protection Agency,* 310 F.R.D. 575 (D. Alaska 2015) (mine owner suing EPA for regulating mining in headwaters of Bristol Bay issues subpoena to Alaska Conservation Foundation seeking ACF's communications with EPA and with 31 other opponents of mining project; subpoena quashed on First Amendment grounds, following *Wyoming v. Dep't of Agriculture*); *Sierra Club v. Union Electric Co.,* No. 4:14-cv-408-AGF, 2015 WL 9583394 (E.D. Mo. Dec. 31, 2015) (denying utility company defendant's motion to compel plaintiff Sierra Club to produce membership information, internal communications between the club and its Missouri members, and the motivation for the Club's suit and its Beyond Coal campaign, following *Perry*).

material relating to legislative activity."  666 F.2d at 52.  The court stated that it agreed that "Noerr-Pennington does not apply to discovery," *id.,* because in creating the Noerr-Pennington doctrine the Supreme Court had held that "evidence of legislative activity, if relevant [may be admitted at trial if] accompanied by an instruction which limits the jury's consideration to non-legislative activities."  *Id.* at 53.  The court then cited one of the Supreme Court's First Amendment cases, *Herbert v. Lando*, 441 U.S. 153 (1979), where the plaintiff had demonstrated *specific need for the evidence going to the heart of the key element in plaintiff's burden of proof* with no viable alternative way to obtain the information; in other words, the plaintiff in *Herbert* had *satisfied* the "exacting scrutiny" test by proving a "compelling need" and that its discovery was the "least restrictive means."

Pulte's other two cases — actually two opinions in one case[14] — actually support quashing the subpoenas in this case.  That case was an EPA Clean Air Act enforcement action against a utility plant, and the key substantive issue was what Duke Power knew about the meaning of the regulation in question.  The EPA sought memos to Duke Power from its utility trade group, the UARG, specifically about the meaning of the regulation in question.  The Magistrate Judge denied UARG's motion for a protective order finding that the "discovery here is limited and for a specific purpose *other than inquiry into UARG's associational activities*.  It is not a general fishing expedition."  218 F.R.D. at 473 (emphasis added).  Here, of course, Pulte's subpoenas are a massive fishing expedition casting a huge net specifically designed to inquire into the Non-Party Citizens' Groups associational activities.  And UARG had made "no showing" of a chilling effect.  *Id.*  Here, the Non-Party Citizens' Groups have made an

---

[14]    *U.S. v. Duke Energy Corp.,* 218 F.R.D. 469 (E.D.N.C. 2003) (Magistrate Judge opinion), *upheld on review,* 2012 WL 1565228 (E.D.N.C. 2012) (District Judge opinion).

overwhelming showing of a chilling effect in their twelve Declarations.  The Magistrate Judge

explicitly distinguished the decisions in *Wyoming v. Dep't of Agriculture,* above, and *FEC v.*

*Machinists Non-Partisan Political League,* above, as "inapposite, in that [in those cases] a wide

range of information was sought with respect to parties' political activities or influencing efforts.

The information sought in this case is restricted to communications that Duke Energy received

from the UARG which would tend to show whether Duke Energy had actual or constructive

notice of the meaning" of the regulation being enforced.  *Id.* at 472.  The district judge came to

the same conclusion, observing that *Wyoming v. Dep't of Agriculture* was "distinguishable"

because — just like in the instant case — the subpoena in *Wyoming* sought "extraordinarily

broad" and "irrelevant" information and the plaintiff "failed to indicate that it had made

reasonable efforts to obtain the information elsewhere."  2012 WL 1565228, at *19.

