IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PULTE HOME CORPORATION and
SHILOH FARM INVESTMENTS, LLC,     *

           Plaintiffs,     *

v.                                     Case No. GJH-14-3955

                               *

MONTGOMERY COUNTY, MARYLAND,
*et al.*,     *

           Defendants.     *

     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM OPINION

This case is a civil rights action brought by Pulte Home Corporation and Shiloh Farm Investments, LLC (collectively, "Pulte") against Montgomery County, Maryland ("County") and the Maryland-National Capital Park and Planning Commission ("MNCPPC") (collectively, "Defendants"). The action centers on the Defendants' enactment of land use legislation that adversely affected Pulte's interests in approximately 541 acres of land that it owns in Clarksburg, Maryland. Pulte alleges that the Defendants violated its constitutional rights to due process and equal protection, and that the Defendants' actions amounted to a taking of private property requiring just compensation.[1] Judge Hazel entered a scheduling order on January 28, 2016 (ECF No. 59) and discovery has been ongoing since that time. The current discovery deadline is January 25, 2018. (ECF No. 164.) Several motions related to discovery disputes are pending before the Court.[2] This memorandum addresses the motions filed at ECF Nos. 113 and 116,

---

[1] Judge Hazel's July 17, 2015 memorandum opinion provides a more robust factual summary than is included in this decision. (ECF No. 33 at 1-5.)

[2] On August 16, 2016, Judge Hazel referred this case to me for the resolution of discovery disputes and related scheduling matters. (ECF No. 87.)

which concern Pulte's efforts to obtain discovery from the County and the County's objection to those efforts on the basis of the legislative and executive privileges.

## I.    Procedural Background

On June 16, 2016, Judge Hazel issued a letter order denying the motions for protective order filed by the Defendants. (ECF No. 81.) In their motions (ECF Nos. 70 & 71), the Defendants sought a protective order shielding them from discovery on the basis of the legislative and executive privileges. At that time, however, no discovery requests had been propounded on the Defendants. Judge Hazel found that the Defendants' assertions of the legislative and executive privileges could not be decided preemptively, where no discovery requests had been propounded, and denied the motions for protective order. Citing *E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) [hereinafter *Washington Suburban*], Judge Hazel also noted that the assertion of a "blanket privilege" would be inappropriate, and that only documents related to "legislative activities" could be protected by the legislative privilege. (ECF No. 81 at 2.)

Approximately two weeks after Judge Hazel issued his letter order, Pulte propounded document production requests on the Defendants. (*See* ECF No. 113-2 at 1.) Pulte sought documents from nine current County Councilmembers, four former County Councilmembers, three County Council staff persons, the County Executive, and one member of the County Executive's staff (collectively, "the custodians"). (*Id.* at 2.) The document requests cover a wide range of subjects, but they are all concerned with the purportedly unconstitutional actions taken by the Defendants in this case. The County has again asserted the legislative and executive

privileges on behalf of the custodians.[3] Both the County and Pulte have complied with the requirements of Local Rule 104.7 and 104.8.[4] The Court has had the benefit of the parties' oral arguments, which were presented during a motions hearing held on January 12, 2017. (ECF Nos. 129 & 130.) Pulte's motion to compel (ECF No. 113) and the County's cross-motion for protective order (ECF No. 116) are both ripe for decision.

## II.     The Legislative and Executive Privileges

Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," whether or not the information would be admissible in evidence. Fed. R. Civ. P. 26(b)(1). To that end, Rule 34 permits a party to obtain from any other party documents or electronically stored information from which relevant information can be obtained. Fed. R. Civ. P. 34(a)(1)(A). If a party refuses to produce documents responsive to a document production request, Rule 37 permits the requesting party to move for an order compelling the production of such discovery. Fed. R. Civ. P. 37(a)(3)(B). Conversely, a party withholding documents may move for a protective order precluding the discovery sought by the requesting party. Fed. R. Civ. P. 26(c).

---

[3] Similar cross-motions related to the discovery Pulte seeks from MNCPPC are also pending. (ECF Nos. 114 & 118.) Those motions are being held *sub curia* while the parties attempt to resolve their disputes without judicial intervention. (*See* ECF No. 136 at 33.)

[4] The County argues that Pulte's motion to compel is untimely under Local Rule 104.8. (*See* ECF No. 116-1 at 21.) It is not necessary for the Court to address that matter. The Court has already spent considerable time reviewing the briefing related to the legislative and executive privilege issues. The interests of justice merit these issues being heard as competing motions to compel and for protective orders. Local Rule 104.8 has sometimes been invoked where consideration of an untimely discovery motion would disrupt a case's schedule, but that is hardly the case here. Even if the Court were to find that Pulte's motion to compel was untimely, it would still be required to address the County's motion for protective order, which raises identical issues. For these reasons, even assuming Pulte's motion is untimely, that is no basis to deny it in this instance.

In federal court, claims of legislative privilege related to acts done in a state or local legislative capacity are governed by federal common law. *See Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 333 (E.D. Va. 2015); *Lee v. Virginia State Bd. of Elections*, No. 15-357, 2015 WL 9461505, at *3 (E.D. Va. Dec. 23, 2015). The same is true of claims of executive privilege raised in cases before a federal court by federal question jurisdiction.[5] *See Jones v. Murphy*, 256 F.R.D. 510, 515 n.5 (D. Md. 2008), *aff'd,* No. CCB-05-1287, 2009 WL 604937 (D. Md. Feb. 23, 2009).

## A.      Legislative Privilege

The legislative privilege has its roots in the parallel concept of legislative immunity, under which the Speech or Debate Clause provides immunity from suit to federal legislators. *Washington Suburban*, 631 F.3d at 180. Legislative immunity guarantees the right "of legislators to be free from arrest or civil process for what they do or say in legislative proceedings." *Id.* (citing *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). Legislative immunity has been extended broadly. *Washington Suburban*, 631 F.3d at 181 (collecting cases). It covers state and local legislators, even if the body to which the legislators belong lacks immunity for its legislative acts. *Id.* It also "covers all those properly acting in a legislative capacity, not just actual officeholders." *Id.* "The determination of legislative immunity is based on the function being fulfilled—not the title of the actor claiming immunity." *McCray v. Maryland Dept. of Transp.*, 741 F.3d 480, 485 (4th Cir. 2014).

