IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PULTE HOME CORPORATION AND     *
SHILOH FARM INVESTMENTS, LLC     *
                                *
        Plaintiffs                *
                                *
    v.                           *     Case No. 14-cv-03955-GJH
                                *
MONTGOMERY COUNTY,         *
MARYLAND, *et al.*            *
                                *
        Defendants            *

**DEFENDANTS' JOINT
REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTIONS FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(c)**

John P. Markovs, Esq.
Paul F. Leonard, Jr., Esq.
Patricia P. Via, Esq.
Montgomery County, Maryland
101 Monroe Street, 3rd Floor
Rockville, MD 20850

Erek Lawrence Barron, Esq.
Whiteford, Taylor & Preston L.L.P.
7501 Wisconsin Avenue, Suite 700W
Bethesda, MD 20814

John J. Hathway, Esq.
Whiteford, Taylor & Preston L.L.P.
1800 M Street, N.W.
Suite 450N
Washington, D.C. 20036

Howard R. Feldman, Esq.
Cara C. Murray, Esq.
Whiteford, Taylor & Preston L.L.P.
7 St. Paul Street
Baltimore, MD 21202

*Counsel for Montgomery County, Maryland*

William C. Dickerson
Tracey A. Harvin
Elizabeth L. Adams
Maryland-National Capital Park and
Planning Commission
6611 Kenilworth Avenue, Suite 200
Riverdale, MD 20737

Thomas J. Whiteford
Aaron L. Casagrande
Patrick D. McKevitt
Whiteford, Taylor & Preston L.L.P.
7 Saint Paul Street
Baltimore, MD 21202

*Counsel for Defendant, Maryland-National
Capital Park and Planning Commission*

# TABLE OF CONTENTS

I.   The Motions are timely under FRCP 12(c) because no trial date has been set, not one deposition has occurred and no experts have been identified.....................................1

II.  Plaintiffs' claims do not involve constitutionally protected property interests................3

    A.  The Plan granted the County broad discretion to adopt changes and defer applications for public water and sewer service—discretion known to Plaintiffs before purchasing the property at issue...........................................................4

    B.  The vested rights rule remains the law of Maryland and it dictates that Plaintiffs had no vested right to develop the subject property......................................9

    C.  Defendants have not harmed Plaintiffs' interest in their TDRs..................................14

    D.  Plaintiffs have no constitutionally protected interest in obtaining public water and sewer service. ..........................................................................................14

III. Plaintiffs' substantive due process claim fails because Defendants' actions, at a minimum, were conceivably related to the exercise of the County's zoning power. ........................................................................................................................15

IV. Plaintiffs have failed to plead a cognizable equal protection claim. ..............................22

    A.  "Class of one" equal protection claims cannot be asserted with respect to individualized, discretionary acts of legislative bodies. ..............................................24

    B.  *Olech* did not alter the elements of proving equal protection claims. .........................27

    C.  Plaintiffs cannot identify parties with whom they are similarly situated....................29

    D.  The Amendment's treatment of Plaintiffs' property, and any classification of them in it, is rationally related to a legitimate governmental interest.........................30

V.   Plaintiffs have not stated a takings claim under *Lucas* or *Penn Central*.........................33

VI.  Plaintiffs' Procedural Due Process claim fails as a matter of law...................................38

VII. Plaintiffs' Article 19 claim should be dismissed.............................................................40

VIII. Conclusion ........................................................................................................................40

i

## TABLE OF AUTHORITIES

CASES

*Argo v. Woods*, 399 F. App'x 1 (5th Cir. 2010) ................................................................ 2

*Baiza v. City of College Park*, 994 A.2d 495 (Md. App. 2010)................................................ 11-12

*Bechtold v. Hogan*, 2017 WL 782274 (D. Md. Feb. 27, 2017) ............................................. 24, 29

*Bey v. City of N.Y.,* 2010 WL 3910231 (S.D.N.Y. Sept. 21, 2010) ...................................... 2

*Board of Cty. Comm'rs v. Gaster*, 401 A.2d 666 (Md. 1979) ......................................... 6

*Booth v. Maryland*, 337 F. App'x 301 (4th Cir. 2009) ................................................. 40

*Browning-Ferris Indus. v. Wake Cty.*, 905 F. Supp. 312 (E.D.N.C. 1995) ................................. 22

*Bruce v. Riddle,* 631 F.2d 272 (4th Cir. 1980)............................................................... 39

*Cleanwater Linganore, Inc. v. Frederick Cty.*, 151 A.3d 44 (Md. App. 2016)............................ 12

*County Council of Prince George's Cty. v. Offen,* 639 A.2d 1070 (Md. 1994) ......................... 27

*Del Marcelle v. Brown Cty. Corp.,* 680 F.3d 887 (7th Cir. 2012)........................................... 23-24

*Dobkins v. Johns Hopkins Hosp.*, 1994 WL 146760 (D. Md. Jan. 25, 1994)............................... 9

*Doe v. Doe*, 747 A.2d 617 (Md. 2000) ...................................................................... 40

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)........................................... 2

*Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008) ....................................................24-27, 30

*FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307 (1993) ..........................................22-23, 26, 28, 32

*Frall Developers, Inc. v. Board of Cty. Commr's for Frederick Cty.*, 2008 WL 4533910
   (D. Md. Sept. 30, 2008) ........................................................................... 9, 15, 34

*Frapple, L.P. v. Commissioners of Town of Rising Sun*, 2012 WL 835604 (D. Md. Mar. 8,
   2012)……………………………………………………………………………………...…………37

*Gardner v. City of Baltimore*, 969 F.2d 63 (4th Cir. 1992) ......................................... 8

*Garza-Moreno v. Gonzales*, 489 F.3d 239 (6th Cir. 2007)......................................... 40

*Goldstein v. F.D.I.C.*, 2014 WL 69882 (D. Md. Jan. 8, 2014) ....................................2-3

*Graham v. Mukasey,* 519 F.3d 546 (6th Cir. 2008) ................................................ 39-40

*Grajales v. Puerto Rico Ports Auth.,* 682 F. 3d 40 (1st Cir. 2012)................................. 2

*Griffin-Bey v. Bowersox,* 978 F.2d 455 (8th Cir. 1992)...................................... 40

*Heller v. Doe*, 509 U.S. 312 (1993) ....................................................................... 32

*Herman v. Lackey,* 309 F. App'x 778 (4th Cir. 2009)…………………………………..23, 28

*In re CCT Commc'ns, Inc.*, 2011 WL 5509197 (Bankr. S.D.N.Y. Nov. 10, 2011)....................... 2

*In re NC Swine Farm Nuisance Litig.*, 2017 WL 2312883 (E.D.N.C. May 25, 2017).................. 2

*Jones v. Prince George's Cty. Pub. Schools*, 2016 WL 4077711 (D. Md. Aug. 1, 2016) .......... 25

*Lee v. Mayor & City Council of Cumberland*, 2011 WL 2443713 (D. Md. June 14, 2011)8, 34, 37

*Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528 (2005)........................................33-34, 36

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)........................................33-37

*Marks v. City of Chesapeake*, 883 F.2d 308 (4th Cir. 1989) ........................................ 22

*Maryland Manor Assocs. v. City of Houston,* 816 F. Supp. 2d 394, 404  (S.D. Tex. 2011) ...................................................................................................... 29

*Maryland Reclamation Assoc., Inc. v. Harford Cty.*, 994 A2d. 842 (Md. 2010)................9-11, 28

*Mathis v. McDonough*, 2014 WL 3894133 (D. Md. Aug. 7, 2014) ...................................... 25, 28

*MLC Auto., LLC v. Town of Southern Pines*, 532 F.3d 269 (4th Cir. 2008) ................................ 22

*Montgomery Cty. v. Butler*, 9 A.3d 824 (Md. 2010)........................................................ 4

*Moore-King v. County of Chesterfield,* 708 F.3d 560 (4th Cir. 2013)........................................ 23

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ............................................. 1, 4, 33-36, 38

*National Waste Managers, Inc. v. Anne Arundel Cty.,* 763 A.2d 264 (Md. App. 2000)............... 9

*Neifert v. Department of the Env.*, 910 A.2d 1100 (Md. 2006) ................................................ 9, 26

*North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) ...................................................................................................... 29

*Osborne v. Georgiades*, 2015 WL 35414093 (D. Md. June 4, 2015)........................................... 2

*Paeth v. Worth Township*, 705 F. Supp. 2d 753 (E.D. Mich. 2010) ........................................ 9

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)....................................................... 34

*Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104 (1978) .......................................... 34-37

*Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184 (N.D. Cal. 2014) .......................................... 2-3

*Pruitt v. Wells Fargo Bank, N.A.*, 2015 WL 9490234 (D. Md. Dec. 30, 2015); ........................... 3

*Quinn v. Board of Cty. Comm'rs,* 124 F. Supp. 3d 586 (D. Md. 2015) ................................... 31

*Quinn v. Board of Cty. Comm'rs,* 2017 WL 2883219
   (4th Cir. July 7, 2017) ............................................................. 1, 14-15, 34-35, 37-38

*Richardson v. Town of Eastover*, 922 F.2d 1152 (4th Cir. 1991) ................................... 9

*Rios v. Montgomery Cty.*, 872 A.2d 1 (Md. 2005) ........................................................ 40

*Robinson v. Bunch*, 788 A.2d 636 (2002) .................................................................. 40

*Rockville Fuel & Feed Co., Inc. v. City of Gaithersburg*, 291 A.2d 672 (Md. 1972) ............ 13-14

*Security Mgmt. Corp. v. Baltimore Cty.,* 655 A.2d 1326 (Md. App. 1995) ................. 26, 29-32, 34

*Sono Irish,  Inc. v. Town of Surfside Beach*, 2015 WL 2412156 (D.S.C. May 21, 2015) .. 29, 37

*South Lyme Prop. Owners Assoc., Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524 (D.
   Conn. 2008) ...................................................................................................... 28

*Sowers v. Powhatan Cty.*, 347 F. App'x 898 (4th Cir. 2009) ..................................... 23, 27-28, 32

*Srail v. Village of Lisle,* 588 F.3d 940 (7th Cir. 2009) ........................................... 25, 28

*Steel v. Cape Corp.*, 677 A.2d 634 (Md. App. 1996), ................................................... 34

*Sunrise Corp of Myrtle Beach v. City of Myrtle Beach,* 420 F.3d 322 (4th Cir. 2005) ............... 32

*Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810 (4th Cir. 1995) .................................... 22, 24, 30

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302
   (2002) ........................................................................................................ 14, 29, 34

*Teras v. Wilde*, 2015 WL 7008374 (D. Md. Nov. 12, 2015) ........................................ 4

*Tri-County Paving, Inc. v. Ashe Cty.*, 281 F.3d 430 (4th Cir. 2002) .................. 23-24, 28, 30-32

*United States v. Windsor*, 133 S. Ct. 2675 (2013) ……………………………………………29

*Vail v. City of N.Y.*, 68 F. Supp. 3d 412 (S.D.N.Y. 2014) ......................................... 2

*Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.,* 507 F.3d 290 (4th Cir. 2007) ........ 23

*Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365 (1926) ................................... 4, 35

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................24-25, 27-28

*Virginia Uranium, Inc. v. Warren*, 848 F.3d 590 (4th Cir. 2017) ................................................. 29

*Williams v. Wicomico Cty. Bd. of Educ.*, 2012 WL 4517745 (D. Md. Oct. 1, 2012) ................... 40

## STATUTES

MD. ENV. CODE § 1-508 ................................................................................................ 13

MD. ENV. CODE § 4-201 ................................................................................................ 12

MD. ENV. CODE § 4-201.1………………………………………………………….…………13

MD. ENV. CODE § 4-203 ................................................................................................ 13

MD. ENV. CODE § 4-204 ................................................................................................ 13

MD. ENV. CODE § 9-206 ................................................................................................ 13

MD. LAND USE CODE § 1-303 ........................................................................................ 6

 MD. LAND USE CODE § 1-417 ........................................................................................ 6

MD. LAND USE CODE § 1-502 ........................................................................................ 13

MD. LAND USE CODE § 7-301 ........................................................................................ 12

## OTHER AUTHORITIES

COMAR § 26.17.02.01 ............................................................................................. 12-13

COMAR § 26.17.02.08 ................................................................................................ 13

COMAR § 26.17.02.09 ................................................................................................ 13

MONTGOMERY COUNTY CODE § 50-4.1………………………………………………….…8

MONTGOMERY COUNTY CODE § 59-4.4………………………………………………………21

MONTGOMERY COUNTY CODE § 59-4.5………………………………………………………21

MONTGOMERY COUNTY CODE § 59-4.9.16………………………………………………...7-8

MONTGOMERY COUNTY CODE § 59-7.3.4………………………………………………………8

**RULES**

Fed. R. Civ. P. 12(c) ................................................................................................... 2-3

**CONSTITUTIONAL PROVISIONS**

Md. Const. Decl. Rts. Art. 19 ...................................................................................... 40

After assessing whether existing water quality measures were "sufficient to protect Ten Mile Creek," the County Council had the broad discretion under the 1994 Master Plan (the "Plan") to defer further approvals of requests for public service and take "such other land use actions as are deemed necessary." In their attempt to convert speculative land purchases to a guaranteed right to develop, Plaintiffs ignore this discretionary language, which is not even mentioned in their 50-page Opposition.  To escape courts' repeated pronouncements that such discretion defeats constitutional challenges, Plaintiffs claim that the Plan and the 2014 Amendment to it are not integral to their claims.  This claim is astounding, not only because they refer to the Plan over 120 times in the Complaint and to the Amendment over 10 times, but also because they claim a right to develop under the Plan's previous zoning.  Plaintiffs' attempt to evade the County's discretion, like their attempts to ignore controlling authority and to deny the clear rational bases for the legislation in question, should be rejected.  Ultimately, Plaintiffs' bald assertions of rigged processes and targeting do not overcome the legal principles at issue.

