FILED
U.S. DISTRICT COURT
2017 AUG 25 P 2: 51
CLERK'S OFFICE
AT ...
BY _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Southern Division

|  |  |  |
|---|---|---|
| PULTE HOME CORPORATION AND SHILOH FARM INVESTMENTS, LLC, | * | |
| Plaintiffs, | * | Case No.: GJH-14-3955 |
| v. | * | |
| MONTGOMERY COUNTY, MARYLAND, *et al.* | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Pulte Home Corporation and Shiloh Farm Investments, LLC (collectively, "Plaintiffs"),

made a substantial investment in 541 acres of undeveloped land in Clarksburg, Maryland in

hopes of developing the property. Steps taken by Montgomery County, Maryland (the "County")

and the Maryland-National Capital Park and Planning Commission (the "Commission" and

collectively, "Defendants") to change zoning, impose new restrictions and delay or deny water

and sewer service to Plaintiffs' property have frustrated Plaintiffs' efforts and led to this

litigation. Specifically, Plaintiffs have asserted claims against Defendants, pursuant to 42 U.S.C.

§ 1983, alleging violations of substantive and procedural due process and equal protection and

that the Defendants' actions amounted to a taking for public use without just compensation.

Plaintiffs have additionally asserted their claims pursuant to the Maryland Constitution. Pending

before the Court is Defendants' Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ.

P. 12(c). ECF Nos. 145 and 146.[1] A hearing on the Motion was held on August 8, 2017. *See* Loc. Rule 105.6 (D. Md. 2016). For the following reasons, Defendants' Motion is granted.

## I.    BACKGROUND[2]

This dispute stems from zoning actions taken by the County regarding 541 acres of undeveloped land in Clarksburg, Maryland near the Ten Mile Creek, west of I-270, which is either owned by or under contract to be purchased by Plaintiffs. ECF No. 2 at 1–2. In 1994, the County designed and approved the Clarksburg Master Plan (the "Master Plan") to guide the development of Clarksburg along the I-270 corridor, while implementing measures to protect the local water quality. *Id.* ¶ 10. Plaintiffs' property was to be zoned for residential development, and was designated as a Transferable Development Rights ("TDR") receiving area. *Id.* ¶ 9. TDRs are development credits which, when purchased, allow property holders to develop their property at a higher density. The Master Plan divided Clarksburg development into four sequential stages, and Plaintiffs' property was included in Stage 4. *Id.* ¶ 8. Included with the staging plan were a number of "triggers" to be met before Stage 4 could proceed, *id.* ¶ 10, and the Master Plan directed that "[o]nce all of the . . . conditions have been met, the County Council will consider Water and Sewer Plan amendments that would permit the extension of public facilities to the Ten Mile Creek area." *Id.* ¶ 11. The Master Plan also provided that "after conducting various assessments," "the County Council may" choose to "[d]efer action on a Water and Sewer Plan category change, pending further study or consideration as deemed necessary and appropriate by the Council," or "[c]onsider such other land use actions as are deemed necessary." ECF No. 191-1 at 23.

---

[1] Although each Defendant filed a separate Motion, the Commission simply incorporated the County's Motion and Memorandum in support by reference. Thus, the Court will refer to them as a single Motion.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Plaintiffs allege that between July 2004 and February 2006, they invested nearly $50 million in purchasing property to the west of I-270, and spent an additional $12 million purchasing TDRs from Montgomery County farmers. ECF No. 2 ¶ 15-16. Plaintiffs further allege that the "triggers" contained in the Master Plan for Stage 4 development were met in 2009, and that Plaintiffs filed a Water and Sewer Category Change Request application on May 12, 2009. *Id.* ¶ 12. On September 17, 2010, sixteen months after Plaintiffs had submitted their application, Defendants stated that Plaintiffs' application would not be processed until early Spring 2011. *Id.* ¶ 18. However, Defendants did not act on Plaintiffs' application during that period either, nor did they act on it after Plaintiffs resubmitted the application in August 2012. *Id.* ¶ 19. In December 2012, Plaintiffs submitted a "Pre-Application Concept Plan" to Defendants, seeking review of their plan for their property. *Id.* ¶ 22. Defendants refused to review Plaintiffs' application, and informed them that it was "too early to get into having pre-applications meetings on sites in the Stage 4 area." *Id.* ¶ 23. Plaintiffs submitted a number of letters to various Montgomery County officials requesting a decision on their pre-application, but did not receive a substantive response. *Id.* ¶¶ 24–29.