### B.   THE NON-PARTY CITIZENS' GROUPS' DECLARATIONS ESTABLISH THAT PULTE'S DISCOVERY REQUESTS WOULD CHILL AND INTIMIDATE THEIR EXERCISE OF THEIR CORE FIRST AMENDMENT RIGHTS TO PETITION THE GOVERNMENT AND TO FREEDOM OF ASSOCIATION

Abridgement of First Amendment rights is not always direct and may sometimes, as in

this case, be stealthy.  "Thus, the government must justify its actions not only when it imposes

direct limitations on associational rights, *but also when governmental action would have the*

*practical effect of discouraging the exercise of constitutionally protected political rights*."  *Perry*

*v. Schwarzenegger,* 591 F.3d at 1159-60 (internal quotations omitted).  Thus, a party invoking

the First Amendment need only show "that enforcement of the [discovery requests] will result in

(1) harassment, membership withdrawal, or discouragement of new members, or (2) *other*

*consequences which objectively suggest an impact on*, or 'chilling' of, the members'

associational rights."  *Id.* at 1160 (internal quotations omitted).  A "litigant seeking protection

need not prove to a certainty that its First Amendment rights will be chilled by disclosure.  It need only show that there is some probability" that enforcement of the discovery request will chill the exercise of its First Amendment rights.  *Black Panther Party,* 661 F.2d at 1267-68.

In this case, the Declarations submitted by the leaders of the Non-Party Citizens' Groups show not just an inchoate possibility but an *actual* and *present* chilling effect arising from the mere act of issuance of the subpoenas that can only be removed by quashing the subpoenas.[15]

> ### 1.    The Non-Party Citizen Groups Have Established A Factual Likelihood That The Discovery Sought Will Chill The Exercise of Their Political and Associational Rights

The Declarations in this case more than meet the "some probability" standard, demonstrating both a potential and an *actual* chilling effect on the Non-Party Citizens' Groups exercise of their First Amendment rights.

The leaders of the Non-Party Citizens' Groups regularly communicate with other leaders of environmental conservation advocacy groups.  Alexander Decl. ¶ 14; Daly Decl. ¶ 6; Smith Decl. ¶ 8; Tulkin Decl. ¶ 9.  The leaders of these groups testify that the Non-Party Citizens' Groups' ability to associate with other organizations when petitioning the government — as most of them did by joining the Save Ten Mile Creek Coalition — would be significantly hindered if the organizations feared that their most candid internal and inter-group advocacy planning and strategy discussions would be disclosed through discovery to third parties, *including third parties*

---

[15]    Other courts, using a common sense approach, have assumed that disclosure of private information will chill an association's First Amendment rights.  *E.g., Local 814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n*, 667 F.2d 267, 272 (2d Cir. 1981) (court assumed chilling effect from disclosure to Waterfront Commission of the names of contributors to political action committee); *Pollard v. Roberts*, 283 F. Supp. 248, 258 (E.D. Ark.) ("naive" not to recognize that in Arkansas disclosure of contributors to the state Republican Party would discourage the exercise of constitutional rights given the party's unpopularity), *aff'd*, 393 U.S. 14 (1968); *Shelton v. Tucker*, 364 U.S. 479, 485–86 (1960) (chilling effect inevitable if teachers who served at the will of school board had to disclose all organizations to which they belonged).

*who are political adversaries.  See* Cameron Decl. ¶ 15 ("Pulte's very broad proposed discovery would severely burden my ability to engage in such associations, in collaborative advocacy, and in political speech by presenting me with the risk that my candid internal and inter-group advocacy, political planning, and strategy discussions would be disclosed to third parties, including third parties who are our political adversaries"); Taylor Decl. ¶ 18 ("my future advocacy work will suffer greatly should our organization's strategy be revealed through release of internal communications in response to this document request").