Courts have recognized that important public policies buttress the doctrine of legislative immunity. *Id.* Legislative immunity "provides legislators with the breathing room necessary" to

---

[5] The parties cite both state and federal law related to executive privilege. Because the state and federal laws of executive privilege do not conflict, the Court may apply federal law without balancing the competing federal interests and principles of comity.  *See Jones*, 256 F.R.D. at 515 n.5.

make choices on difficult decisions, uninhibited by judicial interference and the fear of personal liability. *Id.* It allows legislators to "focus on their public duties" instead of attending to the distractions and costs of lawsuits, and "increases the caliber of our elected officials by preventing the threat of liability from significantly deterring service." *Id.*

The legislative privilege "is related to, but distinct from, the concept of legislative immunity." *N. Carolina State Conference v. McCrory*, No. 13-658, 2015 WL 12683665, at *3 (M.D.N.C. Feb. 4, 2015) (quoting *Favors v. Cuomo*, 285 F.R.D. 187, 209 (E.D.N.Y. 2012)). It exists to "safeguard . . . legislative immunity and to further encourage the republican values it promotes." *Washington Suburban*, 631 F.3d at 181. The legislative privilege extends to discovery, thus allowing legislators and their staff "to focus on their public duties by removing the costs and distractions attending lawsuits," and shielding them from "political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box." *Id.*; *see also Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996). Where a plaintiff seeks "to compel information from legislative actors about their legislative activities," the legislative privilege protects them from compliance. *Washington Suburban*, 631 F.3d at 181.

In "civil suits brought by private plaintiffs to vindicate private rights," the legislative privilege is absolute.[6] *Bethune-Hill*, 114 F. Supp. 3d at 335. It is also broad in application. It protects against discovery into all acts that occur in the "sphere of legitimate legislative activity."

---

[6] The legislative privilege is not absolute under other circumstances, such as cases where important public rights are at stake. Numerous courts have held that the legislative privilege must yield to discovery in redistricting litigation. As *Bethune-Hill* noted, "[r]edistricting litigation presents a particularly appropriate circumstance for qualifying the state legislative privilege because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present." 114 F. Supp. 3d at 336-37. Other cases have recognized the *sui generis* nature of redistricting litigation. *Lee*, 2015 WL 9461505, at *5. This makes the balancing analysis employed by those courts less useful in the present case, where a private party seeks to enforce a private right.

*See Baker v. Mayor and City Council of Baltimore*, 894 F.2d 679, 681 (4th Cir. 1990); *Washington Suburban*, 631 F.3d at 181. The privilege is a shield against the compelled production of documents and deposition testimony. *See id.*; *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995). Accordingly, once a court determines that a party's discovery requests seek information about acts that took place in the "sphere of legitimate legislative activity," the legislative privilege will act as a bar to the compelled production of discovery.[7]

The core arguments presented by Pulte and the County in support of their respective motions to compel and for protective order are as follows. Pulte argues that the legislative privilege does not apply to the discovery it seeks because the custodians' activity was not legitimate or legislative. It was not legitimate because the legislators purportedly violated a local ethics law. It was not legislative because the challenged acts were, by and large, ministerial and administrative. And, to the extent that the acts were legitimate and legislative, some of the discovery predates those acts, so it cannot be protected by the legislative privilege. Pulte also argues that even if the legislative privilege did apply, it has been waived by the custodians' disclosures to third parties. The County argues that the privileges it asserts are broad, that all of the challenged acts were done in the "sphere of legitimate legislative activity," that the executive actors are also protected by the executive privilege, and that the doctrine of third party waiver does not apply.[8] Each of these arguments is addressed below.

---

[7] As with other privileges, the party asserting the legislative privilege has the burden of demonstrating that it applies. *Bethune-Hill*, 114 F. Supp. 3d at 344.

[8] The County also argues that because the Court's review of Pulte's challenges to the Defendants' acts will be largely limited to the legislative record, any discovery seeking information outside the record is not relevant. I decline to address this argument for the reasons stated in my memorandum opinion dated March 24, 2017. (ECF No. 142 at 4.)

## 1.  Pulte Seeks Discovery About Legislative Activities

Pulte argues that the County's broad assertion of the legislative privilege is improper because many of the requested documents relate to non-legislative activities. For example, citing *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 865 F.2d 77, 79 (4th Cir. 1989), Pulte states that as a matter of law, the denial or approval of a water and sewer change application is not a legislative action. (ECF No. 113-2 at 16.) Similarly, Pulte argues that master plan amendments are not legislative acts because they merely "serve as a guide," *see W. Montgomery Cnty. Citizens Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 522 A.2d 1328, 1334 (Md. 1987), and do not carry the force of law as do zoning ordinances. (ECF No. 113-26 at 13.) In addition, as the master plan amendment at issue was passed by resolution, Pulte interprets it as a signal that the amendment was not a legislative act. *Id.* Pulte also notes that its discovery requests seek documents reaching back as far as January 1, 2003, at least six years before the first of the Defendants' challenged acts occurred. (*Id.*) Given that such documents would predate the legislative activity at issue, they necessarily could not be shielded from discovery by the legislative privilege. (*Id.*) Pulte seeks discovery related to all of these acts and argues that the legislative privilege does not apply.