In a decision also involving speculative land purchases, which references the Supreme Court's recent *Murr v. Wisconsin* decision, the Fourth Circuit affirmed the dismissal of a developer's constitutional claims and reasoned that allowing such claims absent constitutionally protected property interests would make "land use planning a well-nigh impossible undertaking." *Quinn v. Board of Cty. Comm'rs,* 2017 WL 2883219, *7 (4th Cir. July 7, 2017).  Defendants' Motions for Judgment do not require the Court to resolve any factual disputes, but only to apply legal principles to the facts alleged.  Those principles require that this Court reach the same result as *Quinn* and dismiss Plaintiffs' claims.

**I.     The Motions are timely under FRCP 12(c) because no trial date has been set, not one deposition has occurred and no experts have been identified.**

In arguing that the Motions are untimely, Plaintiffs ignore the plain language of Rule

12(c), which requires that such motions be filed "[a]fter the pleadings are closed—but early enough not to delay trial[.]" *Osborne v. Georgiades*, 2015 WL 3541409, *3 (D. Md. June 4, 2015)("Rule 12(c)… authorizes a party to move for judgment on the pleadings any time after the pleadings are closed, as long as it is early enough not to delay trial."). As the pleadings have closed and there is no trial date to delay, Defendants' Motions are timely. *See Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1190 (N.D. Cal. 2014) ("[i]n order to determine whether something causes a 'delay' in the trial, there must be a trial schedule set.").[1]

Plaintiffs' argument against a Rule 12(c) motion filed "in the midst of intensive discovery" is equally unsupported. Plaintiffs' Opposition (ECF 171) ("Opp."), at 10. Indeed, in *Goldstein v. F.D.I.C.*, 2014 WL 69882, *1 (D. Md. Jan. 8, 2014), this Court found a Rule 12(c) motion to be timely even where "the parties [had] engaged in extensive and contentious discovery, involving production by the FDIC of hundreds of thousands of documents." *See also Edwards v. City of Goldsboro*, 178 F.3d 231, 240 (4th Cir. 1999) (considering Rule 12(c) motion "[a]fter a significant amount of discovery had taken place"); *Perez*, 75 F. Supp. 3d at 1190 ("Plaintiffs' claim that a Rule 12(c) motion is not appropriate where there has been substantial discovery does not appear to be supported by Rule 12(c)"). Here, no depositions have occurred and no experts have been identified. Thus, while paper and ESI discovery has been exchanged, the parties have not yet incurred the significant time and expense associated with expert

---

[1]      *See also Bey v. City of N.Y.,* 2010 WL 3910231, *2 (S.D.N.Y. Sept. 21, 2010) (rejecting timeliness argument because no trial date had been set); *Vail v. City of N.Y.*, 68 F. Supp. 3d 412, 423 (S.D.N.Y. 2014) (Rule 12(c) motion "will have no perceptible effect on any yet-to-be-scheduled trial."); *In re NC Swine Farm Nuisance Litig.*, 2017 WL 2312883, *3 (E.D.N.C. May 25, 2017) (motion for judgment filed well before deadline for filing dispositive motions, "and there is no issue over delaying trial, given trials have not been scheduled.").
        Plaintiffs rely on several factually inapposite cases. *See Grajales v. Puerto Rico Ports Auth.,* 682 F. 3d 40, 45 (1st Cir. 2012) (questioning timing of Rule 12(c) motion because it was filed after "both the deadline for filing a motion for judgment on the pleadings… and the discovery closure date… had passed."); *In re CCT Commc'ns, Inc.*, 2011 WL 5509197, *1 (Bankr. S.D.N.Y. Nov. 10, 2011) (after "the parties . . . engaged in and completed discovery, participated in an unsuccessful mediation and engaged in substantial motion practice, including a motion for partial summary judgment," court denied Rule 12(c) motion filed six days before trial because "consideration of the Motion [would] delay the trial, and ultimately, the disposition of the case."); *Argo v. Woods*, 399 F. App'x 1, 2 (5th Cir. 2010) (denying Rule 12(c) motion filed three months after dispositive motions deadline and "five days before trial").

designations and fact and expert witness depositions.  Plaintiffs' conclusion that "[t]his sort of sharp litigation practice is not tolerated by courts" is way off the mark.  Opp. at 11.  Plaintiffs also incorrectly assert that both Defendants previously filed motions to dismiss.  Opp. at 11. Rather, the County did not move to dismiss the Complaint, and none of the issues raised in the instant motions were decided by the Court in ruling on the Commission's prior motion.[2]

With respect to the timing of Defendants' Motions, this case arises from land use regulation that evolved over more than a decade and, Plaintiffs' Complaint implicated materials which required time to distill.  As discovery progressed, it became clear that Plaintiffs claims fail as a matter of law when they are reduced to their essentials and analyzed in the context of the law and case precedents that control in this Circuit.

## II.    Plaintiffs' claims do not involve constitutionally protected property interests.

Stripped of hyperbole, Plaintiffs' argument is that they cannot develop their property to the extent they wanted to under the zoning that existed before the 2014 adoption of the Ten Mile Creek Area Limited Amendment to the Clarksburg Master Plan (the "Amendment")[3] and subsequent implementing legislation.  Plaintiffs argue that their purchases of land and TDRs, standing alone and/or combined with an array of disconnected County and State laws, forever

---

[2]      Plaintiffs' argument in regards to the amendment deadline is a red-herring because there is nothing they could add to an amended complaint that would change the result given the legal issues raised in the Motions.

[3]      It is absurd for Plaintiffs to suggest that the Plan and the Amendment are not integral to the Complaint.  *See* Opp. at 14. For example, the first of over 100 mentions of the Plan is in the second paragraph of the Introduction to the Complaint (ECF 1).  The Complaint highlights Pulte's alleged "reliance on the 1994 Master Plan" by devoting seven paragraphs to describing it (¶¶ 7-14), and quotes several instances when Pulte's attorneys invoked the Plan in their efforts to influence land use decisions about the Ten Mile Creek watershed.  *See, e.g., id.* ¶¶ 21, 26, 29, 37, 40, 41, 44.  The Complaint also makes repeated reference to the Amendment.  The Plan, the Amendment and its implementing legislation are the foundation upon which Plaintiffs' claims rest; thus, the County properly attached excerpts of them, and other pertinent public documents, because they are "integral to the complaint and authentic." *Pruitt v. Wells Fargo Bank, N.A.*, 2015 WL 9490234, *2 (D. Md. Dec. 30, 2015); *Teras v. Wilde*, 2015 WL 7008374, *4 n.4 (D. Md. Nov. 12, 2015).  In addition to being  "matters of public record," *see Goldstein*, 2014 WL 69882, at *5, the exhibits include legislation enacted by the County Council.  The Court can take judicial notice of legislation and consider it just as it could any other regulation or statute without converting a motion to one for summary judgment.

estop the County from exercising its inherent police power to make zoning changes for the public welfare.[4]   Plaintiffs also argue that the Amendment has rendered their TDRs without value because they cannot use them on this particular project.

The authorities cited by Plaintiffs do not support their arguments.  Plaintiffs have ignored key provisions of the Plan which gave the County the absolute discretion to do precisely what it did in the Amendment.   It is perhaps understandable that Plaintiffs do not cite to those provisions—there is no way around them.   Plaintiffs contentions that they have been harmed because the development potential of their land has been limited or that they had a right to obtain faster approval of public water and sewer fail as a matter of law on the facts alleged.

### A.   The Plan granted the County broad discretion to adopt changes and defer applications for public water and sewer service—discretion known to Plaintiffs before purchasing the property at issue.

In discussing the Plan, Plaintiffs reference just those portions they believe support their arguments and ignore portions that give that the County the discretion that is fatal to their claims. When viewed in its full context, the Plan advised interested parties of the real possibility that it would be amended. Although they now claim to have relied on the Plan in deciding to buy land and TDRs, it is apparent Plaintiffs actually ignored the language of the Plan before making business and investment decisions.  Plaintiffs suggest that the attainment of the Stage 4 triggers set forth in the Plan were a prompt for them to begin, unimpeded, development of over 1,000 units. As seen from the text of the Plan (as well as from the County Code provisions applicable to TDRs), Plaintiffs' suggestion is preposterous—instead, the triggers were a prompt for action by the County Council.  In a "Notice to Readers," the Plan advises:

Area master plans are intended to provide a point of reference with regard to public

---

[4]     It is well-recognized that zoning regulations are a "legitimate exercise of the government's police power." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1947 (2017); *see also Montgomery Cty. v. Butler*, 9 A.3d 824, 840 (Md. 2010) ("Following . . . *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), it became well settled in Maryland . . . that enacting zoning ordinances and regulations was a legitimate exercise of the police power." ).

policy. . . .[T]hey should be referred to by public officials and private individuals when decisions are made that affect the use of land within the plan boundaries.

Master plans generally look ahead about 20 years from the date of adoption although they are intended to be updated and revised about every 10 years.  It is recognized that circumstances will change following the adoption of a plan and that the specifics of a master plan may become less relevant over time.

**Ex. H,** Plan, at vii.[5]   Thus, it should not have been a surprise to a sophisticated developer that the Council considered amending the Plan in around 2009, after the triggers for Stage 4 were met and the 2007 SPA Report was released.  By 2014, by its own terms, the Plan had reached the end of its projected life.

Because Plaintiffs assert that the Plan created expectations (Opp. at 26), then such expectations must reasonably have been drawn from the Plan as a whole and not just those portions of it which are now deemed to advance a position.  Thus, Plaintiffs cannot ignore that the Stage 4 triggers were not a prompt for Plaintiffs to commence development, but rather were a prompt for the Council, among other things, to "determine if the methods, facilities, and practices then being utilized by applicants as part of the water quality review process then in place are sufficient to protect Ten Mile Creek." Ex. H, at 199; *see id*. ("Once the [triggers] occur, [the] County Council will. . . ").  "After conducting these assessments, the County Council may . . . [d]efer action on a Water and Sewer Plan category change, pending further study or consideration as deemed necessary and appropriate by the Council [and] [c]onsider such other land use actions as are deemed necessary." *Id.*  The County's Water & Sewer Plan also informed that the Council may defer action on individual requests for public service, pending the completion of "another process" such as a "land use, zoning, or master plan decision which is relevant to the decision on water and sewer service, or which could be potentially influenced by

---

[5]        Excerpts from the Plan were attached as Exhibit B to the County's Memorandum (ECF 145-1) (the "Memorandum").  Because additional pages of the Plan are referenced herein, for the Court's convenience, **Exhibit H** attached hereto is comprised of all of the pages from the Plan referenced in both of the Defendants' submissions.

the action of the Council on the issue of water and sewer service."  Memorandum, Ex. A (ECF 145-2), p. 1-40; s*ee also* Ex. H, at 200-01 (amendments to Water Plan will be not be considered piecemeal, but in "a comprehensive or area-wide nature only").  Thus, it should have been a surprise to no one that the Council exercised its discretion to defer action on individual landowners' requests for public service in Stage 4 while it considered amending the Plan.