On October 9, 2012, the Montgomery County Council requested that the Planning Board study the Ten Mile Creek watershed and prepare an amendment to the Master Plan. *Id.* ¶ 36. Plaintiffs or their agents submitted a number of letters to Defendants and appeared at public hearings, expressing concern over the proposed amendment. *Id.* ¶¶ 37–53. Despite Plaintiffs' vigorous opposition, on October 25, 2013, the Planning Board submitted a draft amendment to the County Council, proposing a heightened limit on the amount of impervious terrain in any new development, a heightened open space requirement, and a downzoning of Plaintiffs' property from a residential classification to an agricultural classification. *Id.* ¶ 54. The County

Council subsequently held public hearings, during which Plaintiffs presented written and in-person testimony, and conducted a number of closed working sessions. *Id.* ¶¶ 57, 63. In March and April 2014, the County Council approved the 10 Mile Creek Area Limited Amendment (the "Amendment"), *id.* ¶¶ 65–66, which was subsequently adopted by the Commission. Plaintiffs allege that the "cumulative effect of the severe and interrelated planning, zoning, and regulatory restrictions" is that "Pulte can develop no more than 17 percent of its property . . . ." ECF No. 2 ¶ 83.

On November 14, 2014, Plaintiffs filed a Complaint in Montgomery County Circuit Court. ECF No. 2. On December 18, 2014, with the consent of the County, the Commission removed the case to this Court. ECF No. 1. The Complaint alleges a litany of constitutional and state law violations including: violation of substantive due process rights under the Maryland and United States constitutions and the Civil Rights Act of 1871 (Count I, ECF No. 2 at 54); violation of equal protection rights under the Maryland and United States constitutions and the Civil Rights Act of 1871 (Count II, ECF No. 2 at 57); violation of the takings clauses of the Maryland and United States constitutions (Count III, ECF No. 2 at 60); violation of procedural due process rights under the Maryland and United States constitutions and the Civil Rights Act of 1871 (Count IV, ECF No. 2 at 62); and violation of Article 19 of the Maryland constitution (Count V, ECF No. 2 at 64). The Commission filed a Motion to Dismiss on January 2, 2015, and that motion was denied. ECF Nos. 19 and 33. The Commission then filed a Motion for Reconsideration, which was also denied. ECF Nos. 36 and 46. The County did not originally move to dismiss the Complaint and instead filed a timely Answer on January 14, 2015. ECF No.

4

24. The Defendants now move for Judgment on the Pleadings.[3] ECF No. 145-1. The Court

reviewed submissions from both parties and held a hearing on August 8, 2017. ECF No. 194.

## II.    STANDARD OF REVIEW

Pursuant to Rule 12(c), "[a]fter the pleadings are closed – but early enough not to delay

trial – a party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). In ruling on a

Rule 12(c) motion, courts apply "the same standard as motions brought under Rule 12(b)(6)."

*Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014) (citing *Edwards v. City of Goldsboro*, 178

F.3d 231, 243 (4th Cir. 1999)). To survive a Rule 12(b)(6) motion, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). Courts will dismiss complaints under Rule 12(c) if "after accepting all well-pleaded

allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from

those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of

facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244. This Court's role

is to test "the sufficiency of the complaint," and not to "resolve the merits of the plaintiff's

claims or any disputes of fact." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

As such, the Court will assume all well-pleaded factual allegations in the complaint to be true.

*See Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 702 (4th Cir. 2016).