The testimony is clear that if the Non-Party Citizens' Groups are required to disclose the details of their organizations' political strategies and advocacy efforts whenever political opponents file a lawsuit and seek discovery, it "will drastically alter how [they] communicate[] with other elected officials in the future."  Alexander Decl. ¶ 19.  The Non-Party Citizen's Groups' efforts would be hindered because those groups and volunteers would rightly fear that their strategy discussions could later be discovered through litigation.  *Id.* at ¶ 17.  *See also* Daly Decl. ¶ 10 ("I am worried that responding to these subpoena requests would disclose my organization's strategy to Pulte, and that my organization would be less effective at advocating on behalf of the environment in the future"); Cameron Decl. ¶ 13 ("Responding to these subpoena requests would inhibit our candid communication and reveal our strategy to our political opponents").  They would "have to caution [their] staff not to have discussions of strategy, policy or outreach that might be subject to future subpoenas, thereby muting [their] internal exchange of ideas."  Alexander Decl. ¶ 17.

The leaders of the Non-Party Citizens' Groups testify that enforcement of the subpoenas will directly frustrate the Non-Party Citizens' Groups' exercise of their First Amendment rights in the future because it will reduce their "ability to pursue [their] political goals effectively by

revealing the activities and strategies that [they] have pursued on behalf of the environment in the past *and will likely follow in the future*." *Id.* at ¶ 18 (emphasis added). *See also* Bolin Decl. ¶ 10 ("We are concerned that responding to these subpoena requests would force us to reveal our strategy, *which would affect our future efforts* at fulfilling our organization's mission") (emphasis added); Cameron Decl. ¶ 18 ("If I were required to disclose such communications, it would impair my ability to work with political allies on similar advocacy efforts in the future because those groups would rightly fear that both their candid strategy discussions and their participation in controversial issues could later be discovered through litigation such as this one"); Madsen Decl. ¶ 14 ("Our Board members are concerned about the subpoena's implications for our past activities as well as future programming").

Some of the Declarants have stated that they "would be hesitant to exercise [their] First Amendment rights of association and to petition the government in the future, and would likely make more limited use of [those] rights." Cinque Decl. ¶ 12. *See also* Cameron Decl. ¶ 18; Cook Decl. ¶ 11. ***Others state that if subpoenas are the price of political engagement they will simply stop being engaged***! *See* Smith Decl. ¶ 25 ("If I were required to respond to Pulte's subpoena, *I wouldn't want to speak at a public hearing or work with the County anymore*, since I would be concerned that someone would serve me with another burdensome subpoena request in the future") (emphasis added); Taylor Decl. ¶ 18 ("Knowing that my personal communications could be disclosed in future litigation, I feel deterred from engaging in future advocacy efforts"); Madsen Decl. ¶ 14 ("If members thought that their involvement would or could lead to similar lawsuits or subpoenas, they may not choose to participate in similar efforts in the future"); Howland Decl. ¶ 14 ("This subpoena has cemented the views of some of our already-hesitant board members, and if we are required to comply with Pulte's subpoena, it will make it

extremely difficult for us to take part in advocacy ventures in the future").

In addition, the leaders of the Non-Party Citizens' Groups have testified they expect they would "lose membership and have trouble recruiting new members in the future" because members and potential members would consider these subpoenas to be an invasion of their members' privacy. Taylor Decl. ¶ 17. *See also* Alexander Decl. ¶ 20 ("Responding to these subpoena requests would have the effect of discouraging membership in ANS"); Tulkin Decl. ¶ 17 ("One volunteer said that they wouldn't be comfortable volunteering with Sierra Club if it meant potentially sacrificing their personal privacy"); Daly Decl. ¶ 11 ("I also fear that responding to these subpoena requests would deter volunteers from participating in our organization, and that members would withdraw from our organization in the future"). The Non-Party Citizens' Groups rely heavily on member support for funding. Alexander Decl. ¶ 5; Daly Decl. ¶ 3. A loss of membership would therefore also be detrimental to these groups and their mission. Smith Decl. ¶ 23 ("I am very worried that these subpoena requests would cause our organization to fold"); Tulkin Decl. ¶ 17 ("Our organization would not be able to carry out its mission without our volunteers' support and dedication"); Howland Decl. ¶ 13 ("This subpoena will hurt our group and our following, and will hinder us from fulfilling our organization's mission and purpose").