The County argues that the acts alleged in Pulte's Complaint were all legislative in nature, and therefore protected from disclosure by the legislative privilege. (ECF No. 116-4 at 12.) The Court of Appeals of Maryland has noted that planning and zoning actions are legislative when they "decide questions of law and policy and discretion" and have "broad[], community-wide implications, which encompass considerations affecting the entire planning area or zoning district." *Kenwood Gardens Condominiums, Inc. v. Whalen Properties, LLC*, 144 A.3d 647, 659-60 (Md. 2016). The County argues that its actions—concerning the water and sewer change

request, the zoning changes, and the master plan amendment—all decided questions of law and policy, were within the County's discretion, and have broad implications that impact the entire community.

With regard to Pulte's water and sewer change request, the County states that the *Front Royal* case is inapposite. (ECF NO. 116-4 at 13.) In *Front Royal*, a court had previously ordered a municipality to provide sewer service to certain landowners, thus removing any discretion the municipality might otherwise have had to act on the request for sewer service. 865 F.2d at 79. Because discretion is a hallmark of legislative activity, its absence in *Front Royal* was dispositive. Here, the County retained discretion to act on Pulte's water and sewer change request, and there is no suggestion that it had previously been ordered by a court to grant the request, as had been the case in *Front Royal*.

Regarding the County's amendment to the 1994 Master Plan, the County states that Pulte's reliance on the *W. Montgomery* case is misplaced. (ECF No. 116-4 at 14-15.) This is so because *W. Montgomery* cited with approval cases that found master planning to be a legislative process. (*Id.*) And in any event, Maryland law has changed since that time, with the General Assembly's passage of a law that requires each local jurisdiction "to implement the provisions of its local comprehensive plan" through acts that are "consistent with the plan." (*Id.*) The County notes that this law specifically abrogated the holding of *Trail v. Terrapin Run*, 943 A.2d 1191 (Md. 2008), which Pulte cites in its memorandum. (*Id.*) Because municipalities must make zoning decisions that are consistent with their master plans, the master plans are not advisory; they have the binding force of law. (*Id.*) And finally, the County notes that amending a master plan by resolution does not make the master plan or its amendment non-legislative. The Court of

Appeals recognized as much in *Kenwood Gardens*, where a resolution that allowed a planned unit development was found to be legislative in nature. 144 A.3d at 661.

After thorough consideration, I find that the documents which Pulte seeks are all related to legislative acts. With respect to each act, the County is vested with considerable discretion. The acts also had community-wide implications. Whether they were passed by resolution or some other mechanism, they bear the hallmarks that characterize legislative acts.[9] Pulte's challenge to the County's assertion of the legislative privilege on the basis of the acts not being "legislative" is without merit.

I also reject Pulte's challenge to the assertion of the privilege for documents that predate the legislation in question. The legislative privilege extends to all acts that occur within the sphere of legitimate legislative activity. Pulte has pointed to no authority to suggest that it may only be asserted with respect to acts that are the subject of specific legal challenges. In this way, Pulte far too narrowly construes the privilege. Pulte's discovery requests seek information about the legislative activities of the County in general. Even if some of those activities predate the actions that are challenged in this lawsuit, they remain legislative activities and are thereby

---

[9] In *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007), the court considered whether gathering information in connection with a legislative act itself qualified as a legislative act. The court observed that "[i]t is hard enough to draw the crucial distinction between legislative and non-legislative acts, despite the existence of four decades of Supreme Court and D.C. Circuit case law to provide guidance." *Id.* Instead of further "obscur[ing] this already muddled area and . . . render[ing] the line drawn unworkable," the court noted that "[t]he controlling principle is . . . that a [legislator's] gathering of information beyond the formal investigative setting is protected by the Speech or Debate Clause so long as the information is acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature." *Id.* Given the breadth of the legislative privilege, especially in a case that does not concern the important public rights raised in redistricting or voting rights litigation, I consider it prudent to follow the "controlling principle" laid out in *Jewish War Veterans*. Splitting hairs over whether part of an act is fundamentally legislative or not obscures the purpose of the legislative privilege and adds unnecessary complexity to an already confusing doctrine.

protected by the legislative privilege. Furthermore, to the extent that documents exist that are not related to legislative activities, it is not clear how such documents would be relevant to the claims or defenses in this case. *See generally In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015) ("None of the relevant information sought in this case could have been outside of the legislative privilege.").

### 2. The Legislative Activities Were Legitimate

Pulte argues that it is entitled to discovery regarding the County's activities that violated a Montgomery County ethics law and were therefore illegitimate. (ECF No. 113-2 at 17-18.) Pulte contends that the County violated the law in two ways. First, by engaging in off-the-record communications, the custodians violated the law's prohibition against decision-makers considering "any communication made outside of the record regarding any matter that must be decided on the basis of a record after an application is filed or a proceeding is otherwise initiated." Mont. Cnty. Public Ethics Law § 19A-15(b)(1). Second, by engaging in communications after the close of the public comment period, the County violated Pulte's rights to procedural due process. According to Pulte, these "illegal" acts remove the custodians' activities from the sphere of legitimate legislative activity. Because the legislative privilege only applies to "legitimate" legislative activities, Pulte concludes that these communications are illegitimate and therefore not privileged.

The County disagrees with Pulte's interpretation of the Public Ethics Law and, more generally, the type of legislative activities that might qualify as "illegitimate." (ECF No. 116-4 at 17-18.) According to the County, Pulte misconstrues a section of the Public Ethics Law that applies only to "quasi-judicial proceedings decided on a record." (ECF No. 113-6 at 30.) Applying the provision to legislative decisions, the County notes, "would result in restricting a

legislator's ability to communicate with constituents, interested parties (such as Pulte representatives) or subject-matter experts, all of whom are critical components of the legislative process." (ECF No. 116-4 at 17.) Requiring legislation to "occur in a vacuum" would be inconsistent with the "free flow of written and oral communications . . . that is a normal, everyday part of the legislative process." (*Id.*)

It is not necessary for the Court to reach whether the County ran afoul of the Public Ethics Law or Pulte's procedural due process rights by engaging in off-the-record communications or considering communications made after the close of the public comment period. Even assuming that the custodians' activities were in violation of the Public Ethics Law or Pulte's procedural due process rights, this would be insufficient to render the actions "illegitimate." If Pulte's argument were taken to its logical conclusion, the legislative privilege would be obsolete. This is so because whenever a procedural irregularity was alleged in a case, any resulting legislative actions could be deemed illegitimate, thus obviating the objective of the legislative privilege. If that occurred, the result would be that the legislative privilege would never apply in cases challenging legislative actions.