Moreover, Plaintiffs' assertion that they bought 323 TDRs to use with their 541 acres is inexplicable and belies any assertion that they relied on the Plan in making business decisions. The Plan states that the Ten Mile Creek East area, which includes Plaintiffs' 541 acres, is comprised of 593 acres and limits the number of TDRs that could be used in that entire 593 acre area to 194. Ex. H, at 101; *see also id* at 100-01 (informing that the "zoning density in a receiving area may not be increased by a transfer of [TDRs] beyond the density recommended by the" Plan and that it "establishes density caps of less than the full density allowed by the zone of these properties.").[6] The Plan also states that "up to 900" units would be appropriate for the entire Ten Mile Creek area "if" specified guidelines could be achieved.  *Id.* at 87, 91.  In light of these provisions of the Plan, Plaintiffs' purchase of 323 TDRs and contemplated development of upwards of 1,000 units is unsupported.[7]

Plaintiffs' apparent disregard of the provisions of the Plan (notwithstanding their purported reliance thereon) is further amplified by the provisions of County law applicable to TDRs, which establishes that a purchase of TDRs alone imposes no burden on a buyer or a buyer's property, and guarantees a buyer no benefit with respect to developing any particular

---

[6]     Plaintiffs are intellectually dishonest when they gripe about the development of a shopping center.  *See* Opp. at 26.   The shopping center is located in the Cabin Branch Development, which is part of Stage 3 of the Plan, as depicted in the maps at pages 215 and 65 of the Plan.  *See* Ex. H.  The Plan contemplates that there will be retail in the part of Stage 3 east of I-270, which "includes all portions of Clarksburg **that do not drain into the Ten Mile Creek watershed**." Ex. H, at 196, 64-67 (emphasis added).

[7]     It is both true today and when Plaintiffs acquired the subject property that a proposed development must be consistent with a master plan.  *See* MD. LAND USE CODE §§ 1-303, 1-417; *Board of Cty. Comm'rs v. Gaster*, 401 A.2d 666 (Md. 1979).

6

parcel.  Rather, the creation of TDRs imposes an easement in favor of the County limiting future construction of dwellings on the seller's property.  *See* County Code § 59-4.9.16.B.1.c (requiring the filing of an easement).[8]  The filing of TDRs and an easement in accordance with the Code identifies the seller, the buyer and the seller's property, and not any property on which the buyer intends to use the TDRs.  **Exhibit I** is an example of one of Plaintiffs' filed TDRs and the associated easement in favor of the County.

A buyer of TDRs is not bound to use them to develop any specific property, but can potentially use them on any properties designated as within a receiving zone and may, if it chooses, hold or resell the TDRs just like any other intangible asset.[9]  In fact, a party need not own land to buy TDRs, and the County is unaware of a buyer's plans to use TDRs for a specific property until the buyer requests to use them in a preliminary subdivision plan filed with the County.   County Code § 59-4.9.16.B.1.b.   Notably, the "Planning Board ***may*** approve subdivision of such land at densities up to the maximum density allowed in the applicable TDR Overlay zone ***and substantially conforming to the recommendations in the applicable master plan.***"  *Id.* § 59-4.9.16.B.1.a (emphasis added).  Approval of a subdivision is not mandated and is not final (and, thus, a landowner has no entitlement to use TDRs on a specific property) until a final record plat is recorded.  *See id.* § 59-4.9.16.B.1.c.ii.  Before approving a subdivision, the Planning Board must make findings required by Code § 59-7.3.4, relating to site plans, and must make specified findings about the appropriateness of the proposed development and whether it is

---

[8]    Although stating that cites are to the County's 2014 Zoning Ordinance, the cites at pages 24 and 26 of the Opposition are actually to the 2004 Zoning Ordinance, §§ 59-C-1.39, *et seq*.  For purposes relevant hereto, the 2004 and 2014 ordinances are substantively the same.

[9]    Thus, unlike a building permit, which is issued by the government for development of a specific property, a TDR is not issued or sold for development of a specific property.

compatible with site conditions. *Id.* § 59-4.9.16.B.1.e.[10]  In short, until approval of a record plat, with respect to any receiving area, there is only a potential of increased density by using TDRs. *See also id.* § 50-4.1.C.10.b (requiring that a preliminary plan that uses TDRs in a residential zone include at least 2/3 of the number of potentially permitted, but allowing the Planning Board discretion to reduce the 2/3 requirement for environmental or compatibility reasons).

The Plan and County laws applicable to TDRs establish that Plaintiffs bought far more TDRs than they could possibly have used for the subject property and that subdivision approval, let alone at any particular density, was not "concrete."  By any analysis, the Council had discretion to amend the Plan and adopt land use measures deemed necessary to protect an environmental resource and to defer consideration of an application for public service.  As is evident from the summary of the Amendment below, the Council thoroughly detailed its analysis, findings and goals.  Under *Gardner v. City of Baltimore*, 969 F.2d 63 (4th Cir. 1992) and its progeny,[11] discussed at pages 14-19 of the County's Memorandum, the Plan vested in the Council the discretion to change the zoning, forestalling any assertion by Plaintiffs of a constitutionally protected property interest in a prior zoning classification or a due process claim based on a change of classification.  The authorities cited by Plaintiffs are inapposite to their claimed right to develop in accordance with the prior zoning or to obtain public water and sewer because, for example, the cases involved vested rights obtained via express agreements[12] or

---

[10]     Among the many required findings under § 59-7.3.4 is that a proposed development substantially conforms to the applicable master plan.

[11]     *See, e.g.*, *Lee v. Mayor & City Council of Cumberland*, 2011 WL 2443713, *2 (D. Md. June 14, 2011)(granting motion to dismiss due process claims and stating "Maryland state law does not create any property interest in a particular zoning classification or use").

[12]     *See Dobkins v. Johns Hopkins Hosp.*, 1994 WL 146760, *4-6 (D. Md. Jan. 25, 1994)(involving express agreement regarding traineeship program and express representations to plaintiff about his participation in the program); *Frall Developers, Inc. v. Board of Cty. Comm'r's for Frederick Cty.*, 2008 WL 4533910, *9-10 (D. Md. Sept. 30, 2008)(distinguishing cases such as *Neifert* and *Front Royal*, which hold that access to public sewer service is not a constitutionally protected interest, on ground that plaintiff's claimed interest was not in sewer service, but in

assertions that permits or special exceptions granted for specific parcels expired while the government pursued litigation rights.[13] Here, Plaintiffs never received development approval, let alone a license or permit specifically applicable to their property.

**B.      The vested rights rule remains the law of Maryland and it dictates that Plaintiffs had no vested right to develop the subject property.**

Plaintiffs argue that their purchase of land and TDRs in reliance upon the Plan and the County's TDR program, a state law requiring the use of Environmental Site Design ("ESD") in real estate development to control stormwater, and the passage of a County ordinance designating water and sewer categories County-wide somehow created for Plaintiffs a vested right to develop in accordance with a particular zoning.   From this, Plaintiffs assert that the Council was thereby perpetually prevented from exercising its police power to regulate land use by zoning changes or implement land use measures, regardless of changed circumstances or matters of public interest.   Stated another way, Plaintiffs argue that these laws estopped the County from changing the zoning.    That is not the law; indeed, Plaintiffs concede that the Maryland Court of Appeals has refrained from adopting an estoppel exception to Maryland's vested rights rule.  Opp. at 22-23 n.11.

In *Maryland Reclamation*, a landowner who lacked a building permit and had not started

---

a written letter of understanding with the county -  *i.e.,* a contract right).  Further, at page 21 of the Opposition, Plaintiffs take out of context a quote from *Richardson v. Town of Eastover*, 922 F.2d 1152 (4th Cir. 1991).  In that passage, the court was discussing a town's failure to renew the plaintiff's at-will business license to operate a club when a practice of automatic renewal was established.  922 F.2d at 1157-58.  *Richardson* did not involve a claimed interest in a prior zoning category and the instant case does not involve a government refusal to renew a license.

[13]      In *Maryland Reclamation Assoc., Inc. v. Harford Cty.*, 994 A2d. 842, 869-71 (Md. 2010), the Court of Appeals explained that the Court of Special Appeals' decision in *National Waste Managers, Inc. v. Anne Arundel Cty.,* 763 A.2d 264 (Md. App. 2000), cited by Plaintiffs, stands only for the narrow proposition that a government's exercise of litigation and appeal rights tolls the period during which a government granted special exception or permit might otherwise lapse.  No such facts are alleged here. *Paeth v. Worth Township*, 705 F. Supp. 2d 753, 769 (E.D. Mich. 2010) stands for a similar proposition and, more importantly, was based on Michigan law which, in contrast with Maryland's vested rights rule, provides that the issuance of a permit alone "bestows a right on the property owner to begin and continue construction under the terms of the permit."  As will be discussed below, under Maryland law, a landowner has a vested right in prior zoning only if it obtained a legal permit to develop the property under prior zoning *and* made substantial beginning in construction.

9

construction asserted it had a vested right to construct a landfill on its property and that the county should be estopped from applying an amendment to its zoning code that would render the property ineligible for use as a landfill.  994 A.2d at 868.  The landowner asserted it had a vested right because it purchased the land after it received certain approvals, spent over $1 million in land acquisition, engineering and legal fees and incurred substantial obligations.  *Id.*  This assertion was rejected: "We follow many decades of Maryland law in holding that [a landowner] needs more than a state permit and site plan approval in order to have a vested right."  *Id.* at 868-69.  In so ruling, the Court of Appeals restated the well-established vested rights rule:

> Generally, in order to obtain a vested right in an existing zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance has occurred.

*Id.* at 868 (citations omitted).

The Court of Appeals also rejected the landowner's argument that Maryland should adopt an estoppel exception to the rule.  Continuing a quote that starts in note 11 of the Opposition:

> [W]e also cannot ignore a local government's responsibility to its residents, and thus, Maryland courts should not apply the [estoppel] doctrine casually. As open space disappears, and scientific knowledge about the adverse environmental impact from people's use of land grows, local governments struggle to balance the legitimate interests and rights of landowners wishing to develop against equally legitimate environmental and community concerns. Due to the delicacy of this balancing act, and the overriding need to protect the public, local government cannot always chart a steady course through . . . these disparate interests. Land developers must understand that, to a limited extent, the local government will meander, and before they incur significant expense without final permitting, they must carefully assess the risk that the government will shift course.

*Id.* at 875.  Thus, zoning estoppel "must be applied, ***if at all,*** sparingly and with utmost caution."

*Id.* at 876 (emphasis added). To the extent the Court was receptive to adopting an estoppel exception, on the facts presented, it held that the owner did not establish substantial reliance on the prior zoning because "many facts" available to it when it bought the property "should have

alerted [it] to the real possibility that its plans for a rubble landfill would not come to fruition." *Id.*; *see also id.* at 877 ("Generally, purchase of land, by itself, is insufficient to constitute 'substantial reliance.'. . .To hold otherwise would mean that a purchaser could lock in the zoning of any parcel simply by the act of purchasing property and asking for a permit."), 878 (noting that expenses, such as engineering fees, incurred "in the face of public actions by the County Council to block" the landfill were not spent in reliance upon prior zoning).