---

[3] Plaintiffs urge the Court to deny Defendants' Motion "because of Defendants' inexcusable and prejudicial delay in bringing their Motion." ECF No. 171 at 9. While Defendants filed their Motion over two years after Plaintiffs filed their complaint, the Court will consider the Motion. Under Federal Rules of Civil Procedure 12(c), such motions may be made so long as they are "early enough not to delay trial." Although discovery has commenced in this matter, "no trial date has been set, not one deposition has occurred and no experts have been identified." ECF No. 191 at 8. The mere fact that discovery has commenced is not enough to invalidate Defendants' motion. *See, e.g., Edwards*, 178 F.3d at 240 (district court considered and granted Rule 12 motion "[a]fter a significant amount of discovery had taken place," and before a trial date had been set); *Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1190 (N.D. Cal. 2014) ("In order to determine whether something causes a 'delay' in the trial, there must be a trial schedule set . . . ."). To hold otherwise would be to increase unnecessary litigation costs where, as here, the Court has determined that there is a case dispositive issue for which discovery is unnecessary to resolve.

5

## III.  DISCUSSION

Defendants seek judgment on all claims, arguing that Plaintiffs have not alleged a property interest, that Defendants had a rational basis for their actions and that Plaintiffs have not alleged a taking. In support of their arguments, Defendants specifically point to the language in the 1994 Master Plan and the 2014 Amendment, which they attach to their Motion. Plaintiffs argue that the Court should not consider the documents attached to Defendants' Motion and that they have alleged sufficient facts to state each claim. The Court will first consider whether the documents attached to Defendants' Motion are integral to the Complaint and then discuss the substantive issues raised by the Motion.

### A.  The Master Plan and Amendment are integral to Plaintiffs' Complaint and will be considered by the Court

As a threshold matter, the Court must determine whether to consider the 1994 Master Plan and the 2014 Amendment which Defendants attached to their Motion. The Defendants argue that these documents are "integral to the Complaint," ECF No. 145-1 at 10, while Plaintiffs argue that these documents are not integral and contain disputed facts, ECF No. 171 at 13–14.

Although, as a general rule, extrinsic evidence should not be considered at the Rule 12(b)(6) or 12(c) stage, the Fourth Circuit has held that when a defendant attaches a document to its motion to dismiss, "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."[4] *Phillips v. LCI Int'l Inc.,* 190 F.3d 609, 618 (4th Cir. 1999); *see also Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir. 1998). In *American Chiropractic Association v. Trigon Healthcare, Inc.,* the Fourth Circuit reasoned that "[t]he rationale underlying this exception is that the primary problem raised by looking to documents outside the

---

[4] Plaintiffs have not challenged the authenticity of the attached documents.

complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." 367 F.3d 212, 234 (4th Cir. 2004) (quotations omitted). The Fourth Circuit has previously cited with approval Second Circuit cases for the proposition that "a document is integral to the complaint where the complaint relies heavily upon its terms and effect." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). On the other hand, if the complaint includes only a few quotes from a document and the plaintiff's claims "do not turn on, nor are they otherwise based on, statements contained" in the extrinsic document, then the document is not integral to the complaint. *Id.* Courts in this Circuit have reasoned that an integral document is one that by its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011). As examples, "courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *Id.* n.4.

Here, the 1994 Master Plan and 2014 Amendment are clearly integral to the Complaint. Throughout the Complaint, Plaintiffs repeatedly allege that their property rights were created by the 1994 Master Plan, and that those same rights were violated by the 2014 Amendment. *See, e.g.*, ECF No. 2 ¶ 87 (alleging that Defendants failed to fulfill certain obligations contained in the Master Plan); ¶ 65 (laying out the specifics of the 2014 Amendment); ¶ 86 (alleging that restrictions in the 2014 Amendment were an abuse and violated Plaintiffs' rights); ¶ 100 (alleging that "Defendants' 2014 Amendment" denied Plaintiffs equal protection of the law). This is not a case where Plaintiffs merely quoted the Master Plan and Amendment a few times;

rather, Plaintiffs refer to the Master Plan and Amendment extensively in their Complaint, and their claims are inherently based on these documents. As such, the Court finds that these documents are similar to the "allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute," and will consider the documents. *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 623, n.4.[5]

### B. Plaintiffs fail to plead sufficient Substantive and Procedural Due Process claims as they did not possess a constitutional property interest, and Defendants acted rationally

Having considered the 1994 Master Plan and 2014 Amendment, it is clear that Plaintiffs did not possess a constitutional property interest in the "use and development of the subject property," and that Defendant's conduct was not "arbitrary, capricious, or unreasonable." ECF No. 2 ¶ 85. As such, Plaintiffs' Substantive and Procedural Due Process claims cannot survive a Rule 12(c) motion.