The substantial present and future chilling effects testified to by the various leaders of the Non-Party Citizens' Groups are precisely what the First Amendment and the cases interpreting and applying it are meant to guard against.

### 2.     The Information Sought Is Not "Crucial" To Pulte's Case

The issue in the underlying litigation is whether Pulte had a constitutional "property right" was taken without substantive or procedural Due Process or in violation of the Equal

Protection clause (Counts I, II and IV), or without Just Compensation (Count III).  As a matter of

law, there is absolutely nothing, nor could there by, in the files of the Non-Party Citizens'

Groups that would illuminate the question of whether Pulte had a constitutional "property right"

within the meaning of the Fourth Circuit's *Gardner* case.[16]  Nor is there anything in those

Groups' *internal* files containing their communications with each other that would illuminate

whether the County violated Pulte's Due Process or Equal Protection rights *even if* Pulte were

able to establish a constitutional property right under *Gardner*.  Instead, the rational basis or

arbitrary basis of the County's actions is *by definition* only to be found in the materials that the

County itself possesses and upon which it made its decision.

And nothing possessed by the Non-Party Citizens' Groups is remotely relevant to the

Takings claim.  Whether the County's action — permitting Pulte to build about 500 houses

instead of 900 houses — constituted a Taking of substantially all of the economic value of

Pulte's property and whether the County's action interfered with distinct investment-backed

expectations is evidence *solely within Pulte's domain*.  The Non-Party Citizens' Groups know

nothing of Pulte's land value, either before or after the County's action.  *See Henry v. Jefferson

County,* 637 F.3d at 277 (landowner's burden to provide evidence that would "allow a court to

assess the diminution in value occasioned by the so-called regulatory taking").

### 3.   Pulte Has Not Made The Requisite Showing That It Has Exhausted Every Alternative Source

Pulte has also made no showing at all that the documents it seeks cannot be obtained

---

[16]      *See Gardner,* 969 F.2d at 68 (discussed in Section IV.A, *supra*) (plaintiff, as a "first step," must establish that it "possessed a property interest in the that is cognizable under the Fourteenth Amendment's Due Process Clause.  …  [W]hether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks all discretion to deny issuance of the permit or to withhold its approval.  Any significant discretion conferred upon the local agency defeats the claim of a property interest").

from the party defendants — the County and the Commission.  About half of the requests made

to the Non-Party Citizens' Groups constitute Category One External Communications

Documents, essentially all of the Non-Party Citizens Groups' communications with the County.

*See* Exhibits 15 and 17.  The County has already stated that all of those documents will be

produced to Pulte.[17]  Thus, Pulte has made no showing why the Non-Party Citizens' Groups

should be required to provide it again, except as punishment for having sent the communications

to their elected government in the first place.

Even if one assumes, for the sake of argument, that the County carefully combed through

its Legislative Record in order to eliminate any trace of communication with the Non-Party

Citizens Groups — an assumption for which there is absolutely no evidence — Pulte will still

have the ability to search for evidence of communications from the Non-Party Citizens' Groups

during the numerous depositions of County and Commission employees it undoubtedly plans to

take.  If there is any evidence that the County violated Pulte's constitutional rights, that evidence

will be in the County's files.

The Supreme Court accords the First Amendment "a preferred position" among the

freedoms enumerated in the Bill of Rights.  *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 437

(10th Cir. 1977).  "[A]ny infringement of the First Amendment," therefore, "must be held to a

minimum that it is to be no more extensive than the necessities of the case."  *Id*.  As the Ninth

---

[17]     *See* Memorandum of Grounds and Authorities in Support of Defendant Montgomery County's
Motion for Protective Order ((ECF No. 70, May 6, 2016), p7-8 ("the County Council heard from multiple
experts and citizens who expressed concern about the effects of development on Ten Mile Creek.
Information and analyses were supplied by both independent consultants retained by M-NCPPC and
proponents of development, particularly Pulte.  … Cumulatively, over 6,000 pages of documentary
records, plus many hours of recorded testimony, were provided and relied upon by the County Council.
This body of written submissions and testimony comprises the legislative record on which the County
Council acted….  In discovery, Defendant Montgomery County intends to produce copies of the
voluminous documents and recorded testimony which comprise the legislative record.").