In support of its claim that the Public Ethics Law applies to legislative decisions as well as quasi-judicial proceedings, Pulte cites *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 573 A.2d 1325, 1329 (Md. 1990). But *Sugarloaf* involved a different issue: a council member's vote on a piece of legislation despite a financial conflict of interest. And in any event, the court in *Sugarloaf* declined to enforce the Public Ethics Law because it found that the law's enforcement provision

was unconstitutional. Pulte has not cited any authority where a court has found that a legislative action was "illegitimate" because of the violation of a law governing procedure.[10]

Similarly, in *Kenwood Gardens*, which is cited by the County (ECF No. 116-4 at 5), the court held that even assuming that a councilmember committed an ethical violation in a legislative act, so long as the legislative body "was acting within its legal boundaries," the legislator's improper motivations would not be subject to judicial review. 144 A.3d at 663. Although *Sugarloaf* and *Kenwood Gardens* are not controlling authority, they demonstrate the reluctance of courts to overindulge in judicial review of legislative decisions, even where purportedly unethical conduct by legislators is alleged.

The County's legislative actions were not rendered illegitimate because of any of the ethical and procedural violations that Pulte alleges. The actions were well within the legal boundaries in which the County was permitted to act, and were therefore legitimate. Accordingly, Pulte's contention that the legislative privilege does not apply because the actions were illegitimate is without merit.

### 3. The County Has Not Waived the Legislative Privilege

Pulte argues that the custodians have waived any legislative privilege they might have once possessed. (ECF No. 113-2 at 19-20.) According to Pulte's assertion, a legislator's communication with the public or with third parties amounts to a waiver of the privilege.

Pulte principally relies on two cases from district courts within the Fourth Circuit: *Lee*, 2015 WL 9461505, at *2 (E.D. Va. Dec. 23, 2015) and *McCrory*, 2015 WL 12683665, at *2-4. In *Lee*, plaintiffs brought a lawsuit challenging a recently passed voter identification law. 2015

---

[10] In *Bruce v. Riddle*, 631 F.2d 272, 279 (4th Cir. 1980), the Fourth Circuit suggests in dicta that bribery would not be a "legitimate" act in the legislative sphere. But there is no allegation in this case that any of the custodians engaged in bribery or committed any other crime in connection with the decisions regarding land use in Clarksburg.

WL 9461505, at *2. Plaintiffs sought discovery from certain non-party state legislators regarding the challenged law. In determining the scope of the legislative privilege for the state legislators, *Lee* considered "some in-circuit district courts [that] found a limited exception to the legislative privilege in cases involving legislative redistricting." *Id.* at *5. But because of the "unique nature of redistricting cases,"[11] the *Lee* court did not find that the same approach would be appropriate. Ultimately, *Lee* found that the legislative privilege applied to the legislators and their employees, and that they were acting in a legislative capacity when the passed the bills. As to communications with third parties, however, *Lee* found that the "involvement of third parties necessarily destroyed any privilege that may or may not have existed." *Id.* at *7. In support of this finding of waiver, *Lee* relied on *Alexander v. Holden*, 66 F.3d 62, 66 (4th Cir. 1995) and *McCrory*, 2015 WL 12683665, at *2-4.

In *Alexander*, the Fourth Circuit summarily concluded that certain legislators had waived the legislative privilege by "testif[ying] extensively as to their motives in depositions with their attorneys present, without objection." *Alexander*, 66 F.3d at 68 n.4. The *Alexander* court noted that although "council members may be privileged from testifying in federal district court regarding their motives in enacting legislation," where the legislative privilege is not asserted, the existence of the privilege will not need to be decided. *Id.* This undoubtedly has to be the result because testifying without raising any objection waives any privilege that might exist. However, waiver by failing to object by asserting a privilege is not the same as the nature of the waiver that Pulte argues applies here.

---

[11] Courts have pointed out that legislative redistricting cases are "extraordinary" because "the natural corrective mechanisms built into our republic system of government offer little check upon the very real threat of legislative self-entrenchment." *Id.* at 5.

*Lee* also relied on *McCrory*, 2015 WL 12683665, at *2-4. In *McCrory*, plaintiffs brought race and age discrimination claims related to certain voter identification laws. Finding that the legislative privilege was "not absolute, but qualified," the court applied a "flexible approach," balancing the "serious claims raised under the Constitution and the [Voting Rights Act]" against the interests of legislators in maintaining the legislative privilege.[12] *Id.* at *2-4. *McCrory* recited the values that have been said to justify the legislative privilege: safeguarding legislative immunity, encouraging republican values, preventing legislators from being distracted by lawsuits, and protecting legislators from "political wars of attrition." *Id.* at *5. Quoting *Washington Suburban*, *McCrory* also affirmed that if discovery is sought from legislators "about their legislative activities, they would not need to comply." *Id.* at *5.

*McCrory* did not allow discovery of "communications among legislators and between legislators and their staff," but the court did permit discovery of communications between legislators and constituents. In reaching this ruling, the court relied on a number of district court cases, most of which stated (albeit without reasoning) that communications with non-legislators are not privileged. *Id.* at *7. The court explained that the values underlying the legislative privilege "are less discernible in the context of documents revealing communications between legislators and constituents." *Id.* at *8. The values that *McCrory* cited in support of this conclusion relate to the "reasonable expectation of secrecy" that legislators possess, and the concurrent "threat of timidity for fear that the conversation be discovered." *Id.*

---

[12] Specifically, *McCrory* applied a five-factor balancing test, which considered: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Id.* at *4.