Subsequently, in *Baiza v. City of College Park*, 994 A.2d 495 (Md. App. 2010), a landowner was improperly issued a permit to build a retaining wall on his property and began building the wall in reliance on the permit. After the permit was revoked and a stop work order issued, the landowner sued, seeking a review of the city's denial of his request that the permit be deemed valid. In holding that the landowner lacked a vested right because the permit was not lawfully issued, Court of Special Appeals reaffirmed that Maryland's vested rights rule "has a constitutional foundation, and 'rests upon the legal theory that when a property owner *obtains a lawful building permit*, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations.'"   994 A.2d at 502 (emphasis in original).  Referring to *Maryland Reclamation,* the court refused to apply zoning estoppel:

> It seems safe to say that until the Court of Appeals speaks on the issue again, the rule to be followed in this State is that ordinarily, the doctrine of zoning estoppel does not apply to the acts of . . .public agencies and municipalities, and that very exceptional circumstances are required to invoke the doctrine against the State and its governmental subdivisions.

*Id.* at 504 (citations omitted).  The Court of Appeals has not adopted an estoppel exception to the vested rights and, like in *Baiza,* this Court must apply—not change—Maryland law.[14]

---

[14]     Although Maryland law offers developers and local jurisdictions a statutory mechanism to enter into agreements to promote development and protect developers from the investment risks of proceeding forward with development plans, no such agreement was entered into here.  *See* MD. LAND USE CODE § 7-301(b); *Cleanwater*

11

Even if this Court were inclined to consider applying a heretofore unrecognized estoppel exception to the vested rights rule, application would be inappropriate based on the facts alleged in this case.  As discussed above, the Plan informed Plaintiffs of the "real possibility" that it would change within 10-20 years from its adoption and expressly vested in the Council broad discretion to defer action on applications for public service and to implement such land use measures as it deemed to be appropriate.  Likewise, the County Code provisions relating to TDRs establish that much more than a purchase of TDRs by a buyer with undisclosed intentions about unidentified parcels in County-wide designated receiving areas is required before density and development plans for any specific parcel are approved and finalized. By any analysis, Plaintiffs should have known before they invested in land and TDRs that there was a real possibility that zoning would change.  As such, estoppel is not possible.

Contrary to Plaintiffs' argument, the Maryland Stormwater Management Act (the "Act") and County Subdivision Regulation Amendment 12-01 (**Ex. J** hereto) ("SRA 12-01") do not bestow on Plaintiffs any right to develop their property in accordance with the prior zoning.  The Act was enacted "to reduce as nearly as possible the adverse effects of stormwater runoff and to safeguard life, limb, property, and public welfare."  MD. ENV. CODE § 4-201; *see also* COMAR § 26.17.02.01.  The Act does not grant developers any rights with respect to any aspect of future projects, does not address whether or to what extent any specific parcel can be developed, and it certainly does not restrict the Counties' zoning authority or their oversight over development projects.  The Act also does not eliminate measures such as impervious caps, forest buffer and conservation requirements, and zoning setbacks as tools for managing stormwater runoff, and does not mandate that ESD is the sole, state-wide measure for managing stormwater.  *See* MD.

---

*Linganore, Inc. v. Frederick Cty.*, 151 A.3d 44, 47-48, 54-55 (Md. App. 2016) (discussing Development Rights and Responsibilities Agreements, and recognizing that vested rights rule otherwise applies).

Env. Code § 4-201.1(c)(ESD includes minimizing use of impervious surfaces); COMAR § 26.17.02.08.B.  Instead, the Act specifies that ESD must be implemented to the maximum extent practicable and imposes on developers a requirement that stormwater management plans be submitted.  Md. Env. Code §§ 4-203(b)(5), 4-204; COMAR §§ 26.17.02.01, 26.17.02.09.

In 2012, the state enacted legislation providing that local jurisdictions "may" adopt mapped growth tiers.  Md. Land Use Code § 1-502.  However, the legislation restricted local jurisdictions that did not adopt tiers by December 31, 2012 from authorizing major residential subdivisions served by on-site disposal systems, community sewerage systems or shared systems.  Md. Env. Code § 9-206(f)(1).  SRA 12-01 was the County's prompt response to the new state law (Ex. J, at 2) and designated Tier areas County-wide, including Plaintiffs' property, which was designated as Tier II.[15]  Plaintiffs' argument that SRA 12-01 bolsters its assertion of a vested right to develop is nonsensical because SRA 12-01 does not even address zoning or other land use measures implemented by the Amendment to protect Ten Mile Creek.  Plaintiffs cite no authority for their assertion that the Act and SRA 12-01 create a vested right in the pre-Amendment zoning of their property, and the text of the Act and SRA 12-01 lend no support.  Moreover, Plaintiffs could not have relied on these provisions because they purchased the land and TDRs years before the enactment of the Act in 2007 and SRA 12-01 in 2012.

*Rockville Fuel & Feed Co., Inc. v. City of Gaithersburg*, 291 A.2d 672, 675-77 (Md. 1972) further illustrates why Plaintiffs' claims must fail.  In that case, after the issuance of an appellate decision that the plaintiff was entitled to a special exception to build a concrete plant, the city removed concrete plants as a permitted use in the zone in which the property was situated.  Because a building permit was not obtained, the court rejected the landowner's argument that the earlier appellate decision vested his right to build the plant.  The court also

---

[15]        Tier II areas are planned to be served by public sewer.  Md. Env. code § 1-508(a)(2).

rejected the owner's estoppel argument based on its reliance on the prior zoning, and the time and expense lost in prosecuting its application.  *Id.* at 680-81 (noting that city was unaware of owner's intentions). Just as the prior zoning in *Rockville* did not vest in the owner a pre-approved right to build a concrete plant, the prior zoning, the TDR program and the other items on which Plaintiffs now claim to have relied did not vest in them a pre-approved right to develop 1,000 units.  Plaintiffs had no such vested right and, accordingly, their due process claims must fail.

**C.     Defendants have not harmed Plaintiffs' interest in their TDRs.**

As discussed above, Plaintiffs' ownership interests in their TDRs is completely divorced from and does create any rights regarding any specific parcel of property. Just like any buyer of TDRs, Plaintiffs today may use, hold or sell the TDRs just as they could when they were purchased. The Plan and County TDR laws establish that a proposed development plan, including its density, is not finalized until the requisite approvals are received. Accordingly, Plaintiffs' interest in the TDRs is not harmed because, although they allegedly bought them intending to use all of them to develop a particular property (an intention unknown to Defendants), Plaintiffs remain free to sell them or use them for another project.

**D.     Plaintiffs have no constitutionally protected interest in obtaining public water and sewer service.**

In *Quinn,* the Fourth Circuit reaffirmed that "Maryland law does not recognize a property interest in access to sewer service," even when there has been an unreasonable delay[16] in providing service.  2017 WL 2883219, *6; s*ee also id.* at *3 (no such right under federal law). Thus, any claimed interest in public water and sewer service cannot support Plaintiffs' due

---

[16]     Plaintiffs' protestations about a moratorium are a red-herring because, in any event, the caselaw makes clear that they have no constitutionally protected interest in obtaining water and sewer service.  Also, in baldly asserting that a "moratorium" was imposed here, Plaintiffs take out of context a quote from *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302 (2002) in suggesting that a moratorium lasting for more than a year should be viewed with skepticism.  *See* Opp. at 36-37.  In *Tahoe,* a 32-month moratorium was found to be reasonable.  *See* 535 U.S. at 341.

process claims.  *Id* at *6 (affirming dismissal of due process claims).[17]

### III. Plaintiffs' substantive due process claim fails because Defendants' actions, at a minimum, were conceivably related to the exercise of the County's zoning power.

In affirming the dismissal of a substantive due process claim, the Fourth Circuit explained there is a "high bar" for pleading such a claim because "an action is illegitimate 'only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning.'"  *Quinn*, 2017 WL 2883219, *6 (citation omitted).  This "significant hurdle" reflects courts' "extreme reluctance to upset the delicate political balance at play in local land-use disputes."  *Id.* (citations and brackets omitted).  Thus, the court held that legislation enacted as "part of a comprehensive plan to address . . . serious public health and environmental problems" was related to legitimate government goals.  *Id.*

The legislation in question here was similarly related to legitimate governmental goals.  Before approving the Amendment in April 2014, the Council methodically examined the impact of development in Clarksburg and planned for future development.  Memorandum at 6-8.  The examination and planning began with the release in January 2009 of the 2007 Special Protection Area Annual Report which, *inter alia*, concluded that development to date in Clarksburg had caused the condition of Ten Mile Creek to deteriorate.  *Id.*  The methodical examination included the appointment of an Ad Hoc Water Quality Working Group to provide input.  *Id.*

The legislation in question leaves no doubt as to the legitimate governmental interests and policies addressed, considered and balanced by the Council, as the text of legislation explains it in meticulous detail.  As discussed below, the legitimate governmental interests addressed by the Amendment include environmental protection, economic development/jobs supporting commerce in the Clarksburg town center, housing and transportation.  *See, e.g.,*

---

[17]     Plaintiffs' reliance on *Frall* is misplaced because "access to sewer service [was] not the interest" claimed in that case.  2008 WL 4533910, *10.  At issue was a contract right arising from a letter of understanding. *Id.*

Council Res. 17-1048, Memorandum Ex. E (ECF 145-6); Amendment, **Ex. K** hereto.[18]   The

legislation explains why properties were treated differently by the Council when it made the land

use decisions embodied therein.   The legislation also summarizes the Plan and the process

leading to the passage of the Amendment with Resolution 17-1048 as well as implementing

resolutions approving the Clarksburg West Environmental Overlay Zone Text Amendment

("ZTA"), the Ten Mile Creek Special Protection Area ("SPA") and Sectional Map Amendment

G-965 ("SMA").   *See* Memorandum at 10 and Exs. F (ECF 145-7), G (ECF 145-8).   The

legislation also renders baseless Plaintiffs' assertions that the Council did not consider scientific

evidence and other relevant factors, including the extent to which Ten Mile Creek and its

watershed could be protected through the use of ESD.   *See* Opp. at 21, 28, 33, 36-37, 45.

As a starting point, the Amendment provides background about the Plan, the staged

development for Clarksburg called for by the Plan and explains why the Council determined that

an amendment to the Plan was necessary:

> Staging was the Plan's primary implementation strategy and the Ten Mile Creek Watershed was included in the last stage—Stage 4. Approval to move ahead with Stage 4 was based on two benchmarks: substantial residential development in the Clarksburg Town Center and Newcut Road Districts to support retail and transit, and an evaluation of water quality impacts associated with development, which could help anticipate potential effects on Ten Mile Creek.
>
> The required biological evaluation of stream conditions to determine if measures in use were sufficient to ensure protection of Ten Mile Creek was triggered to occur after the 2,000th building permit in the Town Center and Newcut Road Districts. The Plan stated that once the evaluation was complete, the County Council could allow Stage 4 development to move ahead *or determine whether additional land use actions were necessary.*
>
> The 2009 publication of the County's annual report on Special Protection Area monitoring for the year 2007 constituted the required environmental evaluation. ***This report documented deteriorating stream conditions in the Clarksburg SPA and offered recommendations for remedial efforts.***

---

[18]     The text of the Amendment is contained within Council Resolution 17-1048, but the Amendment is easier to read, because the Resolution shows additions and deletions of text in track changes. The Amendment also includes maps, for which placeholders are shown in the Resolution.  Although citations will hereinafter be to the Amendment, the text of it is the same as in Resolution 17-1048.

*     *     *

> *Consequently, in 2012, the County Council determined that a limited plan amendment was necessary to refine 1994 Plan recommendations given stream monitoring findings, changes to environmental regulations, and the potential need for further safeguards to protect Ten Mile Creek, while balancing community building goals.*

Ex. K, at 10-11 (emphasis added); *see also id.* at 5 ("In October 2012, the . . . Council directed the Planning Board to undertake a Limited Amendment of the 1994 Clarksburg Master Plan . . . because environmental analyses showed continued uncertainty about the ability to protect sensitive resources in Ten Mile Creek if full development occurred under the original Plan").

The Introduction to the Amendment provides this overview:

> This Amendment includes recommendations for achieving the desired community elements envisioned for Clarksburg in the 1994 Plan, while protecting the quality of Ten Mile Creek. *These objectives required studying the extent to which land uses could help protect natural resources and environmental site design could combine to maintain high water quality in the watershed.* Various transportation and land use alternatives were also examined . . . and the balance of jobs and housing.