The Fourteenth Amendment prohibits any State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. This contains both a substantive as well as a procedural protection. To state a violation of substantive due process under the Fourteenth Amendment, plaintiffs must allege "(1) that [they] had property or a property interest; (2) that the state deprived [them] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Quinn v. Board of County Commissioners for Queen Anne's County, Md.*, 862 F.3d 433, 443 (4th Cir. 2017) (emphasis in original) (quoting *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 827 (4th Cir. 1995)). In analyzing a zoning provision,

---

[5] The remaining documents attached to Defendants' Motion present a closer question and have not been considered by the Court.

the court in *Quinn* stated that, "[t]his is a high bar, and an action is illegitimate only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Id.* (internal quotations omitted). To establish a violation of procedural due process, plaintiffs must show that "(1) they had property or a property interest (2) of which the defendant deprived them (3) without due process of law." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005). Of key importance here, both the substantive and procedural due process violations depend on the plaintiffs possessing a constitutional property interest. Here, the Court finds that Plaintiffs did not possess such an interest, and dismisses their Due Process claims.

### 1. Plaintiffs did not possess a property interest in the zoning status of their property or in their right to water or sewer access

The Fourth Circuit has instructed that "[t]he first step in analyzing whether the [defendants] deprived [plaintiffs] of substantive due process is a determination of whether they possessed a property interest . . . that is cognizable under the Fourteenth Amendment's Due Process Clause." *Gardner v. City of Baltimore Mayor and City Council*, 969 F.2d 63, 68 (4th Cir. 1992). Although Plaintiffs allege that they possessed a property interest to "develop under [the Master Plan] in accordance with its terms," as well as a protected right to have their "water-sewer reclassification application" processed by the Defendants, the language of the Master Plan indicates otherwise. ECF No. 171 at 30–31.

The Fourteenth Amendment does not create property interests; rather, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a

9

legitimate claim of entitlement to it." *Id.* In *Gardner,* the Fourth Circuit explained that "whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest." *Gardner*, 969 F.2d at 68 (emphasis in original). There, city officials denied plaintiff's proposals for residential development of plaintiff's property. *Id.* at 64. In response, plaintiffs filed suit, alleging procedural and substantive due process, equal protection, and Takings Clause violations. *Id.* at 66. Affirming the district court's order of summary judgment in favor of the defendants, the Fourth Circuit reasoned that the defendants had "significant discretion" to reject "properly submitted applications" and "submitted final plans" under city regulations. *Id.* at 69–70. As such, plaintiffs did not have a property interest in developing their property as residential units, and the Fourth Circuit affirmed summary judgment for the defendants on all counts.

Similarly here, Defendants possessed significant discretion to change the zoning requirements Plaintiffs' property was subject to, as well as to delay or deny water and sewer change requests.[6] First, more generally, in a "Notice to Readers," the Master Plan provides that:

> Area master plans are intended to provide a point of reference with regard to public policy. . . . [T]hey should be referred to by public officials and private individuals when decisions are made that affect the use of land within the plan boundaries. Master plans generally look ahead about 20 years from the date of adoption although **they are intended to be updated and revised about every 10 years. It is recognized that circumstances will change following the adoption of a plan and that the specifics of a master plan may become less relevant over time.**

ECF No. 191-1 at 5 (emphasis added). More specifically, Plaintiffs essentially allege that once the Master Plan's Stage 4 triggers for development were met, the Defendants had an obligation

---

[6] Property owners do not have an inherent property interest in having water and sewer service on their property. *Neifert v. Department of the Env.*, 910 A.2d 1100, 1122 (Md. 2006). As such, any property interest that Plaintiffs possess regarding the water and sewer service would come from the terms of the Master Plan.

to act on Plaintiffs' water-sewer reclassification application. ECF No. 171 at 32. But Defendants were not so constrained by the Master Plan. While the Master Plan makes clear that once the triggers occur, "County Council will consider water and sewer category changes that would permit the extension of public facilities to the Ten Mile Creek area," the Council was not required to act on or approve any such requests. The Master Plan provides that after conducting various assessments, "the County Council may" choose to "[d]efer action on a Water and Sewer Plan category change, pending further study or consideration as deemed necessary and appropriate by the Council," or "[c]onsider such other land use actions as are deemed necessary." ECF No. 191-1 at 23.