Circuit has put it, "[w]hen First Amendment interests are at stake, the Government must use a scalpel, not an ax." *Bursey v. United States*, 466 F.2d 1059, 1088 (9th Cir. 1972). By demanding that the Non-Party Citizens' Groups turn over every document they possess that relates to the Ten Mile Creek master planning process, along with all the documents they may have shared or received from with and among their political allies, Pulte wields a blunt and constitutionally offensive instrument of precisely the sort that have been barred by the courts. For this reason, Pulte's subpoena should be quashed in its entirety and a protective order issued.

## VI.   PULTE's DISCOVERY REQUESTS ALSO FAIL BECAUSE THEY VIOLATE RULE 45 AND ARE UNDULY BURDENSOME ON NON-PARTIES

In addition to their First Amendment claims, the Non-Party Citizens' Groups' Rule 45 objection letter pointed out that Pulte's document requests are overbroad and unduly burdensome, and seek information that is not relevant to Pulte's claims in this case. Rule 45 provides that "[a] party or attorney responsible for issuing and serving a subpoena *must* take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" and that the "court … where compliance is required *must* enforce this duty and impose an appropriate sanction … on a party or attorney who fails to comply. Fed. R. Civ. P. 45(d)(1) (emphasis added). Pulte's subpoena flies in the face of this rule, imposing an extreme burden on small, non-party citizens' groups whose only connection to the underlying litigation is their exercise of their constitutionally protected First Amendment rights.

Courts have consistently held that non-party status is a significant consideration in weighing whether the burden imposed by a subpoena is undue. *United States v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3111972, at *4 (N.D. Ill. Oct. 21, 2005). *See also City of Greenville v. Syngenta Crop Protection, Inc.* 2011 WL 5118601 at * 3 (C.D. Ill. 2011) ("Non-

party status is a significant factor when comparing the burden of compliance and the benefit of production"); *North Carolina Right to Life, Inc. v. Leake* 231 F.R.D. 49, 51 (D.D.C. 2005) (non-party status relevant in considering the burden of a subpoena); *Wyoming v. U.S. Dept. of Agriculture,* 208 F.R.D. 449, 452 (D.D.C. 2002) ("Non-party status is one of the factors the court uses in weighing the burden of imposing discovery"); *Educ. Fin. Council v. Oberg*, No. 10-MC-0079-JDB, 2010 WL 3719921, at *4 (D.D.C. Mar. 8, 2010) (recognizing the importance of safeguarding non-party subpoena recipients from significant expense resulting from compliance.).  As the First Circuit has explained:

> Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations.  Accordingly, concern for *the unwanted burden thrust upon non-parties is a factor entitled to special weight* in evaluating the balance of competing needs.

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (emphasis added).  Here, the broad and intrusive subpoena requests thrust an "unwanted burden" upon the Non-Citizens' Groups, penalizing them for exercising their First Amendment rights.  This is exactly what Rule 45(d)(1) is intended to guard against.

The burden on the Non-Party Citizens' Groups is particularly undue because they are small organizations with limited or no paid staff.  Several courts have recognized that small non-profit organizations face a particular burden when forced to respond to subpoena requests.  *See North Carolina Right to Life,* 231 F.R.D. at 52 (granting motion to quash subpoena because it placed an undue burden on small non-profit organization); *In re Lazaridis*, 865 F. Supp. 2d 521, 528 (D.N.J. 2011) (granting motion to quash subpoena served on non-profit organization due to cost and burden to organization and lack of showing of actual need or relevance of information sought, as well as organization's First Amendment rights); *Educ. Fin. Council, supra,* 2010 WL 3719921, at *4 (holding that expansive document request placed an undue burden on non-party