The reasoning of *McCrory* is in this regard is not very persuasive. *McCrory* fails to recognize that the compelled disclosure of communications by legislators undermines other interests that justify the legislative privilege besides the interest in maintaining a decision-making process that does not occur "in a fishbowl." *City of Virginia Beach, Va. v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1255 (4th Cir. 1993). For example, if legislators are required to disclose communications with third parties, they will be undeniably distracted from their official duties as legislators and will incur costs related to the disclosure.[13] In this way, a "political war of attrition" could be waged through discovery by unhappy constituents, political opponents, or disgruntled special interest groups. *Washington Suburban*, 631 F.3d at 181. And "[d]iscovery procedures can prove just as intrusive" as being named as a party to a suit. *Id.* (quoting *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988)).

In the absence of clear authority to the contrary, I do not find that the custodians have waived the legislative privilege in the course of their communications with third parties. If the legislative privilege, like the principle of legislative immunity, is truly such that its importance is difficult to overstate, *see Bethune-Hill*, 114 F. Supp. 3d at 332, waiver cannot be premised on an action that courts have characterized as "part and parcel" of the modern legislative process. *See Bruce*, 631 F.2d at 280. Moreover, if regular communication with and responsiveness to constituents and others waives the legislative privilege, the privilege is simply no more. The majority of the cases cited by Pulte arise in the context of redistricting litigation, but these cases

---

[13] Furthermore, if documents could be sought from legislators concerning their communications with constituents or other non-legislator third parties (including lobbyists and special interest groups), it stands to reason that the legislators could also be subject to being deposed regarding the same issues. Allowing a legislator to be deposed regarding their legislative activities is inconsistent with the legislative privilege as it has been previously interpreted in the Fourth Circuit. It is also at odds with the rich historical roots of the Speech or Debate Clause. *See* Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1120-35 (1973) (detailing history of legislative privilege),

are of limited value here. As *Lee* recognized, the public interest in redistricting is unique and goes to the heart of our representative democracy. 2015 WL 9461505, at *5. Where such a strong public interest is present, the interest of maintaining an absolute legislative privilege is questionable. I find that applying *McCrory*'s waiver holding under the circumstances of this case would be inconsistent with Fourth Circuit precedent. Although the Fourth Circuit has not squarely addressed this issue, the historical and practical policy rationale justifying the legislative privilege lends support to a bright line rule that legislators do not have to comply with discovery requests related to their legitimate legislative activities.

This case is precisely what other courts have said the legislative privilege is designed to protect against. Unlike redistricting litigation, where the public's right to fair political representation is at stake, this case is about a private party's right to seek redress from the government for its private damages. The outcome of this case will have a negligible effect on the public, if any impact at all.

For these reasons, I do not find that the custodians have waived their legislative privilege by communicating with third parties. Unlike other recognized privileges, such as the attorney-client privilege, the maintenance of confidentiality is not the fundamental concern of the legislative privilege. The legislative privilege is principally framed to ensure that legislators are free to make difficult decisions on controversial issues without fear that their decision-making process will be later scrutinized or that their time will be consumed with responding to discovery requests in litigation. I find that under the circumstances of this case, the legislative privilege is

not qualified as it is in redistricting litigation and that the custodians have not waived the legislative privilege.[14]

### 4. The County Executive May Assert the Legislative Privilege

Although members of the executive branch are not legislators in name, their actions may be cloaked with derivative legislative immunity if they occur "within the sphere of legitimate legislative activity." *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 299 (D. Md. 1992). The County argues that County Executive Isiah Leggett ("Leggett"), "through executive branch employees and officials, took a number of actions mandated by law that were an integral part of the legislative process." (ECF No. 113-16 at 34.) These actions include: (1) transmitting a fiscal impact analysis, (2) submitting to the County Council a recommendation regarding a comprehensive water and sewer category map amendment, and (3) commenting on the Council's recommendation regarding future development in the Ten Mile Creek area. (ECF No. 116-1 at 42.)

Courts apply a "functional approach" to determine whether an executive was acting in a legislative role, such that the executive may assert legislative immunity and the legislative privilege. *Marylanders for Fair Representation*, 144 F.R.D. at 299. Analyzing an act under the functional approach requires a court to consider the confluence of three factors:

> (1) the actor, who must be a government official or an individual working on his behalf; (2) the act itself, which must fall within the "sphere of legitimate legislative activity"; and (3) the act's proximity to the legislative arena.

*Id.*

---

[14] By this, I do not mean to suggest that the legislative privilege cannot be waived. If the custodians testify or introduce evidence regarding their legislative activities, those acts may amount to a waiver. Because any such actions have yet to occur, that issue is not before me today.

In *Marylanders for Fair Representation*, the court considered whether a governor's actions were protected by the legislative privilege. In that case, the plaintiffs challenged the constitutionality of a legislative redistricting plan that had been prepared by the governor in consultation with a five-member commission that he appointed to develop the plan. *Id.* at 294-295. After submitting the plan to the legislature, the General Assembly took no action. As a result, the governor's proposed redistricting plan became law. *Id.* at 296.

During discovery, the plaintiffs sought information about the "legislative motivation" behind the governor's plan, including discovery from the governor himself. *Id.* The governor asserted the legislative privilege as a bar against discovery. Applying the functional approach, the court determined that the governor's actions in connection with the redistricting plan were "within the sphere of legitimate legislative activity." *Id.* at 300. Recognizing that determining which tasks fall within the legislative sphere is "not easy," the court considered anecdotal examples from past cases and reasoned that the preparation and introduction of legislation is "at the core" of legislative activity. *Id.* at 300-301. As such, the governor and his staff "functioned as would [legislators]" in preparing and submitting the redistricting legislation to the General Assembly.[15] *Id.* at 301. The court determined that the governor was entitled to "full immunity both from liability and inquiry" as to his legislative actions. *Id.*

---

[15] Although the present case does not concern the submission of a legislative redistricting plan by an executive, the actions of the executives are analogous. This is because the recommendations and submissions that Leggett made were required by statute and were targeted to anticipated legislation under consideration by the County Council. Like *Marylanders for Fair Representation*, this type of executive-proposed legislation is different from legislation proposed by an executive in the absence of any statutory requirement that she do so, or that the legislature consider it.