> This Amendment retains the core of the 1994 Plan's vision, refining the 1994 Plan's recommendations *to better achieve two important objectives: the creation of a complete, well-defined corridor town that provides jobs, homes, and commercial activities; and the preservation of natural resources critical to the County's well-being*. . . .

> The Amendment draws on the expertise of independent environmental consultants who studied the effects of several development scenarios on Ten Mile Creek's water quality and transportation; consultants who evaluated land use changes on Clarksburg's existing and planned road network and plans for transit service; and economic consultants who assessed the potential effects of land use change. These consultant reports and additional staff analysis are available in the Appendices.

> The recommendations in this Amendment are designed to further the completion of Clarksburg, following the main policies of the 1994 Plan, while taking advantage of increased knowledge about environmental protection, innovations in environmental mitigation techniques, and new zones created since approval of the 1994 Plan.

Ex. K, at 5 (emphasis added).

The Amendment explains that the Council reached certain land use decisions by balancing goals and factors that were given lesser or greater weight depending on the geographic location of the properties in question.  A key factor in the land use decisions was the proximity

17

of a given property to the Clarksburg town center and whether it was on the more-developed east side or more rural west side of I-270.  In this regard, the Amendment explained:

> This Limited Amendment retains the overall vision of the 1994 Plan, but recognizes that additional environmental protection is needed to allow development to move ahead. It emphasizes environmental protection west of I-270 and provides more flexibility in achieving the community building goals east of I-270 (see Map 3).[19]
>
> *        *        *
>
> On the east side of I-270, proximity to the interstate and the Town Center commercial area, as well as the impact of previous development in the headwaters, offer opportunities to accommodate modest levels of residential and mixed-use development that are complementary to the Town Center District, and help to support enhanced transit and roadway improvements, while strengthening protection for environmental resources.
>
> In the western portion of the Plan area, the presence of significant, sensitive tributaries requires limiting development to tightly-clustered residential uses that contribute to Clarksburg's community-building needs by providing options for housing choices.

Ex. K, p. 12.  The Amendment describes the importance of Ten Mile Creek as a public water supply and notes that it "is a reference stream in Montgomery County, serving as high quality benchmark against which other streams are compared."  *Id.* at 14.  The Amendment further describes that annual reports issued by the County's Department of Environmental Protection state that "environmental protection measures, as applied to date in Clarksburg, have not prevented deterioration in the quality of Ten Mile Creek" and acknowledges that ESD "represents the state of the practice for site planning and post-construction stormwater runoff management, and is now required throughout Maryland."  *Id.* at 16.  However, in the Amendment, the Council expressed strong reservations that implementation of ESD in the watershed, alone, would be sufficient to curb additional deterioration of Ten Mile Creek due to further development in the watershed and specifically identifies adverse impacts to the watershed that analyses showed could result from development:

---

[19]    The referenced Map 3 appears on page 13 of the Amendment (Ex. K hereto) and shows the delineation between the east and west sides of Clarksburg.

18

[R]igorous and comprehensive implementation of ESD across or within watersheds has not occurred, nor has the practice been monitored either in the County or elsewhere, at a scale large enough to establish likely expectations of post-development stream conditions. Impervious cover continues to be widely accepted as an indicator of the complex impacts that are difficult to model sufficiently, including pollutants such as oil, gasoline, and salt associated with roads and parking areas, and impacts to groundwater quality and quantity, as well as heat island effects and the effects of more severe storms.

Gaining watershed-based knowledge on the efficacy of ESD for its ecological effects beyond hydrology will be valuable. ***But given the current lack of corroborating studies at a comparable scale, it remains prudent to include safeguards in addition to ESD to help ensure that the high quality watershed will continue to be able to sustain sensitive species and achieve high quality stream conditions over most of the watershed.***

Ex. K, at 16 (emphasis added); *see id.* at 16 (listing potential adverse impacts).

The Amendment also explains that high quality subwatersheds, with lower existing impervious cover, are more sensitive to change than already-developed areas with significant amounts of existing impervious cover (such as roads, parking lots and buildings).[20]  *Id.* at 17.  As such, the Amendment prescribed a 6% "impervious surface cap for new development in the most sensitive subwatersheds to minimize risk as much as possible."  *Id.*  The Amendment explains:

The highest levels of imperviousness allowed in this Amendment for new development (15 percent) are permitted in the Town Center District . . . where existing imperviousness levels are already high. Various alternatives were analyzed, and the vast majority of environmental experts indicated that the impervious cover increases in this area would have a smaller environmental impact than in the subwatersheds with the most sensitive and highest quality streams and existing low levels of imperviousness.

The lowest levels of impervious cover for new development are allowed in the subwatersheds west of I-270, ***because the tributaries to Ten Mile Creek in this area are unique and among the highest quality streams in the County. Restricting imperviousness, combined with ESD*** and development at or near ridgelines and away from stream channels, ***provides the best chance of protecting these streams.*** In addition, this Plan recommends expanding the environmental buffers around sensitive areas and protecting additional forest to preserve natural resources.

---

[20]   Thus, it is Plaintiffs who ignore the science (or, at the very least, a plausible explanation in the Amendment) when they randomly suggest the appropriateness of an 8% across-the-board imperviousness cap.  *See* Opp. at 18 n.8.

*Id.* (emphasis added).[21]

The Amendment describes the unique geographic and other features of the largest properties on the east and west sides of I-270, including Plaintiffs', and depicts the properties on two maps. Ex. K, at 34-47. The Amendment also describes the "Pulte and King Properties" and the discretion reserved to the Council by the 1994 Master Plan to consider other land use options for Stage 4 based on the impact of development in the watershed:

> These unique properties comprise almost 540 acres west of I-270 and between Shiloh Church and Clarksburg Roads (see Map 11). ***Three major Ten Mile Creek tributaries originate on the properties and two are contained almost entirely within them.*** The properties are a mix of woodlands and farm fields . . . .
>
> The 1994 Plan recommended the properties (and two other parcels to the north) for residential development, with a number of guidelines for environmental protection and housing unit mix. The Plan designated 600 acres as a receiving area for transferable development rights, with a maximum of up to 900 units. . . . The 1994 Plan also included a staging element. The Plan required further review of the effectiveness of stormwater practices and the monitoring of results from development elsewhere in Clarksburg, but in similar stream systems, before any development could be approved in this sensitive area.
>
> ***The Council reserved its authority to consider other land use actions, as appropriate, based on the results of this further review. This review has now been completed, and the analysis indicates that the proposed levels of development in the 1994 Plan would create a significant risk to stream quality in these sensitive subwatersheds.***
>
> ***The subwatersheds that would be affected by building out these properties are largely undeveloped, have high overall stream quality, and support many sensitive species. Any development of these properties will have a negative impact on stream quality. It is on these properties that preserving more undeveled and forested open space, along with [ESD], will most effectively reduce the impact of development on water quality.***
>
> ***This area includes the most sensitive subwatersheds***. . .(see Map 4). . . . The very low existing imperviousness and long-term agricultural uses have resulted in excellent stream conditions that have been maintained since monitoring began in 1994. ***Even small***

---

[21]     *See also id.* at 18 (reiterating that (1) land use measures, "in combination with" ESD, are required to protect Ten Mile Creek's ecological health and (2) the Amendment "sets different imperviousness levels for major properties on each side of I-270 to address the unique environmental conditions in the different subwatersheds and supports the Plan's land use objectives of allowing development that will support the Town Center."); 21-22 (Water Quality Plans for development in the watershed must apply ESD); 31-34 (balancing of environmental and development objectives was achieved by prescribing different land use measures for the east side of I-270, where significant development had already occurred and water quality was already compromised, and the west side, that was "undeveloped and forested land").

> ***changes in imperviousness will likely affect these subwatersheds, but if imperviousness is kept as near to five percent as possible, stream conditions can be maintained in the good to excellent range, based on the majority opinion of environmental experts.***

Ex. K, at 41 (emphasis added; footnote omitted).

Although the legitimate legislative concerns about Ten Mile Creek and maintaining it as a high quality benchmark against which other streams are compared might have warranted more restrictive zoning than was ultimately approved for areas west of I-270, to maximize the economic potential of property, the Council balanced those concerns against countervailing economic development concerns by recommending a higher maximum density than impervious limits would typically accommodate using traditional site design and forms of development. *Id.* at 31. "Property owners are provided a great deal of flexibility regarding unit types and, where appropriate, building heights, to allow them to achieve development objectives, if impervious caps can be met. Higher densities may encourage new forms of development as a means of achieving increased development potential." *Id.; see also id.* at 42. Notably, the Amendment also precludes additional impervious cover on 380 acres of County-owned property west of I-270, which are located within the same overlay zone as Plaintiffs' properties. *Id.* at 44-45.

The measures called for by the Amendment were implemented by the creation of the Clarksburg East and Clarksburg West Environmental Overlay Zones pursuant to ZTA 14-03.[22] The purpose of the overlay zones was "to preserve and protect sensitive natural resources in the watershed by reducing the amount of land disturbed for development. Limiting impervious surfaces enables natural filtering of water runoff and creates undeveloped open space that can be forested. This can help support cooler water temperatures and a diverse stream population of insects and invertebrates." *Id.* at 52; *accord* ZTA 14-03; Memorandum, Ex. F (ECF 145-7), at 7.

---

[22]     ZTA 14-03 is codified at §§ 59-4.9.4 – 59-4.9.5 of the County Code.

21

Against this backdrop, there can be no doubt that the environmental and other goals described in the Amendment were rationally related to the County's traditional police power. In light of the Council's detailed expression of its legislative purpose, Plaintiffs cannot meet the "high bar" of showing there was no conceivable rational relationship between the County's actions and the exercise of its police power through zoning. The Council's expression of its legislative purpose stands in stark contrast with the far different circumstances in cases cited by Plaintiffs.[23] As in *Quinn*, dismissal here is warranted, as it is not this Court's role to assess the correctness of policy decisions or whether legislative decisions lacked scientific support.

## IV.   Plaintiffs have failed to plead a cognizable equal protection claim.

In *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810 (4th Cir. 1995), the Fourth Circuit observed that different treatment of similarly situated parties does not, in and of itself, violate the Equal Protection Clause. 48 F.3d at 818. Likewise, equal protection "does not mean that persons in different circumstances cannot be treated differently under the law. Rather, the essential command of the Equal Protection Clause has always been that the classification of persons to which a law applies must be 'reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.'" *Id.* (citation omitted). Thus, the Supreme Court has cautioned: "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection

---

[23]      *See MLC Auto., LLC v. Town of Southern Pines*, 532 F.3d 269, 273-75 (4th Cir. 2008)(*Burford* abstention upheld where property rezoned after plaintiff was given written confirmation that proposed auto dealership conformed with zoning, and council meeting minutes were silent as to reasons for rezoning, save resident opposition); *Marks v. City of Chesapeake*, 883 F.2d 308, 309-13 (4th Cir. 1989)("*post hoc* explanation" that denial of permit to operate a palmistry was based on financial and commercial considerations were insufficient to overcome record of public hearing that denial was response to pressure "founded in religious prejudice"); *Browning-Ferris Indus. v. Wake Cty.*, 905 F. Supp. 312, 320 (E.D.N.C. 1995)(board's reason for denying access to interceptor was outside of its "purview" and was "best left to the responsible state regulatory agency.").

challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993).

Because this case involves zoning/land use legislation, the requisite level of scrutiny is rational basis review, which poses the question of "whether local officials 'reasonably could have believed that [their] action was rationally related to a legitimate governmental interest.'" *Tri-County Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 439 (4th Cir. 2002) (citation omitted). The Supreme Court and the Fourth Circuit have oft reiterated that a party asserting an equal protection challenge to a statute must negate "every conceivable basis which might reasonably support the challenged classification." *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.,* 507 F.3d 290, 293 (4th Cir. 2007); *see also Beach,* 505 U.S. at 314-15; *Moore-King v. County of Chesterfield,* 708 F.3d 560, 572 (4th Cir. 2013); *Sowers v. Powhatan Cty.*, 347 F. App'x 898, 902-03 (4th Cir. 2009); *Herman v. Lackey*, 309 F. App'x 778, 785 (4th Cir. 2009) (affirming dismissal of equal protection claim).  The inquiry ends if a plaintiff cannot meet this burden.