As in *Gardner*, the amount of discretion left to the Defendants invalidates any property interest or expectation of entitlement that Plaintiffs may have had in developing their property under the original zoning requirements of the Master Plan, or in having their water and sewer application processed. Plaintiffs, who claim to have heavily relied on the details of the Master Plan in deciding to purchase their property, were on notice that the terms of the Plan could change, and that the Defendants maintained broad discretion to defer action on Water and Sewer Plan change or to implement "such other land use actions as are deemed necessary," even after the Stage 4 development triggers were met. As such, even viewing the facts contained in the Complaint most favorably to the Plaintiffs, Plaintiffs cannot now claim that they possessed a "legitimate claim of entitlement." ECF No. 171 at 32.[7] Because Plaintiffs did not have a constitutionally protected property interest, their substantive due process and procedural due

---

[7] Plaintiffs also contend that they possessed a property interest in the "fee simple ownership" of their property and Transferable Development Rights ("TDRs"). While this is correct, the Plaintiffs do not allege that they have been deprived of this property interest, as they still own the property and TDRs. Plaintiffs' claims allege that they have been deprived of the ability to develop their property under preexisting zoning standards; it is to this right that the Court finds Plaintiffs did not hold a property interest.

process claims (Counts I and IV) cannot survive Defendants' Rule 12(c) motion and are dismissed.[8]

### 2. Even if Plaintiff's did possess a property interest, Defendants acted rationally

Even if Plaintiffs had sufficiently pleaded a constitutionally-protected property interest, to state a substantive due process claim, they would still need to allege that "the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Quinn*, 862 F.3d at 443 (quoting *Sylvia Dev. Corp.*, 48 F.3d at 827). In this context, an action is illegitimate "only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Id.* The "significant hurdles" for substantive due process claims in this area reflect "our oft-repeated 'extreme[ ] reluctan[ce] to upset the delicate political balance at play in local land-use disputes.'" *Henry v. Jefferson County Com'n*, 637 F.3d 269, 278 (4th Cir. 2011) (quoting *Shooting Point, L.L.C. v. Cumming*, 368 F.3d 379, 385 (4th Cir. 2004)) (alterations in original). "[I]n the context of a zoning action involving property, it must be clear that the state's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'" *Sylvia Dev. Corp.*, 48 F.3d at 827–28 (quoting *Nectow v. Cambridge*, 277 U.S. 183, 187–88 (1928)).

---

[8] Defendants also argue that Plaintiffs "had no vested right in prior zoning under Maryland law." ECF No. 145-1 at 8. This point is uncontested by the Plaintiffs, who did not have a vested right as they did not possess a permit and had not yet begun construction on the subject property. *Prince George's Cty. v. Sunrise Dev. Ltd. Partnership*, 623 A.2d 1296, 1301 (Md. 1993)(reasoning that "in order to obtain a vested right in an existing zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance has occurred").

Here, the facts as pleaded in the Complaint and contained in the 2014 Amendment, which the Court has determined to be integral to the Complaint, do not show that Defendants acted arbitrarily or irrationally, with "no substantial relation to the public health." In fact, the Amendment explicitly lays out its purported reasoning, which this Court is in no position to second-guess as long as there is a substantial relation to the public health. *See Gardner*, 969 F.2d at 69 (noting the "need for local autonomy in a matter of paramount local concern" and that "decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government-not by federal courts").