non-profit organization, which employed only six individuals, two of whom were part-time). Requiring a subpoenaed party to use several of its staff members — *if it even has staff members, which most of the Non-Party Citizens' Groups do not* — for several weeks to respond to a subpoena is an "excessive" burden, particularly where the subpoenaed party is not a party to the underlying litigation.  *See North Carolina Right to Life*, 231 F.R.D. at 52 ("It is a great burden to require an organization to sacrifice such a large proportion of its staff for several weeks").

     In addition to non-party status, when evaluating undue burden, courts consider "factors such as relevance, the need for the documents, the breadth of the document request, the time period covered by such request, the particularity with which the documents are described, and the burden imposed."  *Wyoming v. U.S. Dep't of Agriculture*, 208 F.R.D. at 453.  *See also Educ. Fin. Council, supra*, 2010 WL 3719921, at *2; *City of Greenville, supra*, 2011 WL 5118601 at *8; *North Carolina Right to Life supra*, 231 F.R.D. at 51.  In order to make this determination, courts often look to declarations submitted by the subpoenaed parties detailing the burden that complying with the subpoena would impose.  *See, e.g., North Carolina Right to Life*, 231 F.R.D. at 52 (discussing declarations submitted on behalf of subpoenaed parties that "indicate with specificity the burden that compliance would impose").

     The Declarations in this case demonstrate the heavy burden the Non-Party Citizens' Groups would face responding to these subpoena requests.  Seven of the eleven Citizens' Groups have *no* paid employees; the leaders and members of those groups all dedicate their personal time, beyond their full-time jobs and family obligations, to protecting and advocating on behalf of the environment in Montgomery County.  *See, e.g.*, Madsen Decl. ¶ 7 ("Conservation Montgomery is an all-volunteer non-profit with no staff resources"); Daly Decl. ¶ 3 ("We have no paid staff and are funded by donations"); Howland Decl. ¶ 10 ("We are an organization of

volunteers and we don't yet have a paid staff member").  Most of the leaders of the Non-Party Citizens' Groups have full-time jobs in addition to their obligations towards the Citizens' Groups they have volunteered to lead.  *See* Cook Decl. ¶ 13 ("I am a private individual with a full-time job and other responsibilities"); Madsen Decl. ¶ 11 ("In addition, I would have to take time away from my full-time job, which involves a two-hour daily commute, in order to respond to these requests"); Daly Decl. ¶ 2; Smith Decl. ¶ 2; Howland Decl. ¶ 1; Hoffman Decl. ¶ 17. Responding to the subpoena requests would take them several days, if not longer.  Cameron Decl. ¶ 21 ("Responding to Pulte's subpoena would probably require me to spend 80 hours"); Tulkin Decl. ¶ 14 ("[W]e estimate it would take each volunteer around five hours, so as much as 100 hours for around 20 volunteers, to search through emails in order to respond to the subpoena"); Madsen Decl. ¶ 11 ("Responding to the broad and overly burdensome subpoenas would take me approximately two full days"); Taylor Decl. ¶ 20 ("It would take me at least several days and would indeed require hours outside my work day to respond to these requests"); Daly Decl. ¶ 8 ("It would take me several days to respond to these subpoena requests").  The leaders of the Non-Party Citizens' Groups would have to spend evenings and weekends responding, thereby sacrificing time they would otherwise devote to their full-time job and family obligations.  *E.g.,* Cameron Decl. ¶ 20 ("The work of responding to Pulte's subpoena has already infringed on my productivity for my earning for my family."); Daly Decl. ¶ 7 ("I would have to work on my responses either very early in the morning, before work, or late at night"); Smith Decl. ¶ 18 ("Due to my time constraints, I would have to spend evenings and weekends working on responses to the requests").