Applying the "functional approach" to Leggett's actions in this case, I find that he is entitled to the protections of the legislative privilege.[16] As to the first factor, it is not disputed that Leggett is a government official. As to the second and third factors, Leggett's actions in submitting to the County Council his fiscal impact analysis, recommendations regarding water and sewer category changes, and recommendations regarding future development in the Ten Mile Creek area, all fall within the "sphere of legitimate legislative activity." Leggett was required by statute to submit his recommendations to the County Council. The County Council considered Leggett's analysis and recommendations in making its decisions. All of his actions relevant to this case were in furtherance of the legislative process. Like the governor in *Marylanders for Fair Representation*, Leggett and his special assistant may properly assert the legislative privilege.[17]

### 5.     The County is Not Required to Prepare a Privilege Log

Pulte presses that the County is required to prepare a document-by-document privilege log with facts sufficient to allow Pulte to assess the legislative privilege claims. (ECF No. 113-2 at 23.) The County argues that claims of legislative privilege do not have to be supported by a privilege log. (ECF No. 113-16 at 40-41.) In support of Pulte's argument, it cites a number of cases where courts have required claims of legislative privilege to be supported by privilege logs. None of these cases are sufficiently persuasive to convince me that a privilege log is appropriate in this case.

---

[16] Leggett's Special Assistant, Joy Nurmi, is also entitled to assert the legislative privilege. *See Marylanders for Fair Representation,* 144 F.R.D. at 298.
[17] The County states that Leggett's only involvement in this litigation is in his capacity as County Executive. (ECF No. 116-4 at 20.) Any documents that predate Leggett's election would therefore be irrelevant to the claims and defenses in this case. *See generally Hubbard*, 803 F.3d at 1311. Pulte does not argue otherwise.

The first category of cases that Pulte cites concerns the assertion of the legislative privilege in the context of redistricting litigation. *See Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, No. 5:13-CV-607-D, 2015 WL 7854590, at *3 (E.D.N.C. Dec. 3, 2015), *Bethune-Hill*, 114 F. Supp. 3d at 333, *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11-5065, 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011). But as previously noted, redistricting cases are unique. Courts considering claims of privilege in redistricting cases have routinely held that the legislative privilege is qualified when important public rights are at stake. Courts in these cases usually undertake a balancing test to determine whether the interests underlying the legislative privilege are outweighed by the interests of the public in disclosure (and thereby the vindication of important public rights guaranteed by the Constitution and federal law). *Benisek v. Lamone*, No. JKB-13-3233, 2017 WL 959641, at *5-7 (D. Md. Mar. 13, 2017) (noting that the legislative privilege "is *qualified*, not absolute" in the context of redistricting litigation) (emphasis in original). Obviously, this case does not concern redistricting and does not seek to vindicate important rights on behalf of the public. The reasons for narrowing the legislative privilege in redistricting cases do not apply in a private civil rights case, brought by aggrieved landowners against the local government's own land use regulations.

The second category of cases that Pulte cites addresses the executive or deliberative process privilege, not the legislative privilege. *See Heyer v. U.S. Bureau of Prisons,* No. 11-3118D, 2014 WL 4545946, at *2 (E.D.N.C. Sept. 12, 2014); *Vietnam Veterans of Am. v. C.I.A.,* No. 09-0037, 2012 WL 1535738, at *1 (N.D. Cal. May 1, 2012).[18] The executive privilege is

---

[18] Not all courts have required parties asserting the executive privilege to prepare privilege logs. *See National Ass'n Chain Drugstores v. U.S. Dep't of Health,* 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009); *Blue Ocean v. Gutierrez,* 503 F. Supp. 2d 366, 372 (D.D.C. 2007).

construed more narrowly than the legislative privilege.[19] *See Jones*, 256 F.R.D. at 517. It also has different purposes. The legislative privilege is concerned primarily with freeing lawmakers from the cost and distraction of attending to lawsuits. The executive privilege is not so concerned with protecting against distraction or expense. Instead, the executive privilege aims to improve the quality of decision-making by protecting executives from tempering their candor out of fear that their policy discussions will be subject to public disclosure. A court's order requiring a party claiming the executive privilege to prepare a privilege log does not undermine the purposes justifying the privilege in any way. A document could be designated as predecisional and deliberative without revealing the actual content of the document, so there is no concern that such a privilege log would embarrass the executives or temper the candor of future decisionmakers. *See Hamilton v. Verdow*, 414 A.2d 914, 922 (Md. 1980). The executives' candid discussions would not be disclosed in the privilege log. And because the executive privilege is not concerned with protecting executives from the distraction or expense of responding to discovery, the burden of preparing a privilege log is not given any more weight than it would be for any other party in litigation.

Even the cases that Pulte cites where the legislative privilege was asserted outside of the context of redistricting litigation are readily distinguishable. In *Petroplex lnt'l, LLC v. St. James Parish, No.* CV 15-140, 2016 WL 379606, at *1-2 (E.D. La. Feb. 1, 2016), for example, although the court referred to a privilege log, it is not apparent whether the log was prepared

---

[19] In addition to being more narrowly construed in general, the executive privilege requires that in order to be protected, each document must be both predecisional and deliberative. Documents do not have to meet such discrete elements to obtain protection from the legislative privilege. Instead, documents are protected by the legislative privilege if they relate to acts that took place in the sphere of legitimate legislative activity. As such, entire classes of documents may be protected under the legislative privilege. The same cannot be said for documents purported to be protected under the executive privilege.

voluntarily by the party withholding discovery or over the party's objection. Similarly, *Benford v. Am. Broad. Cos., Inc.*, 98 F.R.D. 42, 45 (D. Md. 1983) is distinguishable because it opines that the legislative privilege is a privilege against the use of information in a lawsuit, but not against the compelled disclosure of that information. This is simply inconsistent with the law in the Fourth Circuit. *See Washington Suburban*, 631 F.3d at 181 ("Consequently, if the EEOC or private plaintiffs sought to compel information from legislative actors about their legislative activities, they would not need to comply.").