In *Beach*, the Supreme Court explained:

> [B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. . . . In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. . . . "'Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.'"

508 U.S. at 315 (citations omitted); *accord Del Marcelle v. Brown Cty. Corp.,* 680 F.3d 887, 899 (7th Cir. 2012)("The rational-basis test is an ingenious device for uncovering unconstitutional discrimination in legislative classifications. Reluctant to inquire into the personal motivations of lawmakers, judges ask instead whether an objective basis can be posited for a statutory classification challenged as discriminatory."); *Tri-County,* 281 F.3d at 439; *Sylvia,* 48 F.3d at

820 (reiterating that "substantial judicial deference is required so that the court does not substitute its value judgments for those established by the democratically chosen branch.").

In their Opposition, Plaintiffs, for the first time, claim to be a "class of one" and, in contrast to an abundance of authority, argue that subjective "motive matters" in assessing whether a legislative body had a rational basis for making a classification. *See* Opp. at 19. Thus, Plaintiffs would have this Court conduct an extensive inquiry into individual legislators' subjective motivations, when the notion of such an inquiry is deemed inappropriate by the weight of authority. In making these arguments, Plaintiffs rely chiefly on *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  As will be discussed below, this argument is unsupportable.

A.    **"Class of one" equal protection claims cannot be asserted with respect to individualized, discretionary acts of legislative bodies.**

Plaintiffs ignore more recent decisions which have called into question the continued viability of "class of one" claims involving discretionary government decision-making.  The Supreme Court explained that *Olech* recognized "that an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008).[24] In *Olech,* a municipality required a landowner to grant it a 33-foot easement as a condition to her connecting to the municipal water supply, when other landowners were required to grant only a 15-foot easement.  528 U.S. at 563. In *Engquist,* the Court explained *Olech's* rationale for permitting an equal protection claim in the absence of class-based discrimination:

> What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was

---

[24]    *See also Bechtold v. Hogan*, 2017 WL 782274, *2 n.3 (D. Md. Feb. 27, 2017) ("'Class of one' claims, which arise when the plaintiff alleges a violation of the Equal Protection Clause but does 'not allege membership in a class or group,' are subject to rational basis review….").

exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, ***however typical such determinations may be as a general zoning matter***.

*Enquist*, 553 U.S. at 602-03 (emphasis added).  The Court continued:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603.  Accordingly, in *Enquist,* the Court held that "the class-of-one theory does not apply in the public employment context."  *Id*. at 598.

In *Mathis v. McDonough*, 2014 WL 3894133 (D. Md. Aug. 7, 2014), Judge Hollander granted a motion to dismiss and, with respect to a class of one equal protection claim, explained:

> Taking a cue from the Supreme Court's reasoning, a number of courts have questioned whether "class of one" claims in the context of discretionary decision-making remain viable after *Enquist.*
>
> \*       \*       \*
>
> To date, the Fourth Circuit has not addressed the impact of *Enquist* on the viability of class-of-one equal protection claims. . . . Nevertheless, subsequent to *Enquist*, the approaches of other courts cast significant doubt on the viability of a class-of-one theory in this context.

2014 WL 3894133, at *28 (citing cases); *see also Jones v. Prince George's Cty. Pub. Schools*, 2016 WL 4077711 (D. Md. Aug. 1, 2016).  Relevant here, in *Srail v. Village of Lisle,* 588 F.3d 940, 944-45 (7th Cir. 2009), the court held that it harbored "serious doubts" that a municipality's "decision to extend its water mains to some communities and not others" could serve as the basis for a cognizable class of one equal protection claim.  In affirming dismissal of the claim, the court explained that the municipality's decision "is the exact type of individualized and discretionary decision-making to which the *Enquist* Court was referring."  *Id.*

In Maryland, it is recognized that

[t]he very nature of the zoning process requires that parcels of land—even neighboring land—be considered individually. Although neighboring parcels may share some characteristics, each parcel is unique and may not share all of the relevant characteristics possessed by adjacent or nearby parcels. If we were to adopt [an] argument that . . . rights to equal protection have been violated simply because neighboring land has been zoned differently from its land, we would be doing away with the zoning process altogether.

During the quadrennial comprehensive zoning process, the County reviews the current zoning structure, evaluates the changes in the community and environment, and makes any necessary amendments it deems appropriate. "Lines ... must be drawn somewhere."

*Security Mgmt. Corp. v. Baltimore Cty.,* 655 A.2d 1326, 1331 (Md. App. 1995) (citation omitted); *accord Engquist,* 553 U.S. at 602-03 (recognizing that zoning decisions generally involve individualized determinations); *see also Beach,* 508 U.S. at 315-16 (in the context of cable franchising legislation, recognizing that the restraints which are part and parcel of rational basis review "have added force 'where the legislature must necessarily engage in a process of line-drawing.'"); *Neifert v. Department of the Env.*, 910 A.2d 1100, 1117 (Md. 2006) (affirming grant of summary judgment as to equal protection claim arising from law which restricted ability to obtain sewer service and noting: "The Department is not required to choose the fairest or best means of advancing its goals. . . .  Appellants can assert that the goals could be achieved through other means . . . but it is not this Court's role to determine the wisdom, fairness, or logic of the Department's line-drawing.").

As described in the Memorandum and above, the Plan expressly reserved to the Council the discretion and authority to "[c]onsider such other land use actions as are deemed necessary" before moving forward with development in Stage 4 of Clarksburg.  *See* Memorandum at 3-5 and Ex. B at 198-99.  The process of adopting, amending and implementing a master plan and related legislation, such as a sectional map amendment,[25] necessarily involves individualized,

---

[25]     In *County Council of Prince George's Cty. v. Offen,* 639 A.2d 1070, 1074-76 (Md. 1994), the court rejected a landowner's challenge to comprehensive rezoning that downzoned property from commercial to residential-agricultural pursuant to a sectional map amendment.  The court noted that judicial review of the rezoning was

discretionary determinations involving many unique parcels and many, sometimes, countervailing considerations such as environmental protection and economic development. That was no less the case in connection with the adoption of the Amendment to the Plan. As Plaintiffs state in their Opposition, as a would-be "class of one," they are not claiming to have suffered class-based discrimination by the Defendants, but rather claim they were treated differently than any and all other parties. Because the legislative decisions at issue here necessarily involved subjective, discretionary, individualized determinations about land use and land use policy, in light of *Engquist* and its progeny, Plaintiffs' "class of one" equal protection claim cannot be sustained and must be dismissed.

### B. *Olech* did not alter the elements of proving equal protection claims.

If the Court determines that Plaintiffs may assert a "class of one" equal protection claim, it must nonetheless reject their assertion that *Olech* altered well-established precepts of rational basis review and dismiss their claim. Plaintiffs argue that subjective "motive matters," because legislators' subjective intent is relevant to rational basis review. Opp. at 18-19. The Fourth Circuit, this Court and courts in other circuits since *Olech*, however, have found that rational basis review in class of one cases is properly limited to an assessment of whether there are one or more objectively plausible, conceivable or even hypothetical reasonable bases for a classification, each of which must be negated by a plaintiff.

For example, in *Sowers,* a land developer brought a class of one equal protection claim after a local board of supervisors denied his rezoning application. In affirming the district court's grant of summary judgment in favor of the defendant, the Fourth Circuit, citing to the Supreme Court's decision in *Beach* and its earlier decision in *Tri-County*, expressed:

> Rational basis review does not require us to determine the Board's actual motivation. . . .

limited in scope and was given a presumption of correctness that "is particularly difficult for a property owner to overcome[.]". 639 A.2d at 1074.

> We need only decide whether the Board had plausible reasons for its different treatment of Sower's application. . . . The deference to democratic process that undergirds rational basis review means that we consider only whether the Board "reasonably could have believed that [its] action was rationally related to a legitimate governmental interest."
>
> Because Sowers is unable to "negative every conceivable basis which *might* support" the Board's action, he cannot prevail on his Equal Protection claim as a matter of law.

347 F. App'x at 903 (citations omitted; ellipses and italics in *Sowers*).[26]

*Olech* does not say that, in applying the rational basis test, a court can substitute its policy judgment for a democratically elected legislature.  *Olech* also does not say that the scope of rational basis review is different in a "class of one" case as compared to a class of two or more case.  These propositions are not stated in *Olech* or in any case relied upon by Plaintiffs because they would make no logical sense:  Why should the scope of rational basis review of government action be different depending on whether the claim is brought by a class of one or class of many?  The cases cited above (1) demonstrate that Plaintiffs' assertion that "Defendants misrepresent the applicable legal standard" (Opp. at 18) is without basis and, more importantly, (2) dictate that in a rational basis analysis, subjective motive does not, in fact, matter.[27]

---

[26]     *See also Herman,* 309 F. App'x at 784-85 (affirming dismissal of claim and noting that "the district court was correct when it stated that 'one can easily hypothesize "rational" scenarios for [the defendant's] alleged conduct.'"); *Mathis,* 2014 WL 3894133, at *31 ("plaintiff falls well short of alleging 'enough factual matter to plausibly show there was not "any conceivable basis" that rationally supported the enforcement of Maryland election law."); *Srail,* 588 F.3d at 946-48; *Maryland Reclamation,* 994 A.2d at 871-72 (rejecting landowner's argument that it was unfairly targeted and noting that, in determining whether a bill was arbitrary and capricious, the court "'must judge by results, not by the varied factors which may have determined legislators' votes.  We cannot undertake a search for motive.'").  *South Lyme Prop. Owners Assoc., Inc. v. Town of Old Lyme,* 539 F. Supp. 2d 524, 540 (D. Conn. 2008), cited by Plaintiffs, also rejects their claim that subjective motive matters in rational basis review:

> The Plaintiffs do not explicitly argue that they have brought a "class of one" claim, and they could not argue successfully that they should be allowed to use this doctrine so as to prove their equal protection claim with evidence of the Commission's allegedly discriminatory motives. The Plaintiffs cannot circumvent the clear limitations on rational basis review discussed above in this manner. The Defendants' actual motives in adopting the 1995 Regulations are not relevant to the equal protection claim. The Court need only determine whether the seasonal use restrictions in the 1995 Regulations are rationally related to some conceivable legitimate municipal purpose.

[27]     Plaintiffs' reliance on *Virginia Uranium, Inc. v. Warren,* 848 F.3d 590 (4th Cir. 2017), a preemption case, is misplaced.  *Warren* did not involve an equal protection claim and only mentioned in dicta the Equal Protection Clause in relation to cases that do not involve rational basis review.  848 F.3d at 597-98 (noting that pretext analysis

28

**C.      Plaintiffs cannot identify parties with whom they are similarly situated.**

To show that "similarly situated" parties exist, a plaintiff must "'identify persons materially identical to him . . . who have received different treatment.'"  *Bechtold*, 2017 WL 782274, at *3 (citation omitted; ellipses in original); *see also Sono Irish,  Inc. v. Town of Surfside Beach*, 2015 WL 2412156, *6 (D.S.C. May 21, 2015)("For a plaintiff to demonstrate that it is similarly situated, 'the evidence must show an extremely high degree of similarity between [the plaintiff] and the persons to whom [the plaintiff] compares.''); *Maryland Manor Assocs. v. City of Houston,* 816 F. Supp. 2d 394, 404  (S.D. Tex. 2011) (citing cases which state that identified comparators must be "'similarly situated in all *relevant respects*'" and "'directly comparable in all *material respects*.'")(emphasis in original).

On the facts alleged, Plaintiffs could not identify any similarly situated parties.  As discussed above, the Amendment explains that Plaintiffs' property is unique in terms of its (1) size, (2) location on the west side of I-270; (3) distance from the Clarksburg town center; (4) undeveloped state and existing level of impervious surface;[28] and (5) containment of three major tributaries of Ten Mile Creek which originate within its borders, two of which are almost entirely within them.  No other property is similarly situated.  *See Security Mgmt.,* 655 A.2d at 1331 ("Although neighboring parcels may share some characteristics, each parcel is unique and may not share all of the relevant characteristics possessed by adjacent or nearby

---

is necessary "in those contexts because a more searching scrutiny of legislative intent is needed in order to avoid the circumvention of a federally protected right.")(quotation marks and modifications omitted) (citing *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013)(reviewing the Defense of Marriage Act and finding that it explicitly discriminated against same-sex couples) and *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016)(reviewing North Carolina law that "surgically" restricted voting rights of African Americans)).