Generally, the Amendment explains that its passage is the result of the "Montgomery County Council['s]" conclusion that "environmental analyses showed continued uncertainty about the ability to protect sensitive resources in Ten Mile Creek if full development occurred under the original Plan recommendations." ECF No. 191-4 at 14. Furthermore, the Amendment was intended to "achieve two important objectives: the creation of a complete, well-defined corridor town that provides jobs, homes and commercial activities; and the preservation of natural resources critical to the County's well-being." *Id.* The specifics of the Amendment that Plaintiffs bemoan–*e.g.*, ECF No. 2 ¶ 86 (referencing "a radically low impervious cap," "a radically high open space requirement, "parkland dedication requirement," etc.)–are each explained in the Amendment as being substantially related to public health or welfare. *See, e.g.*, ECF No. 191-4 at 26–27 (explaining that "restricting imperviousness . . . provides the best chance of protecting these streams," and that "[m]aintaining and expanding the forest cover [by requiring open space] is essential to protection of water quality and habitat"). Even assuming all facts in the Complaint as true, it is still rationally conceivable that the Amendment was passed in an attempt to protect Ten Mile Stream, which is indisputably a legitimate exercise of

Defendants' police power; as such, this Court would dismiss Plaintiffs' substantive due process claims even if they possessed a constitutional property interest.[9] *See, e.g., Smoke Rise, Inc. v. Wash. Sub. Sanitary Comm'n*, 400 F. Supp. 1369, 1383–84 (D. Md. 1975) (in granting motion to dismiss due process claims, explaining that "it is reasonable, if not essential, that the state act to prevent the pollution of its waters by human wastes and the epidemics of disease which flourish under such conditions").

### C. Plaintiffs' Equal Protection Claim similarly fails, as Plaintiffs were not irrationally singled out by Defendants

Plaintiffs contend that through the 2014 Amendment, they were irrationally singled out and treated differently by Defendants, in violation of the Fourteenth Amendment's Equal Protection Clause. However, while Plaintiffs were treated differently from potentially similarly situated developers,[10] the Amendment establishes a rational basis for this differential treatment.

The Equal Protection Clause of the Fourteenth Amendment "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). It is worth bearing in mind, however, that in governing, the government will "inevitably differentiate in some fashion between people, so outside of certain suspect groups like race or national origin, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Quinn*, 862 F.3d 433 (quotation marks omitted) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). The Fourth Circuit has advised that "[i]t is emphatically not the function of the judiciary to sit as a super-legislature to

---

[9] The Court cannot conclude that Plaintiffs' procedural due process claim would not survive Defendant's Rule 12(c) Motion if the Court were to find that Plaintiffs possessed a constitutionally-protected property interest. Indeed, "the process due is dependent upon the specific circumstances of a deprivation," which would inherently require the Court to make certain findings of fact. *Ihnken v. Gardner*, 927 F. Supp. 2d 227, 239 (D. Md. 2013). Regardless, the Court need not make such a determination, having concluded that Plaintiffs did not possess the requisite property interest to sustain a procedural due process claim.

[10] Defendants conceded during argument that Plaintiffs were treated differently.

14

judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Authority*, 507 F.3d 290, 293 (4th Cir. 2007) (internal quotations omitted). A classification "neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). In fact, the Supreme Court has articulated that "a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification." *Id.* at 320 (internal citations omitted). Instead, "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (internal citations omitted). Indeed, a plaintiff challenging a non-suspect classification bears a "heavy burden of negating every conceivable basis which might reasonably support the challenged classification." *Van Der Linde Housing*, 507 F.3d at 293 (citing *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)).

Plaintiffs' allegations, in light of the text of the Amendment, cannot meet that heavy burden. The 2014 Amendment makes clear that even if the Defendants treated Plaintiffs differently from similarly situated individuals, they had a conceivably valid reason for doing so. The 2014 Amendment makes a distinction between properties East of I-270 and those West of I-270, and treats them differently. ECF No. 191-4 at 50. In describing the restrictions on the properties West of I-270, the Amendment explains that "[t]hese unique properties . . . include[] the most sensitive subwatersheds," and that "[i]t is on these properties that preserving more undeveloped and forested open space . . . will most effectively reduce the impact of development

on water quality." *Id.*[11] This is undoubtedly a rational classification, and, mindful of Plaintiffs'

heavy burden here, the Court will not second-guess Defendants' conclusion as to the most

effective way to protect these watersheds. *Cf. Sylvia*, 48 F.3d at 828 (reasoning that "one cannot

deny that the impact of development on . . . water supply is quintessentially a legitimate zoning

concern."). Thus, Plaintiffs' Equal Protection Claim (Count II) is dismissed.