Even the groups with paid leaders who work for those groups full-time would be severely burdened by the subpoenas because they would have to take time away from fulfilling their

organization's mission and purpose, which would cause their organizations' activities to suffer. *See, e.g.,* Alexander Decl. ¶ 22 ("The countless hours I would have to spend finding, identifying and sorting communications between myself and other environmental organizations about the Save Ten Mile Creek campaign would starve my organization of the essential management that I provide for all of our nature education, conservation and fundraising activities"); Taylor Decl. ¶ 19 ("We would not be able to respond to these subpoena requests without neglecting our other duties and responsibilities at the organization").

None of the Non-Party Citizens' Groups have sufficient staff or resources to help them respond to the subpoena. *See, e.g.*, Taylor Decl. ¶ 20 ("I do not have access to resources to help me respond to these requests quickly or efficiently"); Daly Decl. ¶ 7 ("Since I work full-time, have no paid staff to assist me in responding to these subpoena requests, and am quite frankly unsure whether some email communications are even currently retrievable, I find this request highly burdensome"); Hoffmann Decl. ¶ 17 ("In addition, I have no staff or resources to help me reply to this subpoena, so the burden of responding to the subpoena falls entirely on me"); Howland Decl. ¶ 12 ("Since we have no paid staff and no sophisticated resources, we do not have the appropriate mechanisms to comply with the subpoena in a timely fashion"); Bolin Decl. ¶ 13 ("The request for communication and documents pertaining to this case is onerous as [Clean Water Action] is understaffed").

None of the Non-Party Citizens' Groups would be able to bear the burden of responding to these broad and intrusive subpoena requests. Some of these organizations would crumble under the pressure of responding to these subpoenas. As courts have frequently noted, non-parties, especially small non-profits, should not have to shoulder such a heavy burden.

**CONCLUSION**

In this litigation, Pulte is trying to use its claim that its property has been Taken within the meaning of the Fifth and Fourteenth Amendments as a lever with which to pry open and intrude upon the most sensitive and constitutionally privileged internal workings of its political opponents — the County's environmental groups.  Unless this Court steps in, important First Amendment rights of County citizens will be trampled upon, and the free discourse and assembly and right to petition the citizens' elected government upon which democracy is premised will be deeply infringed and chilled.

For the reasons stated above, and particularly because Pulte has no compelling need in this case for the Non-Party Citizens' Groups' constitutionally protected documents and information, the Non-Party Citizens' Groups respectfully request that this Court deny Pulte's motion to compel and quash all thirteen subpoenas in their entirety.

Respectfully submitted,


_____ */s/ Donald B. Mitchell, Jr.* _____
Donald B. Mitchell, Jr. (D. Md. Bar No. 22944)
Sylvia G. Costelloe
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20006
(202) 857-6172
donald.mitchell@arentfox.com


*Attorneys for Audubon Naturalist Society of the Mid-Atlantic States, Inc.; Montgomery Countryside Alliance, Inc.; Seneca Creek Watershed Partners, Inc.; Sierra Club, Montgomery County Group; Muddy Branch Alliance, Inc.; Clean Water Action; Conservation Montgomery, Inc.; Sugarloaf Citizens Association, Inc.; Friends of Ten Mile Creek and Little Seneca Reservoir, Inc.; Liveable Clarksburg Coalition, Inc.; Ms. Diane Cameron; Mr. John*

*Cook; Save Ten Mile Creek Coalition (an unincorporated association)*

Dated: September 16, 2016

**CERTIFICATE OF SERVICE**

I, Donald B. Mitchell, Jr., hereby certify that I have, this 16th day of September, 2016, filed this Non-Party Citizens' Groups' Opposition to Motion to Compel and Memorandum in Support of Cross-Motions to Quash Subpoenas using the Court's electronic filing system and have thereby caused this document to be served on all parties of record and their counsel who have entered an appearance in this matter.

_____*/s/ Donald B. Mitchell, Jr.*_____
Donald B. Mitchell, Jr.