Again, the Eleventh Circuit's discussion in *Hubbard* is instructive. 803 F.3d at 1298. There, the court considered whether non-party lawmakers should be required to submit a privilege log to sustain their legislative privilege claim.[20] The court noted that requiring strict compliance with the requirements of Rule 45(e)(2)(A) would be inconsistent with the "principle purpose" of the legislative privilege. *Id.* at 1310. This purpose, according to *Hubbard*, is to "ensure lawmakers are allowed to 'focus on their public duties,'" free from the distraction of discovery requests that force them "to divert their time, energy and attention from their legislative tasks." *Id.* (quoting *Washington Suburban*, 631 F.3d at 181). The court went on to find that the lawmakers withholding the information had provided "more than enough" information in their motion to quash to allow the court to assess the claim of privilege. *Id.* at 1309. The court also noted that, given the nature of the claim at issue in the case, all of the documents sought in the subpoenas were either irrelevant or privileged. That is, if the documents sought did not relate to legislative acts, they were not relevant to the plaintiff's claims. If the documents related to

---

[20] In *Hubbard*, the discovery was sought from the lawmakers by subpoena. 803 F.3d at 1302. Here, although the custodians are not parties, the discovery is sought from the County through document production requests. The provisions of Rules 26 and 45 regarding how a party (or non-party) is to assert a privilege against discovery are identical in substance. *See* Fed. R. Civ. P. 26(b)(5) and 45(e)(2).

legislative acts, they were privileged. Because it was clear that all documents sought were either privileged or not relevant, "there was no need for the lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents were covered by the legislative privilege, or to explain why the privilege applied to those documents." *Id.* at 1311. Requiring a privilege log under those circumstances would amount to an insistence on "unnecessary detail and procedures . . . [and] would undermine a primary purpose of the legislative privilege—shielding lawmakers from the distraction created by inquiries into the regular course of the legislative process."[21] *Id.*

Here, as in *Hubbard*, all of the documents sought by Pulte from the custodians are either irrelevant to the claims and defenses in the case, or are protected by the legislative privilege. For example, the documents that Pulte seeks that predate the legislative acts it challenges are not relevant to its claims because they do not relate to the legislation that is at issue.[22] And for documents that are related to the legislative acts at issue, the legislative privilege unquestionably protects them from disclosure. It is not clear what benefit a privilege log would serve in allowing Pulte or the Court to assess the custodians' legislative privilege claims. Here, the reasoning of *Hubbard* and *McCrory* is persuasive. Requiring the custodians to prepare a privilege log would take them away from their official duties and otherwise undermine the fundamental purposes of

---

[21] Along these same lines, the court in *McCrory* rejected a request for a privilege log because "[t]he purposes of legislative privilege—avoiding interference with the legislative process and promoting frank deliberations among legislative decisionmakers" are equally applicable to the production of a privilege log. That is, requiring legislators to produce a privilege log to sustain their claim of legislative privilege "would undermine the very purpose and function of the legislative privilege." *Id.* at *6.

[22] If any such documents related to legitimate legislative activity, they would still be protected by the legislative privilege. This is the case even if they were unrelated to the legislative acts at issue in this case.

the legislative privilege. The County will not be required to produce a privilege log on behalf of the custodians.

## B. Executive Privilege

The "necessity and validity of executive privilege has been recognized for almost 200 years." *Ehrlich v. Grove*, 914 A.2d 783, 794 (Md. 2007) (providing survey of federal law of executive privilege). The executive privilege works "to protect the quality of . . . decisionmaking by ensuring that it is not done 'in a fishbowl.'"[23] *City of Virginia Beach*, 995 F.2d at 1252 (quoting *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87 (1973)). The privilege serves important interests:

> the privilege encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbinding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions, but for matters they considered before making up their minds.

*City of Virginia Beach*, 995 F.2d at 1252-53 (internal quotation marks omitted).

By protecting against the inhibition of "frank discussion of legal or policy matters," the executive privilege is aimed at "protecting the process by which policy is formulated." *Ethyl Corp. v. Environmental Protection Agency*, 25 F.3d 1241, 1248-49 (4th Cir. 1994); *see also N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) ("Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."). Courts have reasoned that "those who expect public dissemination of their remarks may well temper candor . . . to the detriment of the decision-making process." *Hamilton*, 414 A.2d at 922 (quoting

---

[23] The executive privilege, also called the deliberative process privilege, has been specifically incorporated into the Freedom of Information Act ("FOIA") as an exemption from disclosure. 5 U.S.C. § 552(b)(5). In considering the executive privilege, other courts have looked to decisions construing the FOIA exemption. *See* 26A Charles Alan Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5680.

*United States v. Nixon*, 418 U.S. 683, 705 (1974)). The executive privilege encourages policymakers to "give completely candid advice" and to "think out loud" without fear that their "tentative but rejected thoughts will become subjects of public discussion." *Id.*

The executive privilege is narrowly construed. *See Ethyl Corp.*, 25 F.3d at 1248; *Jones*, 256 F.R.D. at 517. Only documents that "are both predecisional and deliberative" are protected by the privilege. *City of Virginia Beach*, 995 F.2d at 1253. In general, documents are predecisional if they were created before the adoption of a policy and were "prepared in order to assist [a decisionmaker] in arriving at his decision." *Id.* Documents are deliberative if they "reveal[] the manner in which the agency evaluates possible alternative policies or outcomes," and "reflect[] the give-and-take of the consultative process." *Id.* (internal quotation marks omitted). The privilege does not extend to facts because "the prospect of disclosure is less likely to make an advisor omit or fudge raw facts." *Id.* However, where factual material is "inextricably intertwined with policymaking processes such that revelation of the factual material would simultaneously expose protected deliberation," and where the factual material is not "reasonably segregable," the material is privileged. *Id.* (internal quotation marks omitted). In deciding whether factual material is inextricably intertwined with policymaker opinions, a court must be careful not to make the inquiry into a "semantics debate" that loses sight of the objectives of the privilege. *Id.* at 1254-55; *see also Hamilton*, 414 A.2d at 927 (noting that because "[o]pinions, advice and recommendations are premised upon or flow from facts," the mere presence of factual material in a document does not deprive it "of its essentially deliberative character").