[28]    In  *Tahoe,* 535 U.S. at 308 (citation omitted), Supreme Court noted:

"Impervious coverage—such as asphalt, concrete, buildings, and even packed dirt—prevents precipitation from being absorbed by the soil. Instead, the water is gathered and concentrated by such coverage. Larger amounts of water flowing off a driveway or a roof have more erosive force than scattered raindrops falling over a dispersed area—especially one covered with indigenous vegetation, which softens the impact of the raindrops themselves."

parcels."). These factors, which are unique to Plaintiffs' property, dictated what land use measures were applied to it—this is fully explained in the Amendment.[29]

### D. The Amendment's treatment of Plaintiffs' property, and any classification of them in it, is rationally related to a legitimate governmental interest.

Even assuming, *arguendo*, that Plaintiffs could identify a similarly situated party from whom they received disparate treatment, they cannot, as a matter of law, establish that the legislation in question does not serve legitimate governmental interests and, with respect to Plaintiffs' property, that the County's action was not rationally related to such interests. As discussed above, from the text of the legislation, it cannot reasonably be said the Amendment does not address legitimate governmental interests such as environmental protection.[30] Likewise, it cannot reasonably be said that the Council did not have plausible reasons for any disparity in the treatment of Plaintiffs' property (*i.e.*, how it was classified) or that the Council did not reasonably believe that its actions were rationally related to the legitimate governmental interests considered in adopting the Amendment and related legislation. In short, it is apparent from the four corners of the Amendment that the Council, in a pragmatic and responsible fashion, tried to strike a difficult balance between countervailing environmental, economic and other concerns.

In *Tri-County,* a landowner brought an equal protection claim after a county denied its application for a permit to build an asphalt plant, passed a one-year moratorium on the construction of asphalt plants and enacted an ordinance that required a polluting industry to obtain a special use permit and restricted the location of such industries.  281 F.3d at 434-35.

---

[29]     The Equal Protection Clause contemplates that persons who are not similarly situated can be treated differently.  *See Sylvia,* 48 F.3d at 818.  The uniqueness of Plaintiffs' and the other properties described in the Amendment highlights that individualized, discretionary decision-making necessarily occurred in the adoption of the Amendment, so as to preclude a class of one equal protection claim in light of *Engquist.*

[30]     Indeed, this is not disputed by Plaintiffs in their Opposition.

The text of the moratorium cryptically stated that its purpose was "'to protect the public health, safety, general welfare, and property values of citizens . . . from potential adverse health effects caused by [asphalt] facilities.'"  *Id.* at 439 (ellipses in original).  In affirming a grant of summary judgment of the equal protection claim, the Fourth Circuit expressed that it "need look only to the text of the [legislation] to uncover the County's legitimate governmental purpose" and, thus, "[t]he actual motivation for the County's actions are irrelevant."  *Id.*  Based only on the cryptic statements in the legislation about the county's purpose for passing the moratorium and enacting the ordinance, the court agreed that county officials reasonably could have believed that their actions were rationally related to a legitimate interest in protecting public health and safety and, thus, that their actions did not constitute a violation of equal protection.  *Id.* at 439-40; *see also Quinn v. Board of Cty. Comm'rs,* 124 F. Supp. 3d 586, 599-600 (D. Md. 2015)(dismissing equal protection claim because county reasonably believed that water and sewer plan was rationally related to legitimate government interest in reducing impact of overdevelopment on the environment and limited public facilities), *aff'd,* 2017 WL 2883219, *6-7 (4th Cir. July 7, 2017).

Likewise, here, the Court need look only to the text of the legislation which, much more than cryptically, explains the legitimate governmental interests addressed and how the Council's action with respect to Plaintiffs' property was rationally related to such interests.  A review of its text reveals that, in passing the Amendment, the Council balanced several social and economic policies, including protection of a pristine stream and its watershed and providing support to the Clarksburg town center and businesses therein.  It is indisputable that these are legitimate governmental interests.  *See, e.g., Security Mgmt.,* 655 A.2d at 1329 (observing that "conservation of watersheds and the limitation of development in those

31

watersheds" is a legitimate governmental interest).[31]  It is also indisputable that the Amendment identifies very plausible reasons for how Plaintiffs' property was treated (whether it be different or not) and that the Council "'reasonably could have believed that [their] action was rationally related'" to the legitimate government interests they addressed.  *Tri-County,* 281 F.3d at 439.

Plaintiffs cannot be allowed to litigate questions as to whether the actual motivations for the legislation were other than as stated in the Amendment or whether legislative decisions based on understandings of scientific principles were wrong or unsupported.  Rational basis review of social or economic legislation is designed to avoid the very inquiry Plaintiffs propose.  *See Beach,* 508 U.S. at 315 ("it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. . . . In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *see also Heller v. Doe*, 509 U.S. 312, 319 (1993)(a classification "neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."); *Sowers,* 347 F. App'x at 902-03 (same).  Again, this Court cannot substitute its policy judgments for those of the Council.

Defendants do not argue that the reason for the legislative enactment does not matter—it does.   However, in cases involving rational basis review, when, as here, ***objectively*** plausible bases for the legislative action are identified, the Court must not go beyond the four corners of the legislation.  Thus, as a matter of law, rational basis review here must end with the

---

[31]     In *Sowers,* the court also noted that "public opposition does furnish a rational basis for differential treatment in zoning decisions."  347 F. App'x at 903; *see also Sunrise Corp of Myrtle Beach v. City of Myrtle Beach,* 420 F.3d 322, 329 (4th Cir. 2005)(evidence that government officials "responded to public opposition does not rise to the level of a Constitutional violation, because we have recognized that matters of zoning are inherently political, and that it is a zoning official's responsibility to mediate disputes between developer, and local residents."); *Tri-County,* 281 F.3d at 44 (observing that no other building permit applicant had met with the kind of public apprehension as the proposed asphalt plant).

identification of *objectively* plausible bases for the Council's action.  Lines were necessarily drawn and difficult decisions were made in passing the Amendment, and Plaintiffs cannot possibly negate every conceivable basis which might support how their property was treated or classified.  Accordingly, Plaintiffs' equal protection claim must be dismissed.

## V.      Plaintiffs have not stated a takings claim under *Lucas* or *Penn Central*.

Plaintiffs' Complaint concedes that, under the RNC zoning presently applicable to their property, they can develop approximately 93 acres of the property.  Complaint, p. 3, ¶ 83. Further, Plaintiffs do not dispute that they may develop up to approximately 660 units with MPDUs with water and sewer service, or 108 units without.  These figures are calculated based on the density prescribed in the County Code.  *See* County Memorandum at 30-31.  Notwithstanding the fact that their property is developable, and remains idle by their choice,[32] as opposed to by government fiat, Plaintiffs argue that they may recover for a *per se* regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).[33]

In *Lucas,* the Court held that a landowner has suffered a *per se* regulatory taking when it "has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle."[34]  505 U.S. at 1019 (emphasis in original); *see also id.* at 1010 (referring to lower court's finding that statute in question obliterated the value of the owner's lots), 1030 (characterizing its holding as requiring a "'total taking' inquiry").  To amplify its holding that "all" indeed means "all", the Court noted

---

[32]      The Council approved a comprehensive water and sewer plan for the Ten Mile Creek area in July 2016, thus allowing developers to submit development plans. Plaintiffs have still not done so.

[33]      A *per se* taking also occurs when a landowner suffers a permanent physical invasion of its property.  *See, e.g., Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 538 (2005); *Lucas,* 505  U.S. at 1015.  Plaintiffs have not alleged that a physical taking has occurred.

[34]      Under *Lucas,* even complete deprivation of use "will not require compensation if the challenged limitations 'inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership.'"  *Murr,* 137 S. Ct. at 1943 (quoting *Lucas,* 505 U.S. at 1029; ellipses in *Murr*).

that an owner, whose property is diminished in value by 95%, cannot "claim the benefit of our categorical formulation" *Id.* at 1019 n.8.   Specifically citing to the *Lucas* Court's 95% example, including in June of this year, the Court has since reinforced that "all" does indeed mean "all."   *See Murr,* 137 S. Ct. at 1949;[35] *Tahoe*, 535 U.S. at 332 (explaining that *Lucas* "carved out" a limited rule applicable to "'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.' . . . The emphasis on the word 'no' in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%."); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 631 (2001)(denial of applications to develop a subdivision and beach club did not give rise to a *Lucas* takings claim because owner could build a residence on his 18-acre parcel).[36]

Thus, unless a regulation **completely** deprives an owner of **all** economically beneficial use of its property, any takings claim must be analyzed under the factors set forth in *Penn Cent. Transp. Co. v. New York City*, pursuant to which a taking **may** be compensable if interferes with a landowner's "distinct investment-backed expectations." 438 U.S. 104, 124 (1978); *see also Lingle*, 544 U.S. at 539-40 (analysis is of the degree to which a regulation "interferes with legitimate property interests.").   Here, it is indisputable that Plaintiffs'

---

[35]     In *Murr*, the property owners, similar to Plaintiffs here, asserted that *Lucas* applied because state law "deprived them of 'all, or practically all, of the use of'" a lot.  137 S. Ct. at 1941.  This argument was rejected because the owners were not in fact "deprived of all economically beneficial use of their property."  *Id.* at 1949.

[36]     *See also Quinn*, 2017 WL 2883219, at *4 (statutory merger requirement is not a *per* se taking under *Lucas* because "the lots are still developable, albeit less densely than Quinn had hoped."); *Lee,* 2011 WL 2443713 at *3 (dismissing takings claim, *inter alia,* because the complaint did not "sufficiently allege that the rezoning of the Property rendered it valueless."); *Frall,* 2008 WL 4533910, at *10-11 (dismissing takings claim because plaintiff failed to allege that denial of sewer service deprived owner of all beneficial or productive use of land);  *Security Mgmt.*, 655 A.2d at 1329-30 (zoning classification used to protect watershed did not deprive landowner of "all economically beneficial or productive use of its land"  and, therefore, no protected right was taken.)  The Court of Special Appeals' decision in *Steel v. Cape Corp.*, 677 A.2d 634 (Md. App. 1996), cited by Plaintiffs, is consistent with the categorical rule enunciated in *Lucas* in that the zoning in question left the owner with "no viable economical uses of the property."  677 A.2d at 651.

property may be put to substantial economic use.  Accordingly, any analysis of whether the

adoption of the Amendment and the related enabling legislation resulted in a compensable

taking must be in accordance with *Penn Central*.[37] *E.g, Lucas*, 505 U.S. at 1019, 1019 n.8.

The Supreme Court recently said that, in determining whether a claimed regulatory

taking is compensable, a court must objectively assess a landowner's "reasonable expectations

about property ownership."  *Murr,* 137 S. Ct. at 1945.  In making this assessment, a court

must give

> substantial weight to the treatment of the land, in particular how it is bounded or
> divided, under state and local law.  The reasonable expectations of an acquirer of land
> must acknowledge legitimate restrictions affecting his or her subsequent use and
> dispensation of the property. . . . A reasonable restriction that predates a landowner's
> acquisition . . . can be one of the objective factors that most landowners would
> reasonably consider in forming fair expectations about their property. *See* [*Palazzolo*,
> 533 U.S. at 627] (*"[A] prospective enactment, such as a new zoning ordinance, can
> limit the value of land without effecting a taking because it can be understood as
> reasonable by all concerned"*).

*Id.* (emphasis added); *see also Quinn,* 2017 WL 2883219, at *2-4 (affirming dismissal of

takings claim and explaining that even a town's unreasonable delay in providing sewer

service cannot support a takings claim because, under federal and Maryland law, a landowner

has no "property right in access to a sewer system").  In short, "the Court's case law . . .

recognizes that reasonable land-use regulations do not work a taking."  *Murr*, 137 S. Ct. at

1947.  Courts must also "look to the physical characteristics of the landowner's property.

These include the physical relationship of any distinguishable tracts, the parcel's topography,

and the surrounding human and ecological environment. *In particular, it may be relevant that

the property is located in an area that is subject to, or likely to become subject to,

environmental or other regulation."  Id.* at 1945-46 (emphasis added).