### D. Plaintiffs have not sufficiently pleaded a public taking in violation of the Fifth Amendment's Takings Clause

The Takings Clause of the Fifth Amendment requires that the government compensate

plaintiffs for "direct government appropriation or physical invasion of private property," *Lingle*

*v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005), and for "regulation [that] goes too far" in

restricting the use of private property. *Quinn*, 862 F.3d at 438 (quoting *Pa. Coal Co. v. Mahon*,

260 U.S. 393 (1922)). It does not, however, create an affirmative obligation on local

governments "to enhance the value of real property," *Front Royal & Warren Cty. Indus. Park*

*Corp. v. Town of Front Royal*, 135 F.3d 275, 286 (4th Cir. 1998), or require compensation for all

"land-use regulations that destroyed or adversely affected recognized real property interests."

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 125 (1978).

There are two categories of actionable takings. First, where the government "requires an

owner to suffer a permanent physical invasion of [its] property" or "'completely deprive[s] an

owner of *all* economically beneficial us[e]' of [its] property," the Government has *per se* taken

the owner's property. *Lingle*, 544 U.S. at 538 (emphasis in original) (quoting *Lucas v. South*

*Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). Second, where the government action

---

[11] Plaintiffs disagree that regulating development of its property will "most effectively" protect the "most sensitive watersheds," and repeatedly argue that Plaintiffs' planned development "would result in an overall 'good' water quality for the Ten Mile Creek." ECF No. 2 ¶ 41. If Plaintiffs' claim turned on whether they are correct, that would almost certainly involve a factual dispute. However, Plaintiffs' disagreement, even if correct, does not make Defendants' reasoning irrational, which is the standard here.

does not rise to the level of a *per se* taking, regulatory takings are governed by the standards set forth in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978), which turn largely on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." Here, accepting as true all facts contained in the Complaint and considering the Master Plan and Amendment, Plaintiffs have not sufficiently pleaded a Takings Clause violation.

First, Plaintiffs clearly do not plead a physical or complete taking under *Lucas*. Plaintiffs state that they can still develop "17 percent of its property, approximately 93 of its approximately 541 acres." ECF No. 2 ¶ 83. As such, Plaintiffs have not been deprived of "all economically beneficial use" of its property.

Second, Plaintiffs do not plead a sufficiently actionable regulatory taking under *Penn Central*. In determining whether a government regulation amounted to a taking of property under *Penn Central*, courts look to three factors: (1) the "economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co.*, 438 U.S. at 124. "[A] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124.

Here, the economic impact does not rise to the level of a constitutional violation. As the Fourth Circuit explained in *Quinn*, "[a] regulation is not a taking merely because it 'prohibit[s] the most beneficial use of the property." *Quinn*, 862 F.3d at 442 (*quoting Penn Cent.*, 438 U.S. at 124, and *citing Hadacheck v. Sebastian*, 239 U.S. 394, 405, 409–10 (1915)). In *Concrete Pipe*

*and Products of Cal., Inc. v. Construction Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 645 (1993), the Court reasoned that "our cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution).

Following this reasoning, at least one Circuit has agreed that a diminution in value similar to what Plaintiffs allege is not sufficient economic impact to constitute a taking under *Penn Central. See MHC Financing Ltd. Partnership v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (reasoning that an "81% diminution in value . . . would not have been sufficient economic loss or interference with [the plaintiff's] reasonable investment-backed expectations to constitute a taking"). Plaintiffs have not pleaded with specificity how much the value of their property was diminished, but do state that they can now develop "no more than 17 percent of its property." While this does not mean the property's value diminished by 83%–presumably the remaining 83% that cannot be developed retains some value–even a total diminution of 83% would be in the range that courts have previously found insufficient to amount to a regulatory taking under *Penn Central*.

Similarly, Plaintiffs' claim fails under the second *Penn Central* factor, as the Amendment did not interfere with their reasonable "investment-backed expectations." Plaintiffs argue that they expected to "be able to proceed with a large scale development of the property" on the basis of, among other things, the Master Plan. ECF No. 171 at 46. Typically, determining whether a regulation interfered with reasonable "investment-backed expectations" requires a fact-specific inquiry; however, these expectations must be "objectively reasonable," and where the defendant has significant discretion to apply zoning restrictions, a developer's "expectations were

18

reasonable only if the [defendant's] interpretation was clearly erroneous." *Home Builders Ass'n of Greater Chicago v. Chicago*, 213 F. Supp. 3d 1019, 1030 (N.D. Ill. 2016). Here, as in *Quinn*, Pulte made a "highly speculative" investment in the land. 862 F.3d at 442. Pulte knew that any development was dependent on receiving approval for sewer and water, which under the Master Plan could be "defer[red] . . . pending futher study or consideration as deemed necessary and appropriate by the Council." ECF No. 191-1 at 23. Having already concluded that the Master Plan granted Defendants significant discretion and that Defendants' conduct fell within that discretion, the Court finds that Plaintiffs have not sufficiently pleaded the second factor under *Penn Central*.

Finally, as in *Quinn*, the character of the Amendment does not suggest a taking. "Interference with property is less likely to be considered a taking when it 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Quinn*, 862 F.3d at 443 (quoting *Penn Cent. Transp. Co.*, 438 U.S. at 124). Regulations that control development based "on density and other traditional zoning concerns" are the paradigm of this type of public program. *Henry*, 637 F.3d at 277. This takes into consideration the fact that "[l]ocal governments need to be able to control the density of development to prevent the overburdening of public services, environmental damage, and other harms." *Quinn*, 862 F.3d at 443.

Here, the Amendment is not "characterized as a physical invasion by government." *Penn Cent. Transp. Co.*, 438 U.S. at 123. Rather, the Amendment is "a reasonable land-use regulation, enacted as part of a coordinated . . . state[ ] and local effort to preserve the river and surrounding land." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1948 (2017).

Taking the facts of the Complaint as true and considering the Master Plan and Amendment, Plaintiffs have not sufficiently pleaded a violation of the Takings Clause under *Lucas* or the three factors of *Penn Central*. Thus, Count III of Plaintiffs' Complaint is dismissed.

**E. State Claims**

As an initial matter, to the extent Plaintiffs bring claims under Article 24 of the Declaration of Rights of the Constitution of Maryland, those claims are dismissed because claims under Article 24 are construed consistently with claims brought under the Fifth and Fourteenth Amendments to the United States Constitution, which will be dismissed. *See, e.g., Robles v. Prince George's Cty.*, 302 F.3d 262, 272 (4th Cir. 2002) (reasoning that "Article 24 and the Fourteenth Amendment of the U.S. Constitution are construed as parallel with each other.").

Plaintiffs' claim under Article 19 of the Maryland Constitution fails as well. Plaintiffs allege that their "right to redress for injury" was "violated" when Defendants "[kept] the subject property from being used and developed." ECF No. 2 ¶ 124. Article 19 guarantees "a right to a remedy for an injury to one's person or property" and "a right of access to the courts." *Jackson v. Dackman Co.*, 30 A.3d 854, 866 (Md. 2011). This second right protects individuals from "unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts." *Id.* (quoting *Piselli v. 75th Street Medical*, 808 A.2d 508 (Md. 2002)). Here, looking to the first protected right of Article 19 as discussed in *Jackson*, the Court concludes that Plaintiffs did not have a property interest in developing their property under the terms of the Master Plan. Regarding the second protected right, Pulte argues that Defendants have placed a restriction on access to the courts; however, this contention is without merit. The Court is not ruling that Defendants are immune

from suit, or that Plaintiffs do not meet certain procedural requirements to access the courts;

rather, Plaintiffs have been granted access to the courts, and their claims have been found to be

deficient under Rule 12(c). Count V is therefore dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings, ECF No.

145, ECF No. 146, shall be granted. A separate Order follows.


Dated: August 25, 2017                    _____
                                          GEORGE J. HAZEL
                                          United States District Judge