Ultimately, in determining whether a document is protected by the executive privilege, courts must consider "whether the materials bear on the formulation or exercise of agency policy-oriented *judgment* . . . [and] whether disclosure would tend to diminish candor within an

agency." *City of Virginia Beach*, 995 F.2d at 1254 (quoting *Petroleum Information Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis in original)). If disclosure would "directly implicate[]" the purposes of the executive privilege, it is likely that the documents qualify as both predecisional and deliberative. *City of Virginia Beach*, 995 F.2d at 1255. The burden is on the party asserting the executive privilege to establish its applicability. *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004).

### 1.    The County Has Not Established the Executive Privilege

In challenging the County's assertion of the executive privilege on behalf of the County Executive and his assistant, Pulte notes that the County "does not provide a shred of information" to support its claim that the documents it has withheld are both predecisional and deliberative. (ECF No. 113-2 at 22.) Indeed, as Pulte states, the County's refusal to search for responsive documents prevents it from making any such showing. Pulte argues that the County's assertion of executive privilege "does not rise above the speculative level."[24] (ECF No. 113-26 at 18.)

The County's argument on executive privilege is somewhat cursory, presumably because the County Executive and his assistant chiefly rely on the application of the more expansive legislative privilege. (ECF No. 116-1 at 40-43.) The County states that although it will produce factual material, the documents in the possession of the County Executive and his assistant are presumptively privileged. (ECF No. 116-1 at 44.) The County relies on *Hamilton*, which states that "when a formal claim of executive privilege is made for confidential communications of the

---

[24] Pulte also argues that any documents predating the County Executive's tenure in office cannot be withheld on the basis of the executive privilege. But given the County's assertion that the County Executive's only involvement in this litigation is in his capacity as County Executive (ECF No. 116-4 at 20), it is unclear why Pulte believes any responsive documents predating his tenure exist, let alone why they would be relevant.

chief executive, . . . there is a presumptive privilege, with the burden upon those seeking to compel disclosure." 414 A.2d at 925. *Hamilton* in turn relied on *United States v. Nixon*, 418 U.S. 683, 714 (1975), where the Court held that "[u]pon receiving a claim of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged and to require the Special Prosecutor to demonstrate that the Presidential material was 'essential to the justice of the (pending criminal) case." The circumstances before the Court in *Nixon* are quite different from the circumstances in this case. There is no suggestion that the documents the County Executive is withholding are such that their disclosure would be "injurious to the public interest." And other courts have "cabined the line of privilege cases based on [*Nixon*] . . . to instances involving the President himself." *Jewish War Veterans v. Gates*, 522 F. Supp. 2d 73, 76 n.1 (D.D.C. 2007); *see also Am. Civil Liberties Union v. Cent. Intelligence Agency*, 109 F. Supp. 3d 220, 238 (D.D.C. 2015) (distinguishing the "presidential communications privilege" established in *Nixon* from the deliberative process privilege). I do not find that the documents the County Executive and his assistant have withheld are presumptively privileged.[25]

The County has not met its burden to demonstrate that the documents it has withheld are protected by the executive privilege. In fact, there is no indication that the County has conducted a search for responsive documents in the possession of the County Executive or his assistant. Without knowing the universe of potentially responsive documents, the County fails to provide a

---

[25] Furthermore, *Hamilton* states that "when a formal claim of executive privilege is made, with an affidavit stating that the demanded materials are of a type that fall within the scope of the privilege, they are presumptively privileged from *in camera* inspection." 414 A.2d at 926. This implies that the documents are only presumptively privileged if an affidavit sufficient to make that finding is submitted to the court. Here, no such affidavit was submitted. And in *Jones*, where an affidavit was submitted, the court nonetheless found that the affidavit was insufficient to establish the executive privilege and proceeded to conduct an *in camera* review. 256 F.R.D. at 517-18.

sufficient level of detail to allow the Court to determine that each document withheld is both predecisional and deliberative, and that no factual material may be easily segregated from the documents. I find that the executive privilege does not apply.[26]

## III.     CONCLUSION

For the reasons set forth above, Pulte's motion to compel (ECF No. 113-1) is **DENIED** and the County's motion for protective order (ECF No. 116-1) is **GRANTED**.

The parties' rights to file objections to this memorandum and order are outlined in Rule 72(a) and Local Rule 301.5(a). These rules provide that any party wishing to object may do so in writing within 14 days of the date of this decision. Unless otherwise ordered, the filing of objections will not operate as a stay of any obligation or deadline imposed by this decision.

An accompanying Order follows.


May 31, 2017                                  /s/
Date                                         Timothy J. Sullivan
                                             United States Magistrate Judge

---

[26] I have already determined that all responsive documents in the possession of the County Executive and his assistant are protected from disclosure because of the legislative privilege. For this reason, it is unnecessary for the County to submit additional evidence (through an affidavit or a privilege log) in an attempt to demonstrate the applicability of the executive privilege. If the County Executive's documents were not subject to the legislative privilege, however, additional evidence from the County would be necessary. Unlike the legislative privilege, the executive privilege is to be narrowly construed. And because the interests it protects are less broad than those protected by the legislative privilege, the issue of the time and expense that would be required to create a privilege log would be of little import.