---

[37]     Confusingly, Plaintiffs criticize the County for relying on pre-*Penn Central* cases for the proposition that
diminution in property value, standing alone, cannot establish a taking.  *See* Opp. at 45 (referring to Memorandum,
at 30 n.16).  Careful scrutiny of the County Memorandum would show that the Supreme Court, not Defendants,
cited to the *Euclid* and *Hadacheck* cases in the passage quoted from *Penn Central*.

In *Murr*, the landowners' parents had held title to two contiguous river-front lots, one of which was titled in the parents' individual names and the other in a corporate name. Together, the lots included a buildable area of only 0.98 acres.  Before the landowners took title to the lots, the state promulgated rules and the county passed an ordinance which prevented the use of lots as separate building sites unless they had at least one acre of land suitable for development.  *Id.* at 1940.  The rules and ordinance included a merger provision, applicable to adjacent lots under common ownership, which prohibited individual sale or development of lots that did not meet the minimum size requirement.  *Id.*  The landowners sued for a taking after their variance requests were denied.

After holding that the owners could not recover under *Lucas* because they were still able use the two lots for residential purposes, the Court went on to hold that they also could not recover under the *Penn Central* test.  *Id.* at 1949-50.  In pertinent part, the Court stated:

> Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots. Finally, the governmental action was a reasonable land-use regulation, enacted as part of a coordinated federal, state, and local effort to preserve the river and surrounding land.

*Id.  Murr's* holding conforms to the key tenet from *Penn Central* and the Court's subsequent decisions, including *Lingle,* that an alleged taking is not compensable if state action did not interfere with a landowner's reasonable expectations and legitimate property interests.  Under the analysis required by the Supreme Court's decisions, if the Amendment did not interfere with Plaintiffs' ***reasonable*** expectations or interfere with their ***legitimate*** property interests, then any taking effected by the land use measures in the Amendment is not compensable.

Plaintiffs note that they own fee simple interests in the real estate and assert that Defendants cite to no authority "for the notion that a lack of a vested right is fatal to a takings claim."  Opp. at 46.  First, Defendants have not taken any part of Plaintiffs' fee simple interest

36

in property.  What Plaintiffs actually contend is that the County took their perceived right to develop the property pursuant to the zoning in effect when they bought the property and that the County interfered with their right to obtain faster approval for public water and sewer.

Second, as the Fourth Circuit made clear in *Quinn*, the lack of a property right is fatal to a takings claim, whether analyzed under *Lucas* or *Penn Central*.  There, the court explained that both under federal and state law, the landowner had no right to expect that his properties would receive public sewer service.  2017 WL 2883219 at *2-5.  Thus, government action which denies or delays access to public sewer, as a matter of law, cannot interfere with an interest to which a property "had no entitlement." *Id.* at *5.  Here, Plaintiffs had no legitimate entitlement to (1) the zoning classification of their property before 2014 or (2) receiving public water and sewer service.  Defendants have cited numerous other cases in which courts, after finding that plaintiffs lacked protectable property rights for purposes of due process claims, also dismissed takings claims based on the clearly, factually interrelated proposition that the plaintiffs also lacked legitimate property interests for purposes of takings claims.  *See, e.g., Sono*, 2015 WL 2412156 at *11; *Frapple, L.P. v. Commissioners of the Town of Rising Sun*, 2012 WL 835604, *8-9 (D. Md. Mar. 8, 2012); *Lee*, 2011 WL 2443713 at *2.  These cases and *Quinn* make clear that the lack of a vested property right for purposes of a due process claim is probative in assessing the reasonableness of a landowner's legitimate expectations for purposes of a takings claim.

When they purchased their property, Plaintiffs could not have had a legitimate expectation that the zoning would remain unchanged—the Plan informed that it may change within 10-20 years from its adoption and expressly vested in the Council broad discretion to implement such land use measures as it deemed appropriate based on its assessment of development through Stage 3 and impacts on Ten Mile Creek. The public was on notice of

37

this real possibility and Plaintiffs, as prospective purchasers, could not have reasonably expected that the status quo which existed when they contemplated buying land and TDRs would remain as such forever.  Moreover, as a matter of federal and Maryland law, Plaintiffs did not have vested property rights in the prior zoning classification or in obtaining public service.  Thus, it necessarily follows that any expectation by Plaintiffs that zoning would remain unchanged or public water and sewer service would be obtained, as a matter of law, would be unreasonable.  As in *Murr,* Plaintiffs cannot recover for a taking because, when they bought their property, it was "located in an area that is subject to, or likely to become subject to, environmental or other regulation." 137 S. Ct. at 1945-46.  Also, as discussed above, there has been no taking of Plaintiffs' TDRs, which today retain value on the open market.

Last, even if Plaintiffs did have legitimate property interests that were taken, the taking is, nonetheless, not compensable because the Amendment and the implementing legislation are reasonable land use regulations. *See, e.g., Murr, supra; Quinn*, 2017 WL 2883219, at *5 (reasonable land use regulations "to control density of development to prevent the overburdening of public services, environmental damage, and other harms," are not compensable as takings).  Accordingly, Plaintiffs' takings claim must be dismissed.

## VI.    Plaintiffs' Procedural Due Process claim fails as a matter of law.

As discussed above, each of Plaintiffs' due process claims fail because they have not asserted a constitutionally protected property interest.   Further, the alleged procedural irregularities on which Plaintiffs rely amount to nothing.  Plaintiffs have identified no County procedure that was not followed.  First, it is standard practice for a legislative body to hold public hearings, take submissions from the public by a specified date, then hold committee sessions to digest the information submitted and gather any additional information that may be needed.  This allows legislators and their staff to gain an understanding of the policy issues under

consideration and work out the details of the proposed legislative measure.

Second, Plaintiffs' *ex parte* contact argument is without merit because it applies only to quasi–judicial adjudications made on the record, not legislative proceedings.   Plaintiffs' argument has no application to the legislative process of amending a master plan.   Moreover, it is well-recognized that interactions between elected officials and their constituents or with public and private interest groups are "part and parcel" of the modern legislative process.   *See Bruce v. Riddle,* 631 F.2d 272, 279-80 (4th Cir. 1980).

Third, Plaintiffs' perception that there was some irregularity in the process by which the SPA was approved is ill-conceived.   The Amendment required the creation of a new SPA and a revision of the boundaries of the existing Clarksburg SPA.   Once a draft Resolution was generated, Council staff made the following unremarkable recommendation: "***Pending any new information at the public hearing***, Staff recommends the Committee support approval of the resolution to establish the Ten Mile Creek SPA and redefine the boundaries of the Clarksburg SPA.…"   **Ex. L**, Memorandum to PHED Committee from Marlene Michaelson, at 2 (emphasis added).   Plaintiffs feign disbelief that this "extraordinary" recommendation was made prior to the public hearing.   Opp. at 41.   However, it is clear from the text of the memorandum that it was understood that the Committee would consider information adduced at the September 9, 2014 hearing.   There has been no allegation that the staff recommendation violated a specific procedural requirement, much less Plaintiffs' procedural due process rights.

Finally, Plaintiffs have failed to allege that, but for these purported procedural irregularities, a different outcome would have resulted.   *See Graham v. Mukasey,* 519 F.3d 546, 549-50 (6th Cir. 2008)("[T]o establish the requisite prejudice, he must show that the [alleged procedural] due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations."); *Garza-Moreno v. Gonzales*, 489 F.3d

239, 241-42 (6th Cir. 2007)(petitioner must show that a complete and accurate transcript "would have changed the outcome of the case"); *Griffin-Bey v. Bowersox,* 978 F.2d 455, 456 (8th Cir. 1992)(denying due process claim because plaintiff failed to assert that but for the alleged violation a "different outcome at the disciplinary hearing" would have occurred).

## VII.   Plaintiffs' Article 19 claim should be dismissed.

Plaintiffs incorrectly suggest that Article 19 of the Maryland Constitution creates a cause of action where none exists.  *See* Opp. at 47-49.  As explained in *Robinson v. Bunch*, 788 A.2d 636, 644 (2002):  "Where a person ***clearly has a right to money or property under a statute or common law principle***, and no statute specifically provides for a remedy, ***Article 19 guarantees a common law remedy to enforce the right***."  (Emphasis added).  Because Plaintiffs fail to assert a cognizable constitutional[38] or common law claim that would give rise to a remedy, Count V must also be dismissed.[39]  *See Williams v. Wicomico Cty. Bd. of Educ.*, 2012 WL 4517745, *6 (D. Md. Oct. 1, 2012)(dismissing Article 19 claim because plaintiff failed to make an "initial showing" that a "protected interest existed"); *Doe v. Doe*, 747 A.2d 617, 625 (Md. 2000)(refusal to recognize a cause of action never previously recognized as a tort in Maryland does not deprive access to the courts).  Accordingly, Plaintiffs' Article 19 claim should be dismissed.

## VIII.   Conclusion

For the reasons stated herein and in the County's previously filed Memorandum, Defendants request that the court grant their Motions for Judgment.

---

[38]     As set forth in the Memorandum, Plaintiffs' Article 19 claims should be dismissed because they fail to allege a viable Constitutional claim. *See also Booth v. Maryland*, 337 F. App'x 301, 313 (4th Cir. 2009) (dismissing Article 19 and 24 claims because plaintiff failed to establish federal due process claim).

[39]     Citing *Rios v. Montgomery Cty.*, 872 A.2d 1, 19-21 (Md. 2005), Plaintiffs argue that Article 19 does not "rely on the existence of a property interest."  Opp. at 47.  *Rios*, however, did not involve an alleged injury to person or property, but rather analyzed whether the Local Government Tort Claims Act's 180-day notice requirement restricted access to the courts. Here, there is no allegation that Defendants restricted "a right of access to the courts."

Respectfully submitted,

|  |  |
|---|---|
| _____/s/_____ | _____/s/_____ |
| John P. Markovs (Bar No. 07599) | William C. Dickerson  (Bar No. 10791) |
| Paul F. Leonard, Jr. (Bar No. 14781) | Tracey A. Harvin (Bar No. 26437) |
| Patricia P. Via (Bar No. 04829) | Elizabeth L. Adams (Bar No. 27565) |
| Montgomery County, Maryland | Maryland-National Capital Park and |
| 101 Monroe Street, 3rd Floor | Planning Commission |
| Rockville, MD 20850 | 6611 Kenilworth Avenue, Suite 200 |
|  | Riverdale, MD 20737 |
| Erek Lawrence Barron (Bar No. 15693) |  |
| Whiteford, Taylor & Preston L.L.P. |  |
| 7501 Wisconsin Avenue, Suite 700W | Thomas J. Whiteford (Bar No. 22965) |
| Bethesda, MD 20814 | Aaron L. Casagrande (Bar No. 28518) |
|  | Patrick D. McKevitt (Bar No. 30078) |
|  | Whiteford, Taylor & Preston L.L.P. |
|  | Seven Saint Paul Street |
| John J. Hathway (Bar No. 03847) | Baltimore, MD 21202 |
| Whiteford, Taylor & Preston L.L.P. |  |
| 1800 M Street, N.W. | *Counsel for Defendant, Maryland-National* |
| Suite 450N | *Capital Park and Planning Commission* |
| Washington, D.C. 20036 |  |

Howard R. Feldman (Bar No. 05991)
Cara C. Murray (Bar No. 28843)
Whiteford, Taylor & Preston L.L.P.
7 St. Paul Street
Baltimore, MD 21202

*Counsel for Montgomery County, Maryland*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August, 2017, a true and correct a copy of the foregoing was served upon all counsel of record via CM/ECF, including:

> Deborah J. Israel, Esquire
> Louis J. Rouleau, Esquire
> Lela M. Ames, Esquire
> Womble, Carlyle, Sandridge & Rice PLLC
> 1200 19th Street, N.W.
> Suite 500
> Washington, D.C. 20036
>
> *Counsel for Plaintiffs*


                                          _____/s/_____
                                          Howard R. Feldman

2